## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LIVE WELL FINANCIAL, INC., | Case No. 19-11317 (LSS) |
| Debtor. | |

| | |
|---|---|
| DAVID W. CARICKHOFF, as Chapter 7 Trustee of LIVE WELL FINANCIAL, INC., | |
| Plaintiff, | Adv. Pro. No. 21-50990 (LSS) |
| v. | |
| STUART H. CANTOR, JAMES P. KARIDES, BRETT J. ROME, LWFVEST, LLC, NORTH HILL VENTURES II, LP, FIVE ELMS EQUITY FUND I, L.P., FIVE ELMS HAAKON, L.P., FIVE ELMS COINVEST, L.P., JAMES BROWN, GANTCHER FAMILY LIMITED PARTNERSHIP, ERIC LEGOFF, and TITLE WORKS OF VIRGINIA, INC., | |
| and | |
| JOHN DOES 1-10, | |
| Defendants. | |

## OPINION

In this adversary proceeding, Plaintiff sues thirteen of Live Well's former directors and preferred stockholders seeking damages under a variety of theories. Two motions to dismiss were filed, one group of defendants filed an answer and Plaintiff voluntarily dismissed this lawsuit as to another defendant.

This is the decision on the motion to dismiss filed by Brett Rome, James Karides, LWFVEST, LLC, North Hill Ventures II, L.P., Five Elms Equity Fund I, L.P., Five Elms

Haakon L.P. and Five Elms Coinvest, L.P. For the reasons stated below, the motion to dismiss is denied in part and granted in part, with leave to amend.

**Background**[1]

Live Well Financial, Inc. ("Live Well" or "Debtor") was a financial services company founded in 2005 by Michael Hild, who served as chairman of the board and Debtor's chief executive officer from 2005 through May 2019. Debtor's outside directors ("Directors") during relevant periods in the Complaint are Defendants Stuart Cantor, Brett Rome, James Karides and Glen Goldstein. Karides served on Live Well's board as the designee of Defendant LWFVEST, LLC, which owned preferred stock. He is a certified public accountant with 30 years of experience, including 12 years at KPMG. Rome served on Live Well's board as the designee of Defendant North Hill Ventures, II, LP ("North Hill"), which owned preferred stock. Rome is a graduate of Princeton University and Dartmouth's Tuck School of Business.

*The HECM IO Bond Portfolio*

Until 2014, Live Well's primary lines of business involved the origination and servicing of home equity conversion mortgages, commonly known as reverse mortgages. Live Well's reverse mortgage business was successful. It held appropriate approvals from both the Federal National Mortgage Association and the Government National Mortgage Association and, prior to its demise, Live Well was among the top reverse mortgage companies in the nation by volume.

---

[1] The facts recited herein are taken from the Complaint. The court is not required to make findings of fact or conclusions of law on a motion to dismiss under Fed. R. Civ. P. 12, made applicable by Fed. R. Bankr. P. 7012, and I make none. *See* Fed. R. Civ. P. 52(a)(3), made applicable by Fed. R. Bankr. P. 7052.

In the fall of 2014, Charles Darren Stumberger, who worked the HECM trading desk at Stifel Nicolaus ("Stifel"), a New York-based investment and broker-dealer, approached Hild with the prospect of a new business line for Live Well—a trading desk to invest in home equity conversion interest only (HECM IO) bond strips.[2]  Hild presented the new business line as a low-risk opportunity to Live Well's board and the board approved Live Well's acquisition of an HECM IO bond portfolio without any general investigation.

Live Well's first prospective acquisition was a portfolio of 18 HECM IO bond strips for $46 million from Stifel.  In order to acquire the portfolio, Live Well required financing. As relevant here, Live Well's choice of financing took the form of repurchase ("repo") agreements with various repo lenders.  Repo agreements are a form of short-term financing that typically operate as a sale and repurchase of a security.  Live Well, as the seller/borrower sold the HECM IO bond strip to the purchaser/repo lender with the promise to buy the bond strip back at a specified price and time.  The bond strip also served as collateral for Live Well's repurchase obligation.  To determine the purchase price of the bond strip, the purchaser/repo lender uses the current value of the pledged bonds and applies a discount (usually 10-20 percent).  Live Well agrees to buy the bond back for the full (undiscounted) purchase price plus interest.[3]

---

[2]  HECM IO's are "reverse mortgage-backed securities that entitle the holder to receive a portion of the interest payments, but not principal payments, from a particular pool of reverse mortgage loans and pay the holder a monthly coupon (effectively, an interest rate) based upon the performance of the underlying mortgage loans."  Compl. ¶ 52.

[3]  So, for example, if the value of the financed HECM IO bond strip is $10 million, the repo lender would lend between $8 million and $9 million and Live Well would agree to buy the HECM IO bond strip back on a date certain for $10 million plus agreed-to interest.  Compl. ¶ 59.

The repo agreements also contain two-way margin requirements that effectively increase or decrease the amount of the loan. If the value of the bonds Live Well purchases decrease by a certain dollar amount, Live Well is required to post margin (i.e. make a payment) to the repo lender. If a bond increases in value, the repo lender can be required to post margin (i.e. permit Live Well to borrow more). Because of the need to value the HECM IO bonds, Live Well needed to find a firm that would provide securities pricing services. Interactive Data Pricing and Reference Data LLC ("IDC") committed to evaluate and publish prices for Live Well's portfolio. That commitment permitted Live Well to enter into repo agreements.

In November 2014, Live Well closed the deal with Stifel and Stumberger joined Live Well as an Executive Vice President bringing with him several members of the team that managed the Stifel HECM IO trading desk. The purchase of the 18 HECM IO bond strips from Stifel was financed through three separate repo lenders.

For the first several months after Live Well's acquisition of the Stifel HECM IO bond strips, IDC's daily independent valuations reflected constant fluctuations in the bond market resulting in frequent margin calls from Live Well's repo lenders and causing cash flow problems. Hild tasked Stumberger with working with IDC on a solution. In February 2015, Stumberger reported to Hild that IDC agreed to accept Live Well's daily prices as IDC's market valuations and to stop performing its own independent market valuations of Live Well's portfolio. Thereafter, IDC stopped its own objective pricing or the use of any market data and published Live Well's pricing submissions verbatim as "broker quotes."

IDC's agreement to publish Live Well's valuations, without question or independent market analysis, gave Hild and Stumberger unfettered ability to set the prices for Live Well's

bond portfolio. IDC's agreement meant that Live Well could stop the fluctuating values and unpredictable margin calls in its current (Stifel) portfolio. After testing IDC's willingness to actually publish the values provided by Live Well, Hild and Stumberger developed what they termed a "pricing model" to establish the values for the bonds Live Well was acquiring. Dubbed "Scenario 14," this purported pricing/valuation model "assumed a dramatic drop in the bond yield (i.e. the return on the bonds demanded by the market), which resulted in a dramatic increase in the purported 'value' of the bond portfolio."[4]

Live Well began submitting to IDC the resulting values generated by Scenario 14 and IDC published them as its own independent values. From September 2015 through November 2016, Live Well purchased bonds on the open market (purportedly identified by utilizing Scenario 14) and then submitted values for those bonds to IDC (often on the same day) that greatly exceeded the actual purchase price Live Well paid for those bonds.[5] On average, the prices submitted to IDC were 29% higher than Live Well's actual purchase price. Within a month of implementing Scenario 14, Live Well's bond portfolio's reported value (based on IDC valuations) nearly doubled, from $71 million to $141 million. In reality, however, Scenario 14 had no market basis whatsoever and the bond values it generated and that IDC reported were completely false.

---

[4] Compl. ¶ 83.

