# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LIVE WELL FINANCIAL, INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 19-11317 (LSS) |
| DAVID W. CARICKHOFF, as Chapter 7 Trustee of LIVE WELL FINANCIAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>STUART H. CANTOR, JAMES P. KARIDES, BRETT J. ROME, LWFVEST, LLC, NORTH HILL VENTURES II, LP, FIVE ELMS EQUITY FUND I, L.P., FIVE ELMS HAAKON, L.P., FIVE ELMS COINVEST, L.P., JAMES BROWN, GANTCHER FAMILY LIMITED PARTNERSHIP, ERIC LEGOFF, and TITLE WORKS OF VIRGINIA, INC.,<br><br>and<br><br>JOHN DOES 1-10,<br><br>Defendants. | Adv. Pro. No. 21-50990 (LSS) |

## OPINION

In this adversary proceeding, plaintiff sues thirteen of Live Well's former directors and preferred stockholders seeking damages under a variety of theories. Two motions to dismiss were filed, one group of defendants filed an answer and plaintiff voluntarily dismissed this lawsuit as to another defendant.

I have already ruled on the motion to dismiss filed by Brett Rome, James Karides, LWFVEST, LLC, North Hill Ventures II, L.P., Five Elms Equity Fund I, L.P., Five Elms Haakon L.P. and Five Elms Coinvest, L.P. ("First Opinion"). In this opinion, I am ruling on the motion to dismiss filed by Stuart H. Cantor. For the reasons stated below, the motion to dismiss is denied in part and granted in part, with leave to amend.

**Background**

The First Opinion contains a lengthy Background section, which will not be repeated, but is incorporated herein. Additional allegations made in the Complaint will be set forth in the Discussion section of this Opinion, as appropriate. A copy of the First Opinion is attached as Exhibit A.

**Procedural History**

On June 10, 2019, Live Well was forced into bankruptcy with an involuntary chapter 7 petition filed against it by three repo lenders.[1] An Order for Relief was entered on July 1, 2019.

On June 29, 2021, Trustee filed this Complaint against Cantor and others. The Complaint contains fourteen counts against the various Defendants.

Cantor filed a Motion to Dismiss[2] together with a Memorandum in Support[3] seeking to dismiss certain Counts of the Complaint. Trustee filed a Response[4] and Cantor filed a

---

[1] Main Case No. 19-11317.

[2] D.I. 15 (Stuart H. Cantor's Motion to Dismiss).

[3] D.I. 16 (Memorandum of Law in Support of Stuart H. Cantor's Motion to Dismiss Complaint)

[4] D.I. 28 (Trustee's Omnibus Response in Opposition to Motion to Dismiss of (1) LWFVEST, LLC, North Hill Ventures II, L.P., Five Elms Equity Fund I, L.P., Five Elms Haakon L.P. and Five Elms Coinvest, L.P., James Karides, and Brett Rome and (2) Stuart H. Cantor).

2

Reply Brief.[5] By the Motion to Dismiss, Cantor seeks to dismiss the following Counts of the Complaint as to him.

| Count | Cause of Action | Defendant(s) |
|---|---|---|
| 2 | Breach of Fiduciary Duty | Cantor |
| 3 | Unlawful Stock Repurchase<br>8 Del. C. § 174 | Cantor, Rome, Karides |
| 7 | Constructive Fraudulent Conveyance (Director Fees)<br>11 U.S.C. § 544(b)<br>6 Del. C. § 1301 *et seq.*<br>Va. Code Ann. § 55.1-400 *et seq.* | Cantor |
| 8 | Actual Fraudulent Conveyance (Director Fees)<br>11 U.S.C. § 544(b)<br>6 Del. C. § 1301 *et seq.*<br>Va. Code Ann. § 55.1-400 *et seq.* | Cantor |

## **Jurisdiction**

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409. The Complaint contains both core and non-core claims.[6] Plaintiff consents to entry of final orders by the court if it is determined that, absent the consent of the parties, the court cannot enter final orders consistent with Article III of the United States Constitution. Cantor does not. In any event, because I will allow Trustee to file a motion for leave to amend, the order entered with respect to this Motion to Dismiss will not be a final order.