[5] For example, on September 15, 2015, Live Well purchased bond GNR 2013-H08 DI for $10.3906 and on that same date it submitted to IDC a valuation for that bond of $12.0469. Also on September 15, 2015, Live Well purchased bond GNR 2015-H16 DI for $13.6406 and on that same date it submitted to IDC a valuation for that bond of $16.8750. A chart of purchases from September 11, 2015 to November 29, 2016 appears at Compl. ¶ 93.

The board received regular updates on the HECM IO bond portfolio performance. For example, in November of 2015, the board held a meeting to discuss, among other things, the dramatic increase of Live Well's bond portfolio due to Scenario 14. Hild and Rohr explained that Scenario 14 was "a more sophisticated methodology than the conventional or forward market was using" and that it "produced a more accurate reflection of the true value of the bonds."[6] Directors asked detailed questions about how the modeling worked, the inputs and the implications of the modeling. The discussion included corporate counsel. The Directors were "euphoric" and "enthusiastic" about Scenario 14 and encouraged Hild and Rohr to "go buy as much of these [HECM IO bonds] as . . . as quickly as we possibly can and as fast as we possibly can."[7]

Live Well followed the board's instructions. In order to fund new purchases of HECM IO bonds, Live Well borrowed funds based on the inflated, above-market values reported by IDC. In doing so, Live Well increased not only the number of HECM IO bonds it held, but the debt it incurred. Live Well's debt far exceeded the actual market value of the HECM IO bonds serving as collateral.

After the board approved the strategy, it continued to receive regular updates regarding the bond portfolio performance, including the dramatic increase in the HECM IO bond portfolio. For example, by September 2016, the reported value of Live Well's bond portfolio (based on IDC's numbers as supplied by Live Well) increased by over 900% and its borrowing (i.e. debt) mirrored the increase. Given the premise of the approved bond-purchasing philosophy (i.e. Scenario 14), the reported values made no sense. While

---

[6] Compl. ¶ 87.

[7] Compl. ¶ 89.

Scenario 14 should have informed Live Well's internal valuations, it could not account for the dramatic rise in the market value of the bonds and, therefore Live Well's ability to borrow funds from repo lenders. Live Well's borrowings should have been tied to actual market values, not any internal values, which Hild stated were proprietary and thus unknown to the market.

### The Preferred Stock Repurchase and the Resignation of Rome and Karides from Live Well's Board

Since Live Well's inception, Hild personally guaranteed all, or substantially all, of Live Well's mortgage warehouse debt arising out of its original mortgage business. That debt held little risk as it was at all times fully secured. Hild insisted that he be compensated for his personal guarantees, but prior to 2016, the board had never agreed to any specific fee. In February 2016, Cantor began lobbying members of the board to approve specific guarantee fees for Hild payable in cash. Rome, Karides, and Goldstein believed the rate of the proposed guarantee fee was above market and refused to approve it. Rome also objected to any guarantee fees being paid in cash at least until dividends had been paid to preferred stockholders.

Rome and Karides were the strongest opponents of the guarantee fees and suggested a special board meeting to address the issue. Ahead of a July 20, 2016 board meeting, Rome circulated two board resolutions providing for the formation of a special committee, chaired by Rome, to determine the amount of any guarantee fees payable to Hild and clarifying that any payments to Hild must first be approved by the board. Hild responded with threats including that he would cease providing/rescind guarantees. Rome sought outside legal advice for the board.

Hild started working on a plan to remove Rome from the board. He engaged Live Well's outside general counsel for assistance with a plan to repurchase Rome's (North Hill's) preferred stock. With input from outside counsel, a term sheet was drafted reflecting a repurchase of all preferred stock and requiring Rome's resignation from the board. Hild proposed to pay preferred stockholders $18 million—a price reflecting the original purchase price of the preferred shares plus accrued dividends. Rohr circulated the term sheet to the board prior to the July 20, 2016 meeting.

At the July 20, 2016 board meeting, the two resolutions proposed by Rome were adopted by the board with Rome, Karides and Goldstein voting in favor and Hild and Cantor voting against. The term sheet was also briefly discussed. Rome and Karides, whose affiliated entities owned nearly three quarters of the outstanding preferred stock, were open to the idea of a preferred stock repurchase and agreed to stay the effectiveness of the two resolutions pending further discussions.

The board met again on July 27, 2016 at which the predominant discussion was the preferred stock repurchase. Rome and Karides backed off of their opposition to Hild's guarantee fees, recusing themselves from any matters related to approval of those fees.[8] The board then appointed Cantor as the sole member of two special committees: (i) a Guarantee Compensation Committee and (ii) a committee to authorize the preferred stock repurchase. The Guarantee Compensation Committee thereafter approved guarantee fees to Hild for the months of August and September 2016 even though the committee was tasked with determining guarantee fees only for August. Notwithstanding, Rome and Karides did not object to the unauthorized approval of guarantee fees for September.

---

[8] At that point, Goldstein resigned.

In the meantime, Rome and Karides led the negotiations to finalize the document memorializing the term sheet—the Stock Purchase Agreement.[9]  The final terms provide that Live Well will repurchase the outstanding preferred stock for $29 million—$18 million in cash and $11 million in notes payable[10]—"representing a stock price based upon the company's financial statements, which were, of course, grossly overstated as a result of the ongoing bond fraud" and that both Rome and Karides will resign.[11]  A further condition precedent to the closing on the Stock Purchase Agreement is the grant of mutual releases ("Release")[12] between the Preferred Stockholders[13] and Live Well, which releases include the directors, managers, officers and employees of each party and thus cover, among others, Rome, Karides, Cantor and Hild.  The deal closed on September 30, 2016 and Rome and Karides resigned on that day.

*The End of Live Well*

Hild and Cantor continued to run the business for the next three years.  Significant guarantee fees were approved and paid to Hild and he was awarded performance bonuses and director fees.  Live Well continued to purchase additional HECM IO bonds.  Certain repo lenders discontinued their respective relationship with Live Well, with Live Well's last remaining repo lender insisting on payments that Live Well could not make in November 2018.

---

[9]  The Stock Purchase Agreement is attached as Exhibit 1 to the Opening Brief.

[10]  A form of Subordinated Promissory Note is an exhibit to the Stock Purchase Agreement.

[11]  Compl. ¶ 139.

[12]  The Separation and Release Agreement is attached as Exhibit 2 to the Opening Brief.

[13]  Preferred Stockholders means: LWFVEST, LLC, North Hill Ventures II, L.P., Five Elms Equity Fund I, L.P., Five Elms Haakon L.P. and Five Elms Coinvest, L.P.

On May 3, 2019, as the Securities and Exchange Commission and the Department of Justice were closing in, Live Well wound down its operations and terminated all of its employees.  On August 29, 2019, Rohr and Stumberger entered into plea agreements with the U.S. Attorney's office admitting a fraudulent bond price-fixing scheme and Hild was indicted on five counts of criminal charges for his role in the bond fraud.  Hild was found guilty on all counts related to the fraudulent scheme in April of 2021 at the conclusion of a jury trial.

**Procedural History**

On June 10, 2019, Live Well was forced into bankruptcy with an involuntary chapter 7 petition filed against it by three repo lenders.[14]  An Order for Relief was entered on July 1, 2019.

On June 29, 2021, Trustee filed this Complaint against Cantor, Karides, Rome, LWFVEST, LLC, North Hill Ventures II, L.P., Five Elms Equity Fund I, L.P. ("Five Elms Equity"), Five Elms Haakon L.P. ("Five Elms Haakon"), Five Elms Coinvest, L.P. ("Five Elms Coinvest"); Gantcher Family Limited Partnership, James Brown, Eric Legoff and Title Works of Virginia, Inc.  The Complaint contains fourteen counts against the various Defendants.