---

[5] D.I. 31 (Reply Brief in Support of Stuart H. Cantor's Motion to Dismiss Complaint).

[6] 28 U.S.C. § 157.

3

**Legal Standard**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a plaintiff's factual allegations.[7] Generally, a plaintiff's complaint must comply with the pleading standard set forth in Rule 8(a)(2) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[8] Except for Count 8, Rule 8(a)(2) is the appropriate standard to judge the Complaint. Count 8 is a claim grounded in actual fraud and is subject to the heightened pleading standard of Rule 9(b) which requires a plaintiff to "state with particularity the circumstances constituting the fraud."[9] Even so, malice, intent and knowledge may be alleged generally.[10]

In evaluating a complaint under Rule 12(b)(6), the court is required to accept well-pled allegations as true.[11] The court then determines whether the well-pled facts state a plausible claim for relief.[12] Mere conclusory allegations are insufficient to state a plausible claim for relief.[13] The complaint must contain sufficient facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[14] The

---

[7] Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bank. P. 7012(b), *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *7 (Bankr. D. Del. Sept. 6, 2019).

[8] Fed. R. Civ. P. (8)(a)(2), made applicable by Fed. R. Bank. P. 7008.

[9] Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bank. P. 7009.

[10] *Id.*

[11] *In re F-Squared Inv. Mgmt., LLC*, 2019 WL 4261168, at *7.

[12] *Id.*

[13] *Id.*

[14] *Id.* (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

reviewing court draws on both its judicial experience and common sense.[15] The movant bears the burden of demonstrating that a plaintiff's claims are insufficient to survive a Rule 12(b)(6) motion.[16]

## Discussion

### I. Count 2

Count 2 of the Complaint alleges Defendant violated fiduciary duties owed to Live Well by: (1) encouraging and approving an increase in Live Well's bond portfolio using an investment strategy he knew or should have known was fraudulent; (2) encouraging and approving a fraudulent investment strategy causing Live Well to incur debts it could not repay; (3) routinely elevating Defendant's own interest and the interest of Hild over that of Live Well; (4) approving the September 2016 guarantee fee without the authorization of Live Well's board; (5) approving the Stock Purchase Agreement and Release while either knowing or being willfully blind to the fact that the stock was worthless, the purpose of the transaction was to free Defendant and Hild from any board oversight, the transaction was procured through breaches of all the Directors' fiduciary duties, and the transaction constituted a self-interested transaction; (6) approving $25 million in compensation to Hild; (7) approving approximately $1.4 million in excessive and unjustified compensation to Cantor as a quid pro quo transaction with Hild; and (8) failing to provide any oversight as the only remaining director on Live Well's board.

---

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[16] *In re Pitt Penn Holding Co.*, 484 B.R. 25, 35 (Bankr. D. Del. 2012) (citing *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F.Supp.2d 404, 408 (D. Del. 2007)).

## The business judgment rule

Cantor's overarching contention is that Count 2 should be dismissed because Trustee must "plead around the business judgment rule"[17] and he has not pled sufficient facts to do so. Trustee does not directly address this contention, but argues that it has met all relevant standards.

The business judgment rule is a powerful "presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company."[18] But, a review of *Tower Air*, the Third Circuit case on which Cantor relies and which binds this court, reveals that the business judgment rule is an affirmative defense which should not be considered at the motion to dismiss stage unless the plaintiff raises the business judgment rule on the face of the complaint.[19] The Complaint does not mention the

---

[17] Memorandum in Support 6 quoting *In re Troll Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008) (quoting *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005)).

[18] *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)).