Defendants Rome, Karides, LWFVEST, LLC, North Hill North Hill Ventures II, L.P, Five Elms Equity, Five Elms Haakon and Five Elms Coinvest ("Movants") jointly

---

[14]  Main Case No. 19-11317.

filed a Motion to Dismiss[15] together with an Opening Brief[16] seeking to dismiss certain Counts of the Complaint.[17] Trustee filed a Response to the Motion to Dismiss[18] and Movants filed a Reply Brief.[19]

By the Motion to Dismiss, Movants seek to dismiss the following Counts of the Complaint.

| Count | Cause of Action | Defendants |
|---|---|---|
| 1 | Breach of Fiduciary Duty | Rome, Karides |
| 3 | Unlawful Stock Repurchase 8 Del. C. § 174 | Rome, Karides |
| 4 | Aiding and Abetting Breach of Fiduciary Duty | LWFVEST, North Hill, Five Elms Equity Fund, Five Elms Haakon, Five Elms Coinvest |
| 5 | Constructive Fraudulent Conveyance (Release) 11 U.S.C. § 544(b) 6 Del. C. § 1301 *et seq.*[20] | All Movants |

---

[15] D.I. 13 (Defendants LWFVEST, LLC, North Hill Ventures II, L.P., Five Elms Equity Fund I, L.P., Five Elms Haakon L.P., and Five Elms Coinvest, L.P., James Karides, and Brett Rome's Motion to Dismiss the Trustee's Complaint).

[16] D.I. 14 (Opening Brief in Support of Defendants LWFVEST, LLC, North Hill Ventures II, L.P, Five Elms Equity Fund I, L.P., Five Elms Haakon L.P., and Five Elms Coinvest, L.P., James Karides, and Brett Rome's Motion to Dismiss the Trustee's Complaint).

[17] Defendant Cantor's motion to dismiss is the subject of a separate opinion. Defendants Gantcher Family Limited Partnership, James Brown and Eric Legoff filed an answer (D.I. 10). Defendant Title Works of Virginia, Inc. has been voluntarily dismissed (D.I. 29).

[18] D.I. 28 (Trustee's Omnibus Response in Opposition to Motion to Dismiss of (1) LWFVEST, LLC, North Hill Ventures II, L.P, Five Elms Equity Fund I, L.P., Five Elms Haakon L.P., and Five Elms Coinvest, L.P., James Karides, and Brett Rome and (2) Stuart H. Cantor).

[19] D.I. 30 Reply Brief in Support of Defendants LWFVEST, LLC, North Hill Ventures II, L.P, Five Elms Equity Fund I, L.P., Five Elms Haakon L.P., and Five Elms Coinvest, L.P., James Karides, and Brett Rome's Motion to Dismiss the Trustee's Complaint).

[20] In the Complaint, Plaintiff also brings Count 5 under Va. Code Ann. § 55.1-400 *et. seq*, but Plaintiff abandons its claim under Virginia Law in its Response n.59 ("Although the Complaint alleges the claim under both Delaware and Virginia law, by its terms, the Release and its enforcement are governed by Delaware law, which binds Defendants here.").

| 6 | Actual Fraudulent Conveyance (Release) 11 U.S.C. § 544(b) 6 Del. C. § 1301 *et seq.* Va. Code Ann. § 55.1-400 *et seq.* | All Movants |
|---|---|---|
| 11 | Actual Fraudulent Conveyance (Interest Payments) 11 U.S.C. §§ 548(a)(1)(A), 550 | LWFVEST, North Hill, Five Elms Equity Fund, Five Elms Haakon, Five Elms Coinvest |
| 12 | Unjust Enrichment (Payment on Stock Purchase Agreement) | LWFVEST, North Hill, Five Elms Equity Fund, Five Elms Haakon, Five Elms Coinvest |
| 13 | Equitable Subordination of Proofs of Claim 11 U.S.C. § 510(c) | LWFVEST, North Hill, Five Elms Equity Fund, Five Elms Haakon, Five Elms Coinvest |
| 14 | Objections to Proofs of Claim 11 U.S.C. § 502 | LWFVEST, North Hill, Five Elms Equity Fund, Five Elms Haakon, Five Elms Coinvest |

## Jurisdiction

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  Venue is

proper pursuant to 28 U.S.C. § 1409.  The Complaint contains both core and non-core

claims.[21]  Plaintiff consents to entry of final orders by the court if it is determined that,

absent the consent of the parties, the court cannot enter final orders consistent with Article

III of the United States Constitution.  Defendants do not.  In any event, because I will allow

Trustee to file a motion for leave to amend, the order entered with respect to this Motion to

Dismiss will not be a final order.

---

[21] 28 U.S.C. § 157.

**Legal Standard**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a plaintiff's factual allegations.[22]  Generally, a plaintiff's complaint must comply with the pleading standard set forth in Rule 8(a)(2) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[23]  Except for Counts 6 and 11, Rule 8(a)(2) is the appropriate standard to judge the Complaint.  Counts 6 and 11 are claims grounded in actual fraud and are subject to the heightened pleading standard of Rule 9(b) which requires a plaintiff to "state with particularity the circumstances constituting the fraud."[24]  Even so, malice, intent and knowledge may be alleged generally.[25]

In evaluating a complaint under Rule 12(b)(6), the court is required to accept well-pled allegations as true.[26]  The court then determines whether the well-pled facts state a plausible claim for relief.[27]  Mere conclusory allegations are insufficient to state a plausible claim for relief.[28]  The complaint must contain sufficient facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[29]  The

---

[22]  Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bank. P. 7012(b), *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *7 (Bankr. D. Del. Sept. 6, 2019).

[23]  Fed. R. Civ. P. (8)(a)(2), made applicable by Fed. R. Bank. P. 7008.

[24]  Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bank. P. 7009.

[25]  *Id.*

[26]  *F-Squared*, 2019 WL 4261168, at *7.

[27]  *Id.*

[28]  *Id.*

[29]  *Id.* (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

reviewing court draws on both its judicial experience and common sense.[30]  The movant

bears the burden of demonstrating that a plaintiff's claims are insufficient to survive a Rule

12(b)(6) motion.[31]

## Discussion

I.    ## Count 1

A.   ### Trustee states a claim for breach of fiduciary duty[32]

1.   **Claims Other than Resignation from the Board**

Count 1 alleges that Rome and Karides violated their fiduciary duties owed to Live

Well by (1) encouraging and approving an increase in Live Well's bond portfolio using an

investment strategy they knew or should have known was fraudulent; (2) encouraging and

approving a fraudulent investment strategy causing Live Well to incur debts it could not

repay; (3) accepting a bribe from Hild in the form of the Stock Purchase Agreement in

exchange for resignations from the board; (4) acting in their own self-interests by

participating in the Stock Purchase Agreement while knowing or being willfully blind in not

knowing that the purchase price was far greater than the fraudulently inflated value of the

preferred stock; and (5) agreeing to resign from the board knowing that Hild would loot

Live Well.

---

[30]  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[31]  *In re Pitt Penn Holding Co.*, 484 B.R. 25, 35 (Bankr. D. Del. 2012) (citing *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F.Supp.2d 404, 408 (D. Del. 2007)).

[32]  Trustee does not allege a duty of care claim with regard to the bond scheme.  Response 11.