[19] *Tower Air, Inc.*, 416 F.3d at 238 ("Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face, however. Stanzialie's Amended Complaint declares that the business judgment rule does not vitiate any of his claims. He thus must plead that he overcomes the presumption created by that rule—that Tower Air's directors and officers acted in good faith and on an informed basis.") (internal citations omitted); *See also Ad Hoc Comm. of Equity Holders of Tectonic*, 554 F.Supp.2d 538, 556-57 (D. Del. 2008) (rejecting the argument that Tower Air stands for the proposition that a complaint that implicitly invokes the business judgment rule must plead around the rule); *Sharmrock Holdings, Inc. v. Arenson*, 456 F.Supp.2d 599, 609 (D. Del. 2006) (declining to dismiss based on unanswered affirmative defenses raised only implicitly on the face of the complaint); (*In re OPP Liquidating Company, Inc.*, Adv. Pro. No. 21-50431 (MFW), 2022 WL 774063, at *6-7 (Bankr. D. Del. Mar. 14, 2022) (concluding that because plaintiff did not raise business judgment rule in his complaint, it could not be considered on a motion to dismiss); *Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity, LLC)*, Adv. Pro. No. 16-50212 (KG), 2017 WL 65069, at *8 (Bankr. D. Del. Jan. 5, 2017) ("there is no question that the Trustee did not raise the business judgment rule in his Complaint, and thereby did not give the Defendants any opening to raise the affirmative defense in the Motions"); *In re The Brown Sch.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("The application of

6

business judgment rule, so I will not employ the presumption at this stage of the case. Rather, as dictated by *Tower Air*, I will employ the notice standard of Rule 8.

### 1. Claims Related to the Bond Program

The first fiduciary claim alleged against Cantor is a bad faith claim for breach of the duty of loyalty with respect to the fraudulent bond scheme. Cantor moves to dismiss on two grounds. Cantor first contends that Trustee fails to plead facts raising the reasonable inference that he had knowledge of any red flags indicating fraudulent conduct occurring at Live Well. For the same reasons set forth in the First Opinion with respect to Count 1, Trustee has sufficiently pled facts creating the reasonable inference that Cantor had knowledge of red flags indicating fraud at Live Well.

Cantor's second ground for dismissal is 8 Del. C. § 141(e).[20] Section 141(e) is also an affirmative defense. It provides a safe harbor for directors who reasonably rely in good faith on reports and opinions from expert advisers.[21] Again, unless an affirmative defense is raised on the face of the Complaint, it cannot serve as a basis to dismiss a complaint at the initial stage of the case.[22] The Complaint does not allege Cantor, or any of the other

---

the business judgment rule is an affirmative defense, the determination of which is not proper at the motion to dismiss stage.").

[20] Del. Code Ann. tit. 8, § 141(e).

[21] *In re ECS Ref., Inc.*, 625 B.R. 425, 450 (Bankr. E.D. Cal. 2020) ("As a rule, the protections of § 141(e) are an affirmative defense."); *Manzo v. Rite Aid Corp.*, No. CIV. A. 18451-NC, 2002 WL 31926606, at *3, n.7 (Del. Ch. Dec. 19, 2002), aff'd, 825 A.2d 239, (Del. 2003) ("the protections of § 141(e) would constitute an affirmative defense for which evidence may be brought at trial").

[22] *Manzo* at *3, n.7 (noting that § 141(e) "cannot affect the ruling on a motion to dismiss").

Directors, reasonably relied on reports issued by expert advisors.[23] Moreover, the Complaint paints a different story of the financial reports Cantor claims to have reasonably relied on. Trustee alleges the Directors knew that the management reports made no sense,[24] the information provided to the Directors clearly demonstrated fraudulent conduct was occurring at Live Well,[25] and the Directors both issued and approved fraudulently misstated financial statements.[26] As such, Section 141(e) cannot act as a mechanism to dismiss the bad faith claims in Count 2.

### 2. Claims Relating to the Stock Purchase Agreement and thereafter

Trustee also alleges Cantor violated the duty of loyalty through approval of the Stock Purchase Agreement, approving the September 2016 guarantee fee to Hild without board approval, approval of gross overcompensation to himself and Hild, and failure to provide oversight after the Stock Purchase Agreement closed.