The duty of loyalty requires directors to act in the best interests of the corporation they serve.[33] The classic breach of loyalty claim involves a self-interested transaction that favors the interest of the fiduciary over that of the company. However, Delaware law also provides that bad faith acts of a fiduciary violate the duty of loyalty.[34] A fiduciary acts in bad faith if he intentionally causes a corporation to violate positive law or if he fails to exercise proper oversight.[35] Oversight liability, often referred to as *Caremark* claims, may arise where a fiduciary fails to implement sufficient controls to prevent company harm or if a fiduciary has knowledge of evidence indicating corporate misconduct and consciously disregards it.[36]

Rome and Karides move to dismiss the duty of loyalty claims arguing that the facts alleged in the Complaint are insufficient to infer their knowledge of any wrongdoing. Rome and Karides contend that (i) Trustee failed to specifically allege that they knew that Live Well was submitting fraudulent values to IDC and (ii) the facts that are alleged do not constitute "red flags." Trustee contends that red flags satisfy his knowledge pleading requirements under both theories of fiduciary liability.

I conclude that Plaintiff has alleged facts that constitute red flags and allow for the inference that Rome and Karides had knowledge of corporate misconduct at Live Well.[37]

---

[33] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[34] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006).

[35] *Id.*

[36] *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, No. CV 2019-0816-SG, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020).

[37] *Kandell on behalf of FXCM, Inc. v. Niv*, No. CV 11812-VCG, 2017 WL 4334149, at *17 (Del. Ch. Sept. 29, 2017) (noting that red flags are used to infer director knowledge); *Teamsters Loc. 443 Health*

Trustee alleges that Rome and Karides had knowledge of Scenario 14, were present at multiple board meetings at which it was discussed and explained and were aware of the massive increases in the values of the bond portfolio as well as the significant purchases of HECM IO bonds. Because of their knowledge of Scenario 14, Rome and Karides were aware, or should have been aware, that Live Well was borrowing from repo lenders based on the values generated by Scenario 14 rather than the lower, actual market values at which HECM IO bonds traded and at which Live Well purchased the bonds. Rome and Karides (both sophisticated investors) knew or should have known that any borrowings based on values generated by Scenario 14 were not based on market value and could only have been the result of some type of fraud.

While Rome and Karides correctly point out that the red flags alleged by Trustee are not the stereotypical red flags involving government investigations or pending lawsuits, an investigation or action need not be commenced for a red flag to exist.[38] Rome's and Karide's argument that astronomical returns on investments cannot constitute red flags is unpersuasive especially in light of their knowledge that repo lenders lend on a discount to market value. Contrary to the arguments made by Rome and Karides, such knowledge gives rise to a reasonable inference of knowledge of corporate wrongdoing.

Trustee has stated a claim for breach of fiduciary duty.

---

*Servs. & Ins. Plan v. Chou*, No. CV 2019-0816-SG, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020). Red flags may also be used to support an allegation of violation of positive law. *Genworth Fin., Inc. Consol. Derivative Litig.*, No. CV 11901-VCS, 2021 WL 4452338 (Del. Ch. Sept. 29, 2021) (recognizing that red flags may be used to show liability for violations of positive law, and discussing distinctions between those claims and *Caremark* claims).

[38] *See id.* at *17-18 (where the positive law violation was central to the company's business, rejecting an argument that the court could not infer that directors were aware that company was violating the law until warnings from a regulatory authority or regulatory action).

## 2. Resignation from the Board

Trustee also asserts that Rome and Karides acted in bad faith by resigning from Live Well's board. Plaintiff alleges that Rome and Karides agreed to resign from the board in exchange for Live Well repurchasing the preferred stock at a grossly inflated value due to the bond fraud. Plaintiff alleges that by resigning, Rome and Karides ceded control of Live Well to a known looter.

Generally, a director does not violate the fiduciary duty of loyalty by resigning from its position on a board of directors.[39] This rule, however, is not absolute. A director may face liability for violation of the duty of loyalty if a director has knowledge of wrongdoing and fails to act prior to resigning.[40] In such cases, courts decline to dismiss claims of bad faith against directors.[41]

Here, Trustee bases its claims on two grounds. Trustee's first contention is that Rome and Karides knew or should have known of the bond fraud and instead of taking action to protect Live Well, resigned. Based on my previous conclusions, I can make the reasonable inference from Trustee's allegations that Rome and Karides ignored evidence of the bond fraud (at least in July through September, 2016) because they stood to gain a financial benefit when the Stock Purchase Agreement was finalized. Thus, Trustee's allegations in this regard are sufficient to prevail at the motion to dismiss stage.

---

[39] *OptimisCorp v. Waite*, No. CV 8773-VCP, 2015 WL 5147038, at *73 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016).

[40] *See In re Puda Coal Stockholders Litig., Consol.*, No. 6476, at 15-16 (Del. Ch. Feb. 6, 2013) (Transcript) (attached to Response as Exh. A and discussed by Movants in the Opening Brief at pp. 26-27); *In re China Agritech S'holder Deriv. Litig.*, No. 7163, 2013 WL 2181514, at *24 (Del. Ch. May 21, 2013).

[41] *Id.*

Trustee's second contention is that Rome and Karides were aware of Hild's intentions to loot Live Well through guarantee fees. Instead of acting to protect Live Well, Rome and Karides ceded complete control of the company to Hild as a condition precedent to the Stock Purchase Agreement. While initially opposed to payment of guarantee fees to Hild, after Hild floated the term sheet, Rome and Karides stood back and let others decide the issue resulting in exorbidant guarantee fees and eventual exorbidant director fees.

Directors may act in bad faith by intentionally failing to act when there is a known duty to act.[42] Trustee alleges Rome and Karides failed to act to prevent Hild from obtaining excessive guarantee and director fees because of the opportunity to receive a financial benefit through the Stock Purchase Agreement. Trustee has sufficiently alleged that Rome and Karides put their own self-interests over the interests of Live Well.

Count 1 will not be dismissed for failure to state a claim.

### B. Statute of Limitations[43]

Rome and Karides also seek to dismiss the fiduciary claims for alleged breaches occurring prior to June 10, 2016 as barred by Delaware's three-year statute of limitations.[44] Specifically, Rome and Karides contend those actions relating to approval and encouragement of the bond investments are outside the three-year period. Plaintiff does not dispute this contention. Instead, Plaintiff argues that the claims are equitably tolled.

---

[42] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 755.

[43] The parties assume Delaware law applies so I do as well.

[44] 10 Del. C. § 8106.

The statute of limitations begins to run at the time a cause of action accrues.[45]  A

cause of action accrues at the occurrence of the harmful act alleged.[46]  But, a statute of

limitations may be tolled under the doctrines of inherently unknowable injuries, fraudulent

concealment, or equitable tolling.[47]  Under any of these theories, the statute of limitations is

only tolled until a plaintiff discovers the cause of action or is put on inquiry notice.[48]  A

plaintiff is on inquiry notice when it has "sufficient knowledge to raise [its] suspicions to the

point where persons of ordinary intelligence and prudence would commence an

investigation that, if pursued would lead to the discovery of the injury."[49]

The statute of limitations is an affirmative defense not typically subject to challenge

on a motion to dismiss.[50]  But, here, Plaintiff relies upon and pleads that the statute of

limitations on the breach of fiduciary duty claims was equitably tolled.  Specifically,

Plaintiff pleads:

> until the Petition Date [] there was no innocent stakeholder of Live Well
> that had knowledge or, through the exercise of reasonably [sic]
> diligence, had reason to know of the fraudulent scheme or the harm it
> caused Live Well until the scheme collapsed.  Indeed, the concealment
> of the fraudulent bond scheme, and the fact that Hild, its primary
> architect, and Cantor, Hild's loyal aid, maintained complete control of

---

[45] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[46] *In re W.J. Bradley Mortgage Capital*, 598 B.R. 150, 167-68 (Bankr. D. Del. 2019).

[47] *Gregorovich v. E.I. du Pont de Nemours*, 602 F. Supp. 2d 511, 518 (D. Del. 2009).

[48] *Tyson Foods,* 919 A.2d at 585.