Cantor moves to dismiss for two reasons. First, Cantor contends that the Complaint fails to identify any disabling interest in relation to the Stock Purchase Agreement. Second, Cantor contends that Trustee has failed to adequately plead that Cantor lacked independence with respect to approval of Hild's compensation.[27]

---

[23] *Ogus v. SportTechie, Inc.*, No. CV 2018-0869-AGB, 2020 WL 502996, at *14 (Del. Ch. Jan. 31, 2020) (stating that Section 141(e) "can protect directors of Delaware corporations from liability if the directors reasonably rely in good faith on the opinion of expert advisors").

[24] Compl. ¶ 99.

[25] Compl. ¶ 107.

[26] Compl. ¶ 311 ("the Directors fraudulently concealed their fraud and breaches of fiduciary duties . . . through their approval and issuance of fraudulently misstated financial statements").

[27] The cases Cantor relies on in support of these arguments also rely on the need to overcome the business judgment rule, and are thus, inapplicable. Memorandum in Support 11-14 citing *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) ("As a general matter, the business judgment rule presumption that a board acted loyally can be rebutted by alleging facts which, if accepted as true,

8

A duty of loyalty claim is sufficiently pled by alleging facts demonstrating "that a self-interested transaction occurred and that the transaction was unfair to the plaintiffs."[28] A duty of loyalty claim is also sufficiently pled if a plaintiff pleads facts allowing for the reasonable inference that a director acted in bad faith.[29]

The Complaint alleges that the sole purpose of Live Well's repurchase of the Preferred Stock was to get Rome and Karides off Live Well's board so that Hild could have the unfettered right to loot the company.[30] In exchange for supporting Hild in these endeavors, Cantor would be handsomely compensated.[31] To demonstrate the quid pro quo, Trustee alleges that (i) Cantor approved the September guarantee fees for Hild despite the lack of authority to do so and (ii) immediately after the closing on the Stock Purchase Agreement, Cantor approved $1 million dollars each in back director fees to himself and

---

establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders."); *RCS Creditor Trust v. Schorsch*, 2017 Del. Ch. LEXIS 820, *44-45 (noting that the plaintiff "failed to allege facts suggesting that the [defendants] had a disabling interest . . . [t]hese decisions therefore receive the protection of the business judgment rule"); *Kanter v. Barella*, 489 F.3d 170, 177–78 (3d Cir. 2007) (stating that the plaintiff's "pleadings fail to create reasonable doubt about the directors' independence and disinterestedness or their valid exercise of business judgment"); *Off. Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, No. CIV.A. 20228-NC, 2004 WL 1949290, at *14 (Del. Ch. Aug. 24, 2004) (noting that "approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment").

[28] *In re W.J. Bradley Mortg. Cap., LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019) (internal citations omitted).

[29] First Opinion 14-15.

[30] Compl. ¶¶ 10-11.

[31] Compl. ¶ 149 ("Cantor, as the sole member of the special committee that approved the Preferred Stock Repurchase, also stood on both sides of the transaction because his loyalties were divided between the company and Hild, who, as discussed below, compensated Cantor handsomely for bending to his will.").

Hild, fees that had not been approved during his previous eleven years of service as a director.[32]

Trustee also alleges that Cantor breached his fiduciary duty by approving the release of the Preferred Stockholders as part of the Stock Purchase Agreement, which includes claims Live Well had against Rome and Karides for breach of fiduciary duty.[33] He also alleges that after the closing on the Stock Purchase Agreement, Cantor remained on the board to receive his director fees and a "steady stream of work" for Cantor's title company, which Hild used for various personal real estate deals.[34]

---

[32] Compl. ¶ 140 ("While these negotiations were ongoing, on or about August 23, 2016, Cantor, as the sole member of the Guarantee Compensation Committee, signed off on paying Hild a $221,917.81 guarantee fee for the month August. Given Cantor's voting history on these issues and his ties to Hild, this was a foregone conclusion after Rome and Karides agreed to accept Hild's bribe. And Rome and Karides knew without a doubt that, after their resignations, Hild would continue to take as much as he could from the company and Cantor would not stand in his way."); ¶ 150 ("Furthermore, both Hild and Cantor had another reason to get Rome, in particular, off of the board. The board had been discussing directorial compensation issues for years with no resolution. For over a year, Rome had been specifically objecting to paying Hild a director fee as an inside director, and Hild would not allow any director fees to be paid if he was excluded. Shortly after Rome and Karides resigned, Cantor was able to pass a resolution to pay himself and Hild over $1 million each in "historical" director fees. Thus, Cantor was also conflicted in the Preferred Stock Repurchase that was, on its face, grossly unfair to the company, and he approved the deal based upon his own interests in violation of the duty of loyalty that he owed Live Well.").