[49] *Pomeranz v. Museum Partners, L.P.*, No. CIV. A. 20211, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005).

[50] *In re Brown Schools*, 368 B.R. 394, 401 (Bankr. D. Del. 2007); *In re: Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005) ("affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)").

the company after 2016, constituted extraordinary circumstances that stood in the way of a claim being filed before their removal from office.[51]

Having pled equitable tolling, I conclude that plaintiff bears the burden of pleading sufficient facts to toll the statute of limitations.[52]

Rome and Karides contend that Plaintiff was on inquiry notice because many of the same facts Trustee alleges to infer that they had knowledge of Live Well's wrongdoing, such as the sudden growth of the bond portfolio's value and lack of downward volatility, were also available to the market and any of Live Well's shareholders or creditors. Trustee counters that Rome and Karides had the additional knowledge of Scenario 14 as Live Well's investment strategy and were aware of how the repo transactions were structured. Trustee argues that these additional facts were not available to shareholders and creditors, and thus, no innocent party had inquiry notice.

While I agree with Trustee that there is nothing pled (or submitted by Movants) to indicate that shareholders and creditors had the critical knowledge surrounding Scenario 14, that is not the correct inquiry. Count 1 is a claim for breach of fiduciary duty. As such, Trustee brings this claim as Debtor's successor in interest. The correct inquiry is whether Live Well—not its shareholders or creditors—were on inquiry notice of the claims.[53] Clearly certain Live Well directors (Hild, Rome and Karides) were on inquiry notice with respect to the underlying facts of Count 1. Whether there is any argument that Live Well

---

[51] Compl. ¶ 310.

[52] *Tower Air*, 416 F. 3d at 238 (where complaint "declares" an affirmative defense does not vitiate plaintiff's claims, court may dismiss complaint on the basis of that defense, if appropriate).

[53] *In re AMC Invs., LLC*, 551 B.R. 148, 155 (D. Del. 2016) (reversing bankruptcy court and holding that "the relevant inquiry turns on a plaintiff's ability to discover the claim, and here, [d]ebtors are the only plaintiffs with a breach of fiduciary duty claim"); *In re: IH 1, Inc. Miller v. Kirkland & Ellis LLP*, No. 09-10982 (LSS), 2016 WL 6394296, at *13 (Bankr. D. Del. Sept. 28, 2016).

itself is not on inquiry notice (as opposed to shareholders or creditors) has not been pled or briefed.

All claims in Count 1 arising prior to June 10, 2016 will be dismissed with leave to amend, if possible.

## Count 3

Count 3 of the Complaint alleges violations of 8 Del. C. § 174 by Rome and Karides in connection with the Stock Purchase Agreement. Section 174 provides a cause of action for a willful or negligent violation of 8 Del. C. § 160. Section 160 provides that "no corporation shall . . . [p]urchase or redeem its own shares of capital stock . . . when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation. . . ."[54] Trustee alleges that Live Well's capital was impaired at the time of the Stock Purchase Agreement and therefore the agreement was unlawful.

Rome and Karides move to dismiss Count 3 contending that directors cannot be liable for violations of § 174 if they abstain from voting on the challenged transaction. Rome and Karides contend that directors must have "authorized" or "approved" the Stock Purchase Agreement to face liability under § 174, which they did not do. Trustee counters suggesting the plain language of § 174 mandates otherwise. While the parties did not cite a case directly on point, I tend to agree with Trustee.

8 Del. C. § 174(a) provides:

In case of any wilful or negligent violation of § 160 or § 173 of this title, *the directors under whose administration the same may happen* shall be jointly and severally liable, at any time within 6 years after paying such unlawful

---

[54] 8 Del. C. § 160(a)(1).

dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued. *Any director who may have been absent when the same was done, or who may have dissented from the act or resolution by which the same was done, may be exonerated from such liability by causing his or her dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the same was done, or immediately after such director has notice of the same.*

The highlighted passages provide the answer. First, § 174(a) is specific that directors "under whose administration" an unlawful stock repurchase occurs are jointly and severally liable in the stated circumstances. This broad language does not limit liability to directors who voted in favor of the challenged action. Second, § 174(a) also provides a specific mechanism for an absent or dissenting director to "be exonerated" from liability, namely "by causing his or her dissent to be entered on the books."[55] While the statute does not directly call out abstaining directors, the absence of abstaining directors from the exoneration provision suggests that an abstaining director may be liable.

Moreover, Delaware courts express caution in dismissing claims alleging wrongdoing simply because a director abstained from voting on a contested transaction noting that abstention raises factual issues not capable of determination on a motion to

---

[55] *Id.*

dismiss.[56]  For example, an abstaining director may be held liable if he played a significant

role in the transaction or negotiated it.[57]

The cases cited by Rome and Karides do not compel a different result.  None of the

cited opinions expressly rule on the specific issue at hand, i.e. whether an abstaining director

can be held liable for an improper stock redemption.[58]

The Motion to Dismiss as to Count 3 is denied.

**Count 4**

Count 4 of the Complaint alleges a claim for aiding and abetting a breach of

fiduciary duty against LWFVEST and North Hill (collectively, the "Funds").  Trustee

pleads that the Funds aided and abetted Rome and Karides in violating fiduciary duties they

owed to Live Well in that they used "their positions as fiduciaries to extract millions of

---

[56] *In re Carvana Co. S'holders Litig.*, No. CV 2020-0415-KSJM, 2022 WL 2352457, at *17 (Del. Ch. June 30, 2022) ("Abstaining from a vote, however, does not provide a defendant with a get-out-of-jail-free card that can be played at the motion to dismiss stage."); *Harris v. Junger*, No. CV 2021-0511-SG, 2022 WL 1657551, at *4 (Del. Ch. May 25, 2022) (declining to dismiss a breach of duty claim where the plaintiff alleged that the defendant participated in the negotiations of the transaction even though the defendant abstained from voting on the transaction).

[57] *Carvana*, at *17 ("Decisions of this court have enumerated a non-exhaustive list of scenarios that preclude the application of the abstention doctrine.  For example, a court may hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director (i) was "closely involved with the challenged [transaction] from the very beginning and the transaction was rendered unfair based, in large part, on the director's involvement;" (ii) "play[ed] a role in the negotiation, structuring, or approval of the proposal;" or (iii) was "deliberately absent ... from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability.") (internal citations omitted).

[58] *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 230 (Del. Ch. 2014) (noting that Delaware contribution statutes require a conscious act); *In re Nat'l Forge Co.*, 344 B.R. 340, 380 (W.D. Pa. 2006) (distinguishing between directors as properly named defendants and officers who were not for purposes of § 174); *In re Amp'd Mobile, Inc.*, 404 B.R. 118, 126 (Bankr. D. Del. 2009) (discussing (i) director's right to subrogation to the corporation's rights and (ii) setoff in the situation where a shareholder is also a director); *In re Edison Bros. Stores, Inc.*, No. 95-1354-PJW, 2001 WL 652025, at *1 (Bankr. D. Del. Jan. 12, 2001) (Mem. Order) (same).

dollars from Live Well in exchange for worthless preferred stock through the Preferred Stock Repurchase and accept[ed] Hild's bribe to resign from the board."[59]  Separately, Trustee pleads that the Funds aided and abetted Hild and Cantor in breaching their fiduciary duties "in connection with the Preferred Stock Repurchase Agreement because the express purpose of the transaction was to remove Rome and Karides from the board so that Hild and Cantor could loot the company without any independent oversight."[60]

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: (1) a fiduciary relationship existed, (2) a fiduciary breached its duty, (3) a non-fiduciary knowingly participated in the breach and (4) damages proximately caused by the breach.[61]  The Funds contend that Trustee failed to sufficiently plead the third element of knowing participation.