[33] Compl. ¶ 151 ("Perhaps most shockingly, Cantor and Hild were so desperate to remove Rome and Karides that they further violated their fiduciary duties to Live Well by purporting to release any claims the company may have against Rome, Karides, and the Preferred Stockholders as part of the Preferred Stock Repurchase. To that end, Hild executed, and Cantor approved, a Separation and Release Agreement (the "Release") on behalf of Live Well. The Release purports to waive and release all of Live Well's claims for any cause of action against the Preferred Stockholders, including "any claim that any present or former director of the Company breached the fiduciary duties that he owed to the Company.").

[34] Compl. ¶ 154 (After the Preferred Stock Repurchase, Cantor remained on the board as little more than a rubber stamp for Hild's agenda of personal enrichment. Cantor enabled the systematic looting of Live Well by Hild and the Criminal Insiders in exchange for massive director fees and a steady stream of business from Hild through his other business ventures. Notably, over $6.6 million of Hild's ill-gotten income from Live Well passed through Title Works, Cantor's title company, in connection with various real estate deals in which Hild was involved and from which Cantor and his company, Title Works, received substantial fees. In other words, at all relevant times, Cantor had a direct financial incentive to keep Hild happy.").

The allegations in the Complaint make it reasonable for me to infer that Cantor was both interested and engaged in a transaction that was unfair to Live Well.[35] The Motion to Dismiss Count 2 for failure to state a claim is denied on this ground.

### B. Statute of Limitations

Cantor moves to dismiss all claims related to actions prior to June 10, 2016 as barred by the statute of limitations. As addressed in the First Opinion, Trustee has failed to meet his burden to plead facts sufficient to infer the applicability of the tolling doctrines.

All claims in Count 2 arising prior to June 10, 2016 will be dismissed with leave to amend, if possible.

## Count 3

Count 3 of the Complaint alleges a claim against Cantor for his role in an unlawful stock repurchase pursuant to 8 Del. C. § 174.

Section 174 provides a cause of action for willful or negligent violations of 8 Del. C. § 160.[36] Section 160 prohibits a corporation from purchasing or redeeming its own shares of stock when the capital of the corporation is impaired or the repurchase would cause the capital to be impaired.[37] A corporation's capital is impaired "if the funds used in the

---

[35] *See e.g. W.J. Bradley*, 598 B.R. at 164 (refusing to dismiss (even when plaintiff required to plead around the business judgment rule) when "[t]he Complaint alleges that Defendants Bradley and Cambi breached their duty of loyalty because they were motivated to close the Redemption Transaction to remove Defendant Demoulas from the Board rather than to advance the Debtors' best interests; Defendant Cambi also approved and accepted Board Fees. The Complaint alleges that Defendants Levins and Kirdar breached their duty of loyalty by abdicating their managerial responsibilities by rubberstamping the Redemption Transaction and accepting their bonuses. The Complaint also alleges that Defendant Baruch and Michalski breached their duty of loyalty by failing to take affirmative action ensuring that the Redemption Transaction was in the Debtors' best interests.").

[36] 8 Del. C. § 174.

[37] 8 Del. C. § 160.