First, Trustee relies on agency principles to show that the Funds knew they were aiding and abetting a breach of fiduciary duty.  Specifically, Trustee alleges that Rome is the agent of North Hill and Karides is the agent of LWFVEST.[62]  As such, Trustee imputes the knowledge of those agents to their respective principals.  An allegation that the breaching party was an agent or exercised sufficient control over an entity defendant is sufficient to impute knowledge to that defendant at the motion to dismiss stage.[63]

---

[59] Compl. ¶ 224.

[60] Compl. ¶ 225.

[61] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[62] Compl. ¶¶ 27-28.

[63] *Stone & Paper Invs., LLC v. Blanch*, No. CV 2018-0394-TMR, 2019 WL 2374005, at *7 (Del. Ch. May 31, 2019); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 643 (Del. Ch. 2013).

Second, the Trustee indentifies the conduct that the Funds, through their respective agents, has engaged in. Trustee alleges the Funds provided substantial assistance to Hild and Cantor by consenting to the Stock Purchase Agreement and receiving payments under it in bad faith.[64] As the Trustee alleges, none of Live Well's directors could have executed the Stock Purchase Agreement without the Funds' participation in the scheme, which Trustee alleges was a bribe to remove Rome and Karides from the board so that Hild could loot the company.

The Funds ostensibly argue that the Trustee has not pled the third prong, but their real argument is that Trustee is seeking to hold the Funds liable for the breaches committed by their own agents. The Funds cite cases for the general rule that agents of a corporation cannot aid and abet one another.[65] In *Anschutz*, then Vice-Chancellor Slights observed that the Chancery Court has offered mixed guidance on the law of agency as it applies to aiding and abetting or conspiracy claims.[66] Some cases (cited by Defendants here) hold that courts apply the general rule where it is alleged that the agents of a single corporation are conspiring with each other (e.g. where plaintiff alleges that the same defendants who breached their duty also aided and abetted the commission of that tort.)[67] Other courts,

---

[64] Compl. ¶ 226.

[65] Opening Brief 33-35.

[66] *See Anschutz Corp. v. Brown Robin Cap., LLC*, No. CV 2019-0710-JRS, 2020 WL 3096744, at *17 (Del. Ch. June 11, 2020).

[67] *Id.* (applying the rule where the same defendants alleged to have committed fraud were also alleged to have aided and abetted each other's fraud); *Cornell Glasgow, LLC v. La Grange Properties, LLC*, No. CIV.A. N11C-05013JRS, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012) (applying the rule where the same defendants and company alleged to have defamed the plaintiff were also alleged to have aided and abetted each other's defamation).

however, conclude that an entity can aid and abet its agent where the entity itself does not face liability for the underlying tort of its agent.[68]

I need not parse this case law too finely. This is not a situation where it is alleged that the agents of a single corporation are only conspiring with each other. Rather, Trustee pleads that North Hill conspired with Karides, Hild and Cantor (and Rome) and LWFVEST conspired with Rome, Hild and Cantor (and Karides). Accordingly, Trustee has sufficiently alleged that each Fund conspired with an unrelated fiduciary who allegedly breached a fiduciary duty.

Further, I conclude for purposes of the Motion to Dismiss, that Trustee has sufficiently alleged participation and breach. Reading the Complaint in its entirety, not only has Trustee pled that the Funds consented to the Stock Purchase Agreement and received payments under it in bad faith,[69] Trustee has also alleged that the Preferred Stockholders (which includes the Funds), led by Karides and Rome, negotiated the terms of the Stock Purchase Agreement, increasing the original proposal by $11 million using valuations based on the overinflated Scenario 14 values. It is alleged, therefore, that this was not a good faith, arms-length negotiation, but rather a quid-pro-quo in which Hild would get the resignations he desired, the Funds would get inflated values for their Preferred Stock and both would get releases all at Live Well's expense.[70]

---

[68] *See Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) (recognizing that separate entities under common ownership and control can aid and abet each other in the commission of a tort).

[69] *See Stone & Paper*, 2019 WL 2374005, at *7 (acceptance of large monetary payments for no work performed sufficient to constitute participation at the motion to dismiss stage).

[70] Compl. ¶¶ 139, 151. *See Malpiede v. Townson*, 780 A.2d 1075, 1097-98 (Del. 2001) (collecting cases distinguishing arms-length transactions from knowing participation in a board's breach of fiduciary

The Motion to Dismiss with respect to Count 4 is denied.

**Count 5**

Count 5 of the Complaint seeks to avoid the Release as a constructively fraudulent transfer pursuant to 11 U.S.C. § 544 and applicable state law.  Section 544(b) allows a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."[71]  Plaintiff seeks to avoid the Release under Delaware law.

A transfer made or obligation incurred by a debtor is constructively fraudulent if the debtor did not receive reasonably equivalent value for the transfer or obligation and "the debtor was either: a) insolvent or became insolvent as a result of the transfer; b) engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due."[72]

Movants move to dismiss Count 5 contending that the Release was exchanged for reasonably equivalent value because it contains mutual releases between the parties.[73] According to Movants, the standard for reasonably equivalent value is satisfied if an

---

duty to extract terms at the expense of shareholders or in directors preferring their interests at the expense of shareholders).

[71]  11 U.S.C. § 541(b).

[72]  *In re Plassein Int'l Corp.*, 428 B.R. 64, 67 (D. Del. 2010) (construing Delaware law).

[73]  Although unclear, it appears Defendants move to dismiss Count 5 under the safe harbor provisions in Del. Code tit. 6 § 1308 and Va. Code § 55.1-400.  Such grounds are insufficient to dismiss Count 5.  The safe harbor provision in § 1308 only applies to claims grounded in actual fraud.  Del. Code tit. 6 § 1308.  Plaintiff has abandoned its constructive fraud claim under Virginia law.; Response, n.59.

agreement contains "sufficient consideration" to form a contract.[74]  Plaintiff counters that

the reasonably equivalent value analysis differs from a determination of whether a contract

contains sufficient consideration.  Plaintiff is correct.

Under Delaware law, "reasonably equivalent value" is determined by applying a

totality of the circumstances test designed to establish whether the value received by a

debtor in a given transaction is "reasonably equivalent" to what debtor gave up.[75]  Courts

typically consider whether a transaction occurred at arm's length, the difference between the

price paid and the asset's fair market value, and whether the transferee acted in good faith.[76]

This analysis clearly differs from a determination of whether consideration exists for

---

[74] D.I. 14. *Seiden v. Kaneko*, No. 9861, 2017 WL 1093937 (Del. Ch. Mar. 22, 2017) (determining
whether a release was invalid for lack of consideration); *Fuller v. Gemini Ventures, LLC, No.
CIV.A.05C-06-019RFS*, 2006 WL 2811708, at *4 (Del. Super. Ct. Oct. 2, 2006) (finding that a
release was valid because it contained sufficient consideration); *Alexakis v. Mallios*, 261 Va. 425, 430,
544 S.E.2d 650, 653 (2001) (finding that a settlement agreement containing a release did "not fail for
lack of valuable consideration"); *Hamm v. Scott*, 258 Va. 35, 38, 515 S.E.2d 773, 774 (1999) (noting
that adequate consideration can be found where a party promises to forebear the exercise of its legal
rights).