11

repurchase exceed the amount of the corporation's surplus, defined by 8 Del. C. § 154 to mean the excess of net assets over the par value of the corporation's issued stock."[38] The term "net assets" is "the amount by which total assets exceed total liabilities."[39]

Cantor moves to dismiss Count 3 contending that Trustee failed to plead sufficient facts to demonstrate that Live Well's capital was impaired at the time of the execution of the Stock Purchase Agreement, and thus, Trustee has also failed to plead Cantor was aware of any impairment of capital. Cantor also argues that he is shielded from liability because he was entitled to rely on the financial reports issued by Hild, Rohr, and Stumburger purporting to show that Live Well was solvent at the time of the preferred stock repurchase. Trustee counters that he has sufficiently pled Live Well was insolvent at the time the Stock Purchase Agreement was executed and that he is not required to meet a "balance sheet test" at the pleadings stage.[40]

Trustee is correct; he need not provide a detailed balance sheet in the Complaint to satisfy Rule 8. Nonetheless, Trustee must still plead facts sufficient for the court to infer that Live Well's capital was impaired at the time of the closing on the Stock Purchase Agreement. In the Response, Trustee points to two paragraphs in the Complaint to show he has met the pleading requirements. Trustee alleges that "the actual realizable market value of Live Well's bond portfolio could not cover these debts, and the deficiency far outstripped the value of all of Live Well's legitimate assets and business operations by a significant

---

[38] *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 37 A.3d 205, 210 (Del. 2011) (internal citations and quotations omitted).

[39] *Id.* (citing 8 Del. C. § 154).

[40] Response 30.

12

margin, rendering the company insolvent."[41] And, he alleges that "Live Well was hopelessly insolvent at the time of the [preferred stock purchase] transaction due to the crushing debt obligations the company had already incurred in connection with the Criminal Insiders' fraudulent bond price-fixing scheme."[42]

Cantor points out, however, that the Complaint also contains allegations that Live Well's original lines of business—the origination and servicing of reverse mortgages—were profitable. For example, Trustee alleges that Live Well's origination and servicing lines of businesses—its "core business operations" were "successful."[43] Trustee also alleges that, "[a]t all relevant times, Live Well's assets from its core mortgage origination and servicing businesses comfortably exceeded its liabilities from those business."[44] Further, Trustee alleges that at year end 2018 "considering liabilities associated with the business, the fair-market value of Live Well's origination and servicing business was over $100 million."[45]

Viewing all facts in favor of Trustee, I am unable to reasonably infer that Live Well's capital was impaired on September 30, 2016. Live Well had multiple lines of business, two of which were always "comfortably" solvent (in the balance sheet sense). Other than conclusory allegations, Trustee has not explained or otherwise factored the value of these two businesses into his solvency allegations. Additionally, I note that while the Complaint

---

[41] Compl. ¶ 106.

[42] Compl. ¶ 143.

[43] Compl. ¶¶ 42, 44.

[44] Compl. ¶ 46 ("At all relevant times, Live Well's assets from its core mortgage origination and servicing businesses comfortably exceeded its liabilities from those businesses. Indeed, considering liabilities associated with the business, the fair-market value of Live Well's origination and servicing business was over $100 million as of year-end 2018.").

[45] *Id.*

13

contains detailed facts of the growth of the bond portfolio, there are no facts distinguishing the legitimate value of the bonds from the fraudulent values. I am unable to make a reasonable inference as to Live Well's total assets or total liabilities at the time of the Stock Purchase Agreement.[46]

Because I am unable to reasonably infer whether Live Well's capital was impaired at the time of the Stock Purchase Agreement, Trustee also failed to plead that Cantor knew or was negligent in not knowing that Live Well was insolvent.[47] Count 3 is dismissed with leave to amend with respect to Cantor.

**Count 7**

Count 7 of the Complaint seeks to avoid certain Director Fees paid to Cantor as constructively fraudulent transfers pursuant to 11 U.S.C. § 544 and Delaware law. As detailed in the Complaint, Cantor received almost $1.4 million in director fees, as follows:

| Date | Amount |
| --- | --- |
| 12/16/2016 | $100,000 |
| 01/05/2017 | $902,200 |
| 04/07/2017 | $42,975 |
| 07/05/2017 | $42,975 |
| 10/10/2017 | $42,975 |
| 01/05/2018 | $42,975 |
| 04/06/2018 | $42,975 |

---

[46] *See e.g. In re F-Squared Inv. Mgmt., LLC*, 2019 WL 4261168 at *16 ("Because I can draw no reasonable inferences as to assets or the magnitude of liabilities relative to assets from the facts alleged in the Complaints . . . I cannot reasonably infer insolvency.").