[75] *Plassein*, 428 B.R. at 67. *See also R.M.L, Inc.*, 92 F.3d 139, 153 (3d Cir. 1996) (analyzing 11 U.S.C.
§ 548 and articulating a two-part inquiry for the determination of reasonably equivalent value: (i) an
initial factual determination as to whether debtor received any value at all, and if so (ii) a
determination, under a totality of the circumstances test, whether that value was reasonably
equivalent to what the debtor gave up.); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648
(3d Cir. 1991), as amended (Oct. 28, 1991) (The reasonably equivalent value analysis considers the
totality of circumstances surrounding a transaction, including "the value of consideration received . .
. compared to the value given by the debtor."); *In re PHP Healthcare Corp.*, 128 F. App'x 839, 847 (3d
Cir. 2005) (noting that it was not necessary to separately address alleged claims under the Delaware
Fraudulent Transfer Act because they "are substantially the same as" the claims determined by the
court under 11 U.S.C. § 548).

[76] *Id.*

purposes of a valid contract.[77]  Movants' use of the incorrect standard defeats its motion to

dismiss on these grounds.

Movants also cite 11 U.S.C. § 546(e) as grounds for dismissal of Count 6.

Defendants' single paragraph in the Opening Brief is conclusory in nature and fails to

explain how § 546(e) is applicable to the facts of this case (as set forth in the Complaint) or

make any distinction between avoidance based on a constructive fraud theory and an actual

fraud theory.

Section 546(e) provides:

> the trustee may not avoid a transfer that is a . . . settlement payment . . .
> made by or to (or for the benefit of) a commodity broker, forward contract
> merchant, stockbroker, financial institution, financial participant, or securities
> clearing agency, or that is a transfer made by or to (or for the benefit of) a
> commodity broker, forward contract merchant, stockbroker, financial
> institution, financial participant, or securities clearing agency, in connection
> with a securities contract . . . commodity contract . . . or forward contract,
> that is made before the commencement of the case.[78]

In the Reply, Movants argue that the Release, when viewed as inseparable from the Stock

Purchase Agreement, is a "settlement payment" and that the transfers were made through

financial institutions.

How the transfers were made is not pled in the Complaint.  Instead, Movants rely on

Schedule 1 of the Stock Purchase Agreement which they attach as an exhibit to the Opening

Brief.  Even assuming I should consider this document, it merely shows that Live Well was

---

[77] *First Mortg. Co. of Pennsylvania v. Fed. Leasing Corp.*, 456 A.2d 794, 796 (Del. 1982) (whether a contract contains sufficient consideration merely considers whether there is "a benefit to the promiser or a detriment to the promisee"); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (In analyzing a claim for specific performance the Supreme Court stated "[t]he Vice Chancellor could not have more correctly held that we limit our inquiry into consideration to its existence and not whether it is fair or adequate.").

[78] 11 U.S.C. § 546(e).

to direct cash payments through various financial institutions; there is no evidence that Live Well actually made payments in accordance with the Stock Purchase Agreement. More importantly, Movants' position that the avoidance of the Release is shielded by § 546(e) because "the transfers were clearly made through financial institutions" relies on outdated cases. In *Merit Management*,[79] the Supreme Court ruled that, absent an argument that a plaintiff misidentified the transfer to be avoided, conduit financial institutions (i.e., the banks Movants rely on here) are "irrelevant to the analysis under § 546(e)."[80] Movants do not mention *Merit Management*, much less explain why the (alleged) conduit financial institutions here should bring the Releases within the ambit of the safe harbor. As such, Movants' argument fails.[81]

Count 5 survives the Motion to Dismiss.

**Count 6**

Count 6 of the Complaint seeks to avoid the Release as actually fraudulent pursuant to 11 U.S.C. § 544 and applicable state law as against all Movants.[82] Claims alleging actual fraud are subject to the elevated pleading standards of Rule 9(b).[83] Defendants however, do

---

[79] *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018).

[80] *Id.* at 895.

[81] There are not facts in the Complaint (or in the Stock Purchase Agreement) that address other elements of § 546(e). Because Defendants' argument does not support dismissal, I need not address: (i) Plaintiff's argument that the Release is an "obligation" and not a "transfer" and thus not within the safe harbor of § 546(e) or (ii) whether a release that is part of a transaction which contains a "settlement payment" falls within the shield.

[82] 6 Del. C. § 1304; Va. Code Ann. § 55.1-400.

[83] Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009; *In re Nat'l Serv. Indus., Inc.*, No. AP 14-50377 (MFW), 2015 WL 3827003, at *3 (Bankr. D. Del. June 19, 2015).

not take issue with the line of cases holding that the pleading requirements of Rule 9(b) are interpreted liberally when a trustee asserts fraudulent transfer claims.[84]

A plaintiff may use circumstantial evidence to demonstrate an intent to defraud.[85] This is often accomplished by alleging various badges of fraud.[86] Indeed, "the confluence of several [badges] in one transaction generally provides conclusive evidence of an intent to defraud."[87] But, the presence or absence of any one badge of fraud is not dispositive and courts are free to consider additional factors as well as other allegations in the complaint.[88]

Movants contend Count 6 should be dismissed for six reasons: (1) the Release contained adequate consideration; (2) an allegation that a transaction involved insiders is insufficient by itself to infer intent to defraud; (3) the insolvency of Live Well has little significance because the Release contained financial benefits to both sides of the transaction; (4) Trustee improperly relies on the Ponzi scheme presumption to satisfy the pleading requirement; (5) § 546(e) acts as an absolute bar to the avoidance of the Release and (6) Defendants are bona fide purchasers.

The Complaint alleges the presence of at least three badges of fraud: (1) the obligations Live Well incurred were to insiders, (2) Live Well received less than reasonably

---

[84] Opening Brief 8 citing *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).

[85] *Id.* at 545.

[86] *Id.* (the badges of fraud include: "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction.").

[87] *Id.*

[88] *Id. In re Millennium Lab Holdings II, LLC*, No. 15-12284 (LSS), 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019).

equivalent value because the release of claims was exchanged for worthless stock, and (3) Live Well was insolvent at the time the obligations were incurred.[89] The assertion of these three badges of fraud, which are based upon well pled facts—or allegations that Movants do not contest—are sufficient to state a cause of action for actual fraud. Additionally, Plaintiff alleges that the Release was part of a *quid pro quo* whereby Rome and Karides resigned from the board and their preferred stock was repurchased at fraudulently inflated values in exchange for allowing Hild the unfettered ability to loot the company.[90] Although these facts may not fit squarely within any of the badges of fraud, if true, they could form the basis of actual fraud.

Further, for the reasons set forth above, Movants' argument that Plaintiff's actual fraudulent conveyance claim should be dismissed under § 546(e) is not well taken.[91]

Finally, Movants' argument that they are "bona fide purchasers" does not require dismissal. Under Delaware law, an actual fraudulent conveyance is not voidable "against a person who took in good faith and for reasonably equivalent value."[92] As discussed previously, "adequate consideration" for purposes of contract determinations does not equate to "reasonably equivalent value." Similarly, under Virginia law, an actual fraudulent conveyance is not voidable as to a grantee if the transfer is for "valuable consideration, unless it appears that [the grantee] had notice of the fraudulent intent of his immediate

---

[89] Compl. ¶ 240.

[90] Compl. ¶ 229.

[91] Movants do not distinguish between actual and constructive fraudulent conveyances or grapple with whether a state law actual fraudulent conveyance action is shielded by § 546(e) when an actual fraudulent conveyance claim under § 548 is not.

[92] 6 Del.C. § 1308(a).

grantor or of the fraud rendering void the title of such grantor."[93]  Whether "valuable consideration" was given is a question of fact not appropriate on a motion to dismiss.[94] Trustee has also sufficiently alleged that Rome, Karides and the Funds had knowledge of Live Well's fraudulent intent in the granting of the Release.