[47] For the reasons discussed previously, at the motion to dismiss stage, it is inappropriate to consider whether Cantor is shielded from liability because he reasonably relied on Live Well's financial statements.

| | |
|---|---|
| 07/05/2018 | $42,975 |
| 10/03/2018 | $42,975 |
| 01/04/2019 | $42,975 |
| 04/05/2019 | $42,975 |
| **TOTAL:** | **$1,388,975** |

A transfer is constructively fraudulent if an insolvent debtor received less than reasonably equivalent value in exchange for the transfer.[48] Cantor moves to dismiss on grounds that Trustee has failed to adequately plead Live Well received less than reasonably equivalent value and that Live Well was insolvent at the time of the transfers.

*Reasonably Equivalent Value*

Determining whether a transfer was for "reasonably equivalent value" requires a court to first decide "whether the debtor received any value at all.[49] Whether a debtor received any "value is not a high bar; even a slight chance that a benefit (tangible or intangible) might be conferred upon a debtor is sufficient."[50] If value is conferred, a court then determines whether that value was "reasonably equivalent" under a totality of the circumstances test.[51] The totality of the circumstances test considers "whether the debtor

---

[48] *In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294, 303 (Bankr. D. Del. 2019) (discussing constructively fraudulent transfers under 11 U.S.C. § 548); *In re PHP Healthcare Corp.*, 128 F. App'x 839, 847 (3d Cir. 2005) (noting that the requirements for constructively fraudulent transfers under Delaware law are "substantially the same as" the analysis under 11 U.S.C. § 548).

[49] *In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996).

[50] *F-Squared*, 600 B.R. at 304 (citing *R.M.L.*, 92 F.3d at 153).

[51] *In re R.M.L., Inc.*, 92 F.3d at 153.

15

got roughly the value it gave."[52] Relevant factors include "(1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith."[53] A dispute over whether the value exchanged was reasonably equivalent is inappropriate at the motion to dismiss stage.[54]

Cantor contends the Complaint does not contain any facts demonstrating that that the value received by Live Well for Cantor's directorial services was inequivalent to the director fees that Live Well paid in exchange for such services. Trustee does not dispute that Live Well received some value from Cantor's directorial services, but rather alleges that "Cantor was drastically overcompensated for his faithless 'services' to Live Well."[55]

To demonstrate that Live Well did not receive reasonably equivalent value for the retroactive director fees (denominated "historic" in the Complaint) paid to Cantor, Trustee pleads that the board had never approved director fees prior to the resignation of Rome and Karides.[56] Despite this, Cantor approved director fees for himself of over $1 million shortly after the stock repurchase.[57] Trustee also pleads that following the stock repurchase, Cantor allowed Hild the unfettered right to siphon money from Live Well by rubber stamping all of

---

[52] *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006).

[53] *Id.* (internal citations and quotations omitted).

[54] *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 269 (Bankr. D. Del. 2019) (stating that "disputes over reasonably equivalent value are not appropriate for determination on a motion to dismiss").

[55] Response 42.

[56] Compl. ¶ 150.

[57] Compl. ¶¶ 158, 160, 245.

16

Hild's requests for additional compensation.[58] In exchange for approving Hild's requests, Cantor would continue to have the ability to approve his own director fees as Live Well's only remaining outside director.[59] At this stage, Trustee has sufficiently pled that Live Well did not receive reasonably equivalent value for the director fees paid to Cantor.

*Live Well's financial condition*

For purposes of constructively fraudulent transfers, a plaintiff must plead one of three financial conditions: "(i) the debtor was insolvent at the time of the transfer, or became insolvent as a result of the transfer, (ii) the debtor had unreasonably small capital at the time of [the] transfer or as a result of the transfer, or (iii) the debtor intended to incur, or believed it would incur, debts beyond its ability to pay as those debts become due."[60] As with pleading any cause of action, "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" are insufficient to defeat a motion to dismiss.[61]

Cantor argues that Trustee has failed to allege facts sufficient to establish Live Well's financial condition under any of the tests. He argues that because Trustee has failed to allege facts allowing for the reasonable inference that Live Well was insolvent at the time of the transfers, the claim must be dismissed. Trustee contends the Complaint "alleges a

---

[58] Compl. ¶¶ 158-162.