The Motion to Dismiss with respect to Count 6 is denied.[95]

## Count 11

Count 11 of the Complaint seeks to avoid interest payment transfers from June 10, 2017 to June 10, 2019 to Preferred Stockholders as actually fraudulent under 11 U.S.C. § 548(a)(1)(A).  The interest payments are listed on Exhibit A to the Complaint.  While not specifically stated in the Complaint, the interest payments appear to be the quarterly interest payments made to Preferred Stockholders on account of the promissory notes issued as consideration for the repurchase of the preferred stock.[96]  To avoid a transfer for actual fraud, a plaintiff must allege a debtor made the transfer with the actual intent to defraud its creditors.

Rather than alleging the presence of certain badges of fraud or other evidence of intent, Trustee relies on the Ponzi scheme presumption to demonstrate fraudulent intent.[97] The Ponzi scheme presumption provides that "all payments made by a debtor in furtherance

---

[93]  Va. Code § 55.1-400.

[94]  *In re LeClairRyan PLLC*, No. 19-34574-KRH, 2021 WL 5177368, at *9 (Bankr. E.D. Va. Nov. 3, 2021) ("[T]he determination of the adequacy of consideration in connection with an action brought under section 55.1-400 of the Virginia Code requires a fact-specific inquiry").

[95]  As Plaintiff adequately pleads fraud, I need not address Defendant's argument on the *Ponzi* scheme presumption.

[96]  Subordinated Promissory Note, Ex. A to Ex. 1 of the Opening Brief.

[97]  Compl. ¶¶ 281, 282.

of a Ponzi scheme are made with actual fraudulent intent."[98]  The applicability of the Ponzi

scheme presumption turns on a plaintiff's ability to demonstrate both that a Ponzi scheme

existed and that the specific transfers at issue were in furtherance of the Ponzi scheme.[99]

Nowhere do Movants contest the existence of a Ponzi scheme.  Instead, they move to

dismiss contending that the Complaint contains no facts demonstrating that the challenged

interest payments were in furtherance of that scheme.

Even where a Ponzi scheme is present, a plaintiff must still plead facts demonstrating

that the specific transaction sought to be avoided was in furtherance of the Ponzi scheme.[100]

Here, the basis of the Ponzi scheme, as detailed in the Complaint, is the fraudulent bond

price-fixing scheme.  The question, therefore, is whether Trustee has pled facts sufficient to

show that the interest payments were made in furtherance of that scheme.  He has not.

The Trustee alleges that "the Interest Payment Transfers were made with the fruits of

the Criminal Insiders' fraudulent bond price-fixing scheme."[101]  Trustee also asserts that

because of the fraudulent price-fixing scheme "all transfers made by Live Well, including

the Interest Payment Transfers, are presumed to have been made with the actual intent to

hinder, delay, or defraud creditors."[102]  But, the law is more nuanced than that.  Not all

---

[98] *In re DBSI, Inc.*, 476 B.R. 413, 422 (Bankr. D. Del. 2012) ("A Ponzi scheme exists where 'money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme.'") (internal citation omitted).

[99] *Id.*

[100] *Id.*

[101] Compl. ¶ 280.

[102] *Id.*

transfers made by a company engaged in a Ponzi scheme are subject to avoidance.[103] Here, Trustee pled that the goal of the Stock Purchase Agreement was to remove Rome and Karides from the board so that Hild could receive guarantee fees and director fees, not so that Live Well could continue its fraudulent bond-pricing scheme. Indeed, Trustee pleads that Rome and Karides knew about the bond-pricing scheme and took no action to stop it. Accordingly, on the facts pled, the Ponzi scheme presumption does not apply to show intent to hinder, delay or defraud creditors.

Trustee attempts to rehabilitate his Complaint in his Response. There he argues that there was a substantial likelihood that the Funds would expose the fraudulent bond scheme if Live Well failed to make the interest payments and that, "as is true with any Ponzi scheme, the scheme could only survive so long as Live Well continued to pay its debts."[104] The Complaint contains no such allegations and, in any event, the latter ignores the need to examine the specific transfer at issue.

For these reasons, the Motion to Dismiss Count 11 is granted, but with leave to amend.

## Count 12

Count 12 of the Complaint alleges a claim for unjust enrichment against the Preferred Stockholders for the consideration actually paid in connection with the Stock Purchase Agreement. To state a claim for unjust enrichment the Trustee must allege five

---

[103] *DBSI*, 476 B.R. at 422-23 (concluding that plaintiff must plead that the debtor was engaged in a Ponzi scheme and that the challenged transfer was "related to or in furtherance of" the fraudulent scheme) (citing *Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply")).

[104] Response 47.

elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[105]

Preferred Stockholders move to dismiss the unjust enrichment claim on three grounds. First, Preferred Stockholders cite one of the myriad *DBSI* decisions for the proposition that where a valid contract exists, a claim cannot be asserted for unjust enrichment. However, the court in *DBSI* rejected that argument at the motion to dismiss stage because the court had yet to determine that the contract was valid and enforceable.[106] This *DBSI* decision provides no basis to dismiss Count 12.

Second, the Preferred Stockholders argue that the claim fails because Trustee has failed to plead it has no other remedy at law. This argument also lacks merit. Bankruptcy courts in Delaware allow unjust enrichment claims to proceed at the pleading stage as an alternative legal theory when it is plausible a plaintiff's other claims may fail.[107] I dismissed Count 11, albeit with leave to amend. Accordingly, the Trustee should be permitted to plead unjust enrichment in order to attempt to recover the Interest Payments as well as the cash consideration paid to the Preferred Stockholders, which are not the subject of another Count.

Finally, the Preferred Stockholders contend the claim must be dismissed because the Complaint does not allege the Preferred Stockholders engaged in any misconduct. To support this contention, they argue that a plaintiff must "establish the requisite causal nexus

---

[105] *In re FAH Liquidating Corp.*, 572 B.R. 117, 130 (Bankr. D. Del. 2017).

[106] *In re DBSI, Inc.*, 477 B.R. 504, 514 (Bankr. D. Del. 2012) (applying Idaho law).

[107] *FAH Liquidating* 572 B.R. at 131 (and cases cited therein).

between the alleged wrongful conduct . . . and the injuries suffered."[108]  They contend that a

causal nexus has not been pled because the Complaint "is devoid of any allegations that the

Funds committed any improper act."[109]  The Funds ignore Trustee's allegations that the

Funds aided and abetted breaches of fiduciary duty in connection with the Stock Purchase

Agreement.[110]  Further, the Trustee has adequately pled a casual nexus by alleging that the

impoverishment of Live Well was a direct consequence of the improper Preferred Stock

Repurchase.[111]  The Motion to Dismiss is denied with respect to Count 12.

**Counts 13 and 14**

Count 13 seeks to equitably subordinate claims filed by the Preferred Stockholders in

the bankruptcy case and Count 14 is an objection to those claims pursuant to sections

510(a), 510(b), 502(b)(1), and 502(d) of the Bankruptcy Code. The only assertion made by

Preferred Stockholders related to Counts 13 and 14 is that "the Court should further dismiss

Counts 1, 3, 4, 11, 12, 13, and 14 in their entirety as barred under the terms of the Release

Agreement."[112]  As Trustee has sufficiently stated claims to avoid the Release as both

actually and constructively fraudulent, the Release provides insufficient grounds to dismiss

Counts 13 and 14.  The Motion to Dismiss is denied as to these counts.

---

[108]  *The Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010).

[109]  Opening Brief 38.

[110]  *The Pennsylvania Emp., Benefit Tr. Fund*, 710 F.Supp.2d at 485.

[111]  Compl. ¶ 296.

[112]  D.I. 14.

## **Conclusion**

For the reasons set forth above, the Motion to Dismiss is granted in part and denied in part.  A separate order will be entered consistent with this decision.


Dated:  June 13, 2023

Laurie Selber Silverstein
United States Bankruptcy Judge