[59] Compl. ¶ 160.

[60] *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *10 (Bankr. D. Del. Sept. 6, 2019).

[61] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

detailed financial picture of how Live Well's debt had rapidly metastasized during the year leading up to Cantor's transfers."[62]

For the same reasons as discussed previously, I conclude that Trustee has not met its burden to plead insolvency. Moreover, the Complaint does not allege any facts to support arguments on the other two distinct financial conditions; rather it contains what can only be characterized as "threadbare recitals." Merely alleging that "the Cantor Director Fees were transferred to Cantor at a time when Live Well had unreasonably small capital"[63] and "when Live Well had incurred, intended to incur, or believed it would incur debts beyond its ability to repay,"[64] without any facts to support such assertions, will not defeat a motion to dismiss.

Count 7 is dismissed with leave to amend.

**Count 8**

Count 8 of the Complaint seeks to avoid the Director Fees as actually fraudulent pursuant to 11 U.S.C. § 544 and applicable state law.[65] Under both Delaware and Virginia law, a plaintiff is required to plead specific facts allowing for the inference that the debtor made the transfer with the actual intent to hinder, delay, or defraud creditors.[66] Intent can

---

[62] Response 44.

[63] Compl. ¶ 249 ("All of the Cantor Director Fees were transferred to Cantor at a time when Live Well had unreasonably small capital.").

[64] Compl. ¶ 251("All of the Cantor Director Fees were transferred to Cantor at a time when Live Well had incurred, intended to incur, or believed it would incur debts beyond its ability to repay as such debts matured").

[65] Trustee asserts the actually fraudulent claims under 6 Del. C. § 1304(a)(1) and Va. Code § 55.1-400.

[66] Del. R. Civ. P. 9(b); Fed. R. Bankr. P 7009; *In re Nat'l Serv. Indus., Inc.*, No. AP 14-50377 (MFW); 2015 WL 3827003, at *3 (Bankr. D. Del. June 19, 2015); 6 Del. C. § 1304(a)(1) ( "A transfer made or obligation incurred by a debtor is fraudulent . . . if the debtor made the transfer or incurred the

be shown through circumstantial evidence by alleging certain "badges of fraud."[67] The presence or absence of any one badge of fraud is not determinative and courts are permitted to consider additional factors based on the allegations in the complaint.[68]

Cantor contends Trustee fails to allege facts sufficient for the Court to infer fraudulent intent. The Complaint alleges that the Director Fees (1) were transferred to an insider, (2) Live Well received less than reasonably equivalent value in exchange for the Director Fees, (3) Live Well was insolvent at the time of the transfers, and (4) based upon the Ponzi-like nature of the Criminal Insider's fraudulent scheme, the Director Fees were paid shortly after Live Well had incurred a substantial debt.[69]

As discussed in Count 7, Trustee has failed to allege sufficient facts to demonstrate that Live Well was insolvent at the time of the transfers.[70] Trustee's reliance on the Ponzi presumption is also unavailing as the Complaint contains no facts indicating that the Director Fees were made in furtherance of the bond scheme.[71]

Despite this, Trustee has pled that Live Well did not receive reasonably equivalent value for the Director Fees and Cantor does not contest that the payments were made to an

---

obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor"); Va. Code § 55.1-400 ("Every . . . transfer . . . given with intent to delay, hinder, or defraud creditors . . . [is] void").

[67] *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).

[68] *Id. In re Millennium Lab Holdings II, LLC*, No. 15-12284 (LSS), 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019.).

[69] Compl. ¶ 256.

[70] *See* Count 7 discussion.

[71] *See* discussion in the First Opinion at pages 33-35; *In re DBSI, Inc.*, 476 B.R. 413, 422-23 (Bankr. D. Del. 2012).