## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LIVE WELL FINANCIAL, INC., | Case No. 19-11317 (LSS) |
| Debtor. | |
| DAVID W. CARICKHOFF, as Chapter 7 Trustee of LIVE WELL FINANCIAL, INC., | |
| Plaintiff, | Adv. Pro. No. 21-50990 (LSS) |
| v. | |
| STUART H. CANTOR, JAMES P. KARIDES, BRETT J. ROME, LWFVEST, LLC, NORTH HILL VENTURES II, LP, FIVE ELMS EQUITY FUND I, L.P., FIVE ELMS HAAKON, L.P., FIVE ELMS COINVEST, L.P., JAMES BROWN, GANTCHER FAMILY LIMITED PARTNERNSHIP and ERIC LEGOFF, | |
| and | |
| JOHN DOES 1-10, | |
| Defendants. | |

### MEMORANDUM

Defendants Karides, Rome, LWFVEST LLC, North Hill Ventures II, LP, Five Elms

Equity Fund I, L.P., Five Elms Haakon, L.P. and Five Elms Coinvest, L.P. (collectively, or

a subset thereof, "Movants") move to dismiss[1] Counts 1 and 9 of the Amended Complaint.[2]

For the reasons stated below, the Motion to Dismiss is denied.

---

[1] Defendants LWFVest LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, LP, Five Elms Haakon, LP, and Five Elms Coinvest, LP, James Karides, and Brett Rome's Mot. to Dismiss Counts 1 and 9 the Trustee's Compl., Dkt. No. 54 ("Motion").

[2] Am. Compl., Dkt. No. 45.

**Procedural Posture**

On June 13, 2023, I issued that certain Opinion on Movants' motion to dismiss

Trustee's original complaint; it was followed by an Order on June 16, 2023.[3] I denied the

motion to dismiss as to Counts 3, 4, 5, 6, 12, 13 and 14.

I also denied the motion as to Count 1 (breach of fiduciary duty against Defendants

Rome and Karides) for claims arising on or after June 10, 2016. But I granted the motion as

to claims arising before that date, concluding that they were barred by Delaware's statute of

limitations.

Finally, I granted the motion to dismiss, in full, as to Count 11 (actual fraudulent

conveyance claims against LWFVEST, North Hill, Five Elms Equity Fund, Five Elms

Haakon, and Five Elms Coinvest). Trustee relied on the Ponzi scheme presumption to

establish fraudulent intent, but I concluded that he had not pled that the transfers at issue

were "in furtherance" of the Ponzi scheme.[4]

On August 11, 2023, Trustee filed his Amended Complaint, which includes amended

versions of the dismissed counts renumbered as Counts 1 and 9. Movants timely moved to

dismiss Counts 1 and 9. The matter has been fully briefed and is ripe for decision.[5]

---

[3] *Carickhoff v. Cantor (In re Live Well Financial, Inc.)*, Adv. Pro. No. 21-50990, 2023 WL 3995900
(Bankr. D. Del. 2023), Dkt. No. 40 ("Opinion"); Order Granting In Part and Denying In Part Defs.
LWFVest LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, LP, Five Elms Haakon, LP,
and Five Elms Coinvest, LP, James Karides, and Brett Rome's Mot. to Dismiss the Trustee's
Compl. [Dkt. No. 13], Dkt. No. 41.

[4] Op. 34-35.

[5] Opening Br. in Supp. of Defs. LWFVEST LLC, North Hill Ventures II, LP, Five Elms Equity
Fund I, LP, Five Elms Haakon, LP, and Five Elms Coinvest, LP, James Karides, and Brett Rome's
Mot. to Dismiss Counts 1 and 9 the Trustee's Am. Compl., Dkt. No. 55 ("Opening Br."); Trustee's
Resp. in Opp'n to Mot. to Dismiss of LWFVEST LLC, North Hill Ventures II, LP, Five Elms
Equity Fund I, LP, Five Elms Haakon, LP, and Five Elms Coinvest, LP, James Karides, and Brett
Rome, Dkt. No. 62 ("Resp."); Reply Br. in Supp. of Defs. LWFVEST LLC, North Hill Ventures II,

2

## Jurisdiction

I still have jurisdiction over the matter pursuant to 28 U.S.C. § 1334(b).  As relevant here, Count I is non-core and Count 9 is core.  Trustee consents to entry of final orders by the Court if it is determined that, absent the consent of the parties, the Court cannot enter final orders consistent with Article III of the United States Constitution.  Movants do not. If this matter goes to trial, I will have to recommend findings of fact and conclusions of law to the district court on non-core counts.  But this is not a final decision.

## Legal Standard

"A Rule 12(b)(6) motion challenges the sufficiency of the factual allegations contained in the complaint."[6]  A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" to survive a motion to dismiss.[7] The facial plausibility requirement is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]  I will not repeat analysis done in my Opinion, but will address only whether the new allegations are sufficient to correct the previous deficiencies.

---

LP, Five Elms Equity Fund I, LP, Five Elms Haakon, LP, and Five Elms Coinvest, LP, James Karides, and Brett Rome's Mot. to Dismiss Counts 1 and 9 of the Trustee's Am. Compl., Dkt. No. 65 ("Reply").

[6] *Gavin Solmonese LLC v. Shyamsundar (In re AmCad Holdings, LLC)*, 579 B.R. 33, 37 (Bankr. D. Del. 2017) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)).

[7] *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

**Discussion**

**I.    Count 1: Trustee has adequately pled that the statute of limitations was tolled**

Trustee alleges in Count I that Defendants Rome and Karides breached their fiduciary duties to Live Well "[f]rom at least September 2015 through their resignations in September 2016 . . . ."[9] While the statute of limitations is an affirmative defense not typically subject to challenge of a motion to dismiss,[10] because Trustee affirmatively pleads that the statute of limitations has been tolled,[11] he bears the burden of pleading sufficient facts to support his assertion.[12] The question here is whether Trustee has pled sufficient facts to toll the statute of limitations for claims which accrued prior to June 10, 2016.

Delaware decisional law recognizes that the statute of limitations may be tolled under the doctrines of inherently unknowable injuries, fraudulent concealment or equitable tolling.[13] Regardless of the theory, the tolling ends when the plaintiff is on inquiry notice of the cause of action.[14] At issue here is whose knowledge may be imputed to Live Well for purposes of establishing inquiry notice.

In response to the dismissal of Count I, Trustee now pleads:

---

[9] Am. Compl. ¶ 205.

[10] *In re: Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005) ("affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)").

[11] Am. Compl. ¶¶ 307-309.

[12] *Tower Air*, 416 F.3d at 238 (where complaint "declares" an affirmative defense does not vitiate plaintiff's claims, the court may dismiss the complaint based on that defense).

[13] *Gregorovich v. E.I. du Pont de Nemours*, 602 F. Supp. 2d 511, 518-19 (D. Del. 2009). The parties assume Delaware substantive law applies, so I do as well.

[14] *Pomeranz v. Museum Partners, L.P.*, No. CIV. A. 20211, 2005 WL 217039, at *3 (Del. Ch. Ja. 24, 2005). A plaintiff is on inquiry notice when it has "sufficient knowledge to raise [its] suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury." *Id.*

307.    Prior to Live Well's bankruptcy, all statutes of limitations for claims against the Directors related to the fraudulent bond scheme, and the harm caused to Live Well thereby, were equitably tolled until the Petition Date because neither Live Well nor any innocent stakeholder of Live Well had knowledge or, through the exercise of reasonably [sic] diligence, had reason to know of the fraudulent scheme or the harm it caused Live Well until the scheme ultimately collapsed.

308.    Live Well, as an entity, had no knowledge of the fraudulent bond scheme independent from the knowledge of its agents and fiduciaries. The only Live Well agents and fiduciaries that had knowledge, or, through reasonable diligence, could have obtained knowledge, of the fraud, were the Criminal Insiders and the Directors. As described in detail above, however, the interests of the Criminal Insiders and Directors were adverse to the interests of Live Well with respect to the fraudulent bond scheme because each of them stood to gain financially, to the detriment of Live Well, from the fraud. They were also highly incentivized to ensure that neither Live Well nor any innocent stakeholder of Live Well learned of the fraudulent bond scheme because its revelation could potentially subject them to significant civil and/or criminal liability. As such, Live Well cannot be charged with the Criminal Insiders' or its faithless directors' knowledge of the bond fraud. And, for the same reasons, the existence of the bond fraud was inherently unknowable to Live Well.

309.    Moreover, Hild and the Directors fraudulently concealed their fraud and breaches of fiduciary duties from Live Well and its creditors and innocent stockholders (the only other stake holders [sic] that could have brought a claim) through their approval and issuance of fraudulently misstated financial statements, which were reasonably relied upon by such stakeholders. As such, all statutes of limitations related to the bond fraud and Defendants' breaches of fiduciary duties are equitably tolled under the doctrine of fraudulent concealment.[15]

Movants assert that Director Glen Goldstein, various "board observers" (including Live Well's outside corporate counsel) and the employees responsible for managing Live Well's bond portfolio all had knowledge which, if imputed to Live Well, would have put it on inquiry notice.[16] Additionally, they allege "the market, Live Well, even Live Well's

---

[15] Amended Complaint ¶¶ 307-309. The first paragraph was contained in the original Complaint. The second and third paragraphs are new.

[16] Opening Br. 9-13.

shareholders saw exactly what the Directors saw" which would defeat claims of equitable tolling.[17]

Neither Movants nor Trustee specifically briefed what is necessary to plead in this context, which is, if not singular, rare. But this is a complaint in federal court, so notice pleading is the standard.[18]

The *Tower Air* case is instructive. There, plaintiff pled in his complaint that the business judgment rule did not vitiate any of his defenses. Because he did so, the Third Circuit held that plaintiff had to "plead that he overcomes the presumption created by that rule—that Tower Air's directors and officers acted in good faith and on an informed basis."[19] More specifically, the Court stated:

> the question for this Court is whether [plaintiff's] Amended Complaint sets out a simple and brief statement of claims of irrationality or inattention and gives the [defendants] fair notice of the grounds of those claims. "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims[s] which would entitle him to relief," *Conley*, 355 U.S. at 45-46, 78 S.Ct. 99, we must reverse the District Court['s granting of the Rule 12(b)(6) motion].[20]

Applying the *Tower Air* methodology here: having raised the tolling of the statute of limitations, Trustee must plead that he overcomes the three-year statute of limitations.[21] Because this is notice pleading, he must do so by providing a short and concise statement as

---

[17] Opening Br. 13.

[18] *Tower Air*, 416 F.3d 229, 237.

[19] *Id.* at 238.

[20] *Id.* at 239. Since *Tower Air*, the Supreme Court established a new pleading standard on motions to dismiss—the plaintiff must now allege "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face'"—but the principle is the same. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

[21] *Tower Air*, 416 F.3d at 237. This is a burden Trustee would not otherwise have had. *Id.*

to why the statute of limitation is tolled. In other words, after reading the Amended Complaint, I will only grant the motion to dismiss if Trustee has not alleged facts, which taken as true, "state a claim for relief that is plausible on its face."[22]

Here, Trustee alleges that the only agents or fiduciaries with knowledge of the fraud were the Criminal Insiders and the Directors, all of whom had adverse interests.[23] Trustee also alleges that no creditors or shareholders knew of the bond scheme because the Directors issued fraudulent financial statements.[24] While he does not make specific allegations in the Amended Complaint regarding the knowledge (or lack thereof) of corporate counsel, other board observers or the bond portfolio management team, I conclude that is not fatal in these circumstances.[25]

### 1.    Director Glen Goldstein

The parties agree that, as a director, Glen Goldstein had sufficient knowledge of the Criminal Insiders' scheme to put Live Well on inquiry notice if his knowledge were imputed to the company.[26] The general rule is that a director's knowledge is imputed to the corporation, however, "application of the rule is not automatic, [it] is dependent upon the circumstances."[27]

---

[22] *Twombly*, 550 U.S. at 570.

[23] Capitalized terms not defined herein shall have the meaning given them in the Amended Complaint.

[24] Am. Compl. ¶¶ 309.

[25] He does plead that creditors and stockholders are the "only other stake [sic] holders that could have brought a claim." Amended Complaint ¶ 309.

[26] Resp. 9. *See also* Op. 16.

[27] *Cred Inc. Liquidation Trust v. Uphold HQ Inc. (In re: Cred Inc.)*, 650 B.R. 803, 825-26 (Bankr. D. Del. 2023).

The adverse interest doctrine is one exception to the general rule.[28] "[I]n a case where the agent's action is totally adverse to the interests of his principal, the law will not impute knowledge of the bad act to the principal, because it seems nonsensical to presume that a thieving agent would tell his principal about the theft."[29] But if a reasonable fact finder could conclude that the agent acted, at least in part, in the principal's interest, the agent's knowledge will be imputed to his principal.[30] In other words, absent total adversity, a director's knowledge will be imputed to the company.[31]

Trustee asserts that the adverse interest doctrine prevents Goldstein's knowledge from being imputed to Live Well. Trustee contends that, as a director, Goldstein either knowingly or with willful blindness "permitted Hild to cause Live Well to violate the law, which would expose Goldstein to liability if the scheme was discovered."[32] Movants

---

[28] The caselaw cited by the parties shows disagreement among Delaware courts as to whether the adversity must be complete, with no benefit received by the company or whether the mere presence of self-interest is sufficient for the exception to apply. *Compare Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 309 (Del. Ch. 2015) (applying total adversity standard) (quoted with approval in *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1204 (Del. 2015)) *and Eugenia VI Venture Holdings, Ltd. v. MapleWood Holdings, LLC (In re AMC Investors)*, 637 B.R. 43, 58 (Bankr. D. Del. 2022) (applying *Stewart* standard) *with In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n.22 (Del. Ch. 2003) ("An exception to the general rule that knowledge of an officer or agent will be imputed to the corporation arises when an officer . . . is acting in a transaction in which he is personally or adversely interested or is engaged in the perpetration of an independent fraudulent transaction, where the knowledge relates to such transaction and it would be to his interest to conceal it." (alteration in original) (quoting 18B Am.Jur.2d *Corporations* § 1680 (2003))) *and Cred*, 650 B.R. at 825-26 (quoting *HealthSouth*). *See also In re Amer. Int'l Group, Inc.*, 965 A.2d 763, 813 (Del. Ch. 2009) (finding equitable tolling may apply beyond cases of "pure self-dealing" where shareholders benefited from a fiduciary's fraud). It is not necessary for me to decide the proper standard at this stage because even applying *Stewart*'s more exacting "totally adverse" standard, Trustee pled sufficient facts to survive the Motion.

[29] *Stewart*, 112 A.3d at 309.

[30] *See id.*

[31] *Id.*

[32] Resp. 9.

8

counter that Trustee fails to plead facts establishing that Goldstein was totally adverse to Live Well and note that Trustee has neither brought claims against Goldstein nor alleged that Goldstein received financial payments or had any financial interest in the bond/price inflation scheme.

In the Opinion, I concluded that Trustee pled facts "that constitute red flags and allow for the inference that Rome and Karides had knowledge of corporate misconduct at Live Well" and therefore, that Trustee stated a claim for breach of fiduciary duty.[33] Those red flags included facts learned/discussed at board meetings, including knowledge of scenario 14, the massive increase in the value of Live Well's bond portfolio and the significant purchases of HECM IO bonds. These allegations remain in the Amended Complaint. The Amended Complaint alleges Goldstein was a director. His presence at these same board meetings would provide him the same knowledge as Rome and Karides.

Given my previous conclusions regarding the allegations in the Complaint with respect to Rome and Karides—Goldstein's fellow directors—a reasonable person could infer Goldstein knowingly or with willful blindness permitted Live Well to violate positive law by allowing the Criminal Insiders' fraud to continue.[34] The mere fact that Trustee chose not to sue Goldstein does not establish that the potential for liability—and the incentive to remain silent for fear of self-incrimination—did not exist.[35] Because Trustee has alleged facts which

---

[33] Op. 15.

[34] *Kandell, Derivatively on Behalf of Nominal Defendant, FXCM, Inc. v. Niv*, C.A. No. 11812-VCG, 2017 WL 4334149, at *2 (Del. Ch. Sept. 29, 2017) ("Where directors knowingly cause or permit a Delaware corporation to violate positive law, they have acted in bad faith, and are liable to the corporation for resulting damages."). *See also* Op. 16.

[35] A trustee's fiduciary duties include "not merely care, diligence and skill in the prosecution of the estate's claims. It is also care, diligence, and skill in deciding which claims to prosecute, and how far." *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995)).

could plausibly render Goldstein totally adverse to Live Well's interests, Goldstein's knowledge is not imputed to Live Well for purposes of the Motion.[36]

## 2.    Shareholders

Because shareholders can bring derivative actions, equitable tolling ceases when shareholders have information sufficient to put shareholders on inquiry notice.[37] "[W]hen disclosures of the alleged harmful acts are made to shareholders, the corporate entity is no longer without redress against those who control it because the shareholders have both the knowledge and authority to protect the corporation's rights . . . therefore, there is no reason to toll the statute of limitations."[38] Publicly filed documents, including annual reports and Securities & Exchange Commission filings, have been held to put shareholders on inquiry notice.[39]

In the Opinion, I determined "that there is nothing pled (or submitted by Movants) to indicate that shareholders and creditors had critical knowledge surrounding [s]cenario 14

---

[36] *See e.g. AIG*, 965 A.2d 763, 807 (Del. Ch. 2009) ("[B]ad faith conduct [gave] [. . .] guilty insiders an interest in hiding what they had done. As a result, the knowledge of those culpable fiduciaries is not imputed to [the principal]."); *HealthSouth*, 845 A.2d 1096, 1108 n.22 (Del. Ch. 2003) ("When corporate fiduciaries – such as HealthSouth managers - have a self-interest in concealing information – such as the falsity of the financial statements that they had helped prepare – their knowledge cannot be imputed to the corporation"); *Cred*, 650 B.R. at 826 (same). At a later stage in the case, Movants will be able to present evidence, if any, to sufficient to show that the statute of limitations should not be tolled. *Compare White v. Irwin*, 114 F.Supp.3d 174, 185 n.11 (D. Del. 2015).

[37] *Tyson Foods*, 919 A.2d 563, 585 (Del. Ch. 2007); *Asher Candy Co. v. MAFCO Holdings, Inc. (In re Marvel)*, 273 B.R. 58, 76 (D. Del. 2002) ("[W]here representatives of the corporation have both notice and opportunity to redress the alleged wrongs against the corporate entity, tolling is inappropriate.").

[38] *Marvel*, 273 B.R. at 76.

[39] *See id.* (collecting cases).

. . . ."[40] Movants now argue that stockholders and creditors did have such knowledge. They contend that Live Well's shareholders "could have easily seen the 'sudden meteoric growth' of the bond portfolio's value and the 'lack of any downward volatility in the bond prices' just by looking at IDC's data" and Live Well's financial statements.[41] Trustee counters that those factors, in the absence of the Directors' additional knowledge, would not cause an objectively reasonable person to investigate further.[42] Evaluating inquiry notice requires analysis of: "(1) the precise nature of the claims asserted by [Trustee], (2) whether an objectively reasonable person would have realized the need to investigate further, and (3) the information such an inquiry would have disclosed."[43]

Taking the facts alleged in the Amended Complaint as true, starting in February 2015, IDC listed daily prices for the bonds in Live Well's portfolio provided by the Criminal Insiders in lieu of independent, market-based prices.[44] Beginning in or about August 2015, the Criminal Insiders provided IDC with prices generated using scenario 14.[45] The Criminal Insiders then used the values published by IDC in Live Well's financial statements.[46] In those periods, the Criminal Insiders "harvested" money though margin calls issued to its repo lenders, inflating Live Well's liability beyond the value the bonds could cover. This

---

[40] Op. 20.

[41] Opening Br. 12.

[42] Resp. 14.

[43] *EBS Litig. LLC v. Barclays Global Invs., N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) (evaluating inquiry notice under Delaware law).

[44] Am. Compl. ¶¶ 65, 67-68.

[45] Am. Compl. ¶¶ 82-84.

[46] Am. Compl. ¶ 84.

situation would not be readily apparent from Live Well's financial statements. Further, in the absence of price comparisons on the bonds (as provided in paragraph 92 of the Amended Complaint), the Criminal Insiders' fraudulent inflation of the bond values was not apparent.

Trustee has pled sufficient facts from which I can find that it is at least plausible that an objectively reasonable person would not have realized the need to investigate the valuation of the bonds. Accordingly, Live Well's shareholders were not on inquiry notice and their knowledge cannot be imputed to Live Well for purposes of this Motion.

### 3.    Corporate Counsel[47]

In the Amended Complaint, Trustee makes only passing references to corporate counsel. As relevant here, citing to Hild's testimony at his criminal trial, Trustee pled that

> [t]he Directors asked a lot of questions about the new methodology [scenario 14]. As described by Hild: "They wanted to understand how the methodology framework worked, what some of the inputs were, what the implications were and the like. It was a very free-flowing discussion amongst the board and board observers, corporate counsel and the like. We all discussed it."[48]

Movants assert that corporate counsel was an agent of Live Well such that his knowledge is imputed to Live Well.[49] Trustee counters that corporate counsel's knowledge cannot be imputed because, to the extent counsel knew of the bond fraud, he too could face liability if

---

[47] Resp. 10 n.22 ("Live Well had outside general counsel, referred to in the Amended Complaint and herein interchangeably as 'outside corporate counsel,' 'outside counsel,' 'corporate counsel,' and company counsel.' Live Well did not have in-house counsel.") (internal citations omitted).

[48] Am. Compl. ¶ 87 (alterations in original omitted).

[49] Opening Br. 11 (citing *XRI Inv. Holdings LLC v. Holifield*, 283 A.3d 581, 627 (Del. Ch. 2022); *Martin v. Med-Dev Corp.*, C.A. No. 10525-VCP, 2015 WL 6472597, at *13 (Del. Ch. Oct. 27, 2015); *Davis v. 24 Hour Fitness Worldwide, Inc.*, C.A. No. 12-1370-GMS, 2014 WL 4955502, at *4 (D. Del. Sept. 30, 2014)).

the fraud was exposed, and, further, he would not have standing to bring a claim against Live Well.[50]  Trustee also attempts to distinguish Movants' cited authorities, arguing that "in none [of the cases cited by Movants] was the knowledge of outside counsel, standing alone, imputed to the corporation for purposes of inquiry notice."[51]

"Delaware law states that the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."[52]  "Whether notice or knowledge of an attorney is imputed to his or her corporate client follows the same rules governing whether notice to or knowledge of an attorney is imputed to any client, regardless whether the client is a corporation."[53]  Imputation under this standard has three elements: (i) the individual must be an agent,[54] (ii) the agent must take an action and (iii) the agent's action must be taken within the scope of his or her authority.[55]

There is nothing in the Amended Complaint suggesting that corporate counsel was an agent of Live Well for purposes of the bond pricing scheme.  Nor are there any allegations in the Amended Complaint suggesting that the attorney took some action at the

---

[50] Resp. 12-13.

[51] *Id.* at 13.

[52] *XRI Inv.*, 283 A.3d at 627 (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005)).

[53] 3 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 807.10 (Sept. 2024) (but noting, "[i]f an attorney-at-law is also an officer of a corporation but the information in question comes to the attorney in his or her professional capacity as a member of the bar, and not in the capacity as an officer of the corporation, the knowledge the attorney acquired as a practicing attorney-at-law will not be imputed to the corporation.").

[54] An agent is an entity which another entity (the principal) has authorized to act on the principal's behalf.  Restatement (Third) of Agency § 1.01 (A.L.I. 2006).

[55] *XRI Inv.*, 283 A.3d at 627.  *See also Rogers v. Palmer*, 102 U.S. 263, 268 (1880) ("the agent of a creditor, whose acts and whose knowledge, obtained in the course of the employment, would have been the acts and the knowledge of his principal").

direction of Live Well or that any actions in particular were within the scope of corporate counsel's authority. Even though Trustee pled that the statute of limitations was tolled and therefore must allege some facts to show equitable tolling, I will not conclude that Trustee must have anticipated and pled around every potential agent Movants could assert to defeat Count I. Given the fact-intensive nature of this affirmative defense, that is too great a task for a notice pleading standard.

### 4.    Other Board Observers

Board observers are mentioned even less than corporate counsel in the Amended Complaint, referenced only once. In Paragraph 87 (full text above), Trustee pleads that "board observers" participated in the November 2, 2015 board meeting. Trustee does not identify the board observers.

Movants, on the other hand, purport to identify one board observer. In so doing, they ask me to consider three pages of testimony (pages 1124, 1512 and 1730) from the trial transcript of Mr. Hild's criminal trial. These three pages reflect the testimony of Mr. Rohr and Mr. Cantor, both of whom testified that board observers attended board meetings. The only board observer mentioned by name is Mr. Coulson, a preferred shareholder.

Assuming, without deciding, that I should consider this testimony, it does not aid Movants. Trustee alleges that all preferred stockholders were bought out under the Preferred Stock Repurchase.[56] Thus, all preferred stockholders, including Mr. Coulson, are arguably implicated in the wrongdoing. If Mr. Coulson is not a preferred shareholder, then

---

[56] Am. Compl. ¶ 145 ("the parties agreed that Live Well would repurchase *all the outstanding preferred stock*") (emphasis added).

it is unclear who Mr. Coulson is and whether his knowledge could be imputed to Live Well. Certainly, it is plausible that the statute of limitations is tolled.

### 5.    Bond Portfolio Management Team

Finally, in a two sentence argument, Movants contend that Mr. Strumberger and "several members" of the Stifel team that Live Well hired to manage the 18 HECM IO bond strips had "knowledge of the original volatility of the bond" and "should have been more suspicious of the change in stability and valuation."[57] Movants cite no authority for the proposition that the members of the bond portfolio management team were agents of Live Well or that they could protect Live Well's rights (akin to shareholders). This argument presents no basis on which any knowledge of Live Well's bond portfolio management team can be imputed to Live Well.

\*      \*      \*

Consistent with *Tower Air*, I will only grant the motion to dismiss if Trustee has not alleged facts, which taken as true, state a plausible claim that the statute of limitations is tolled. Having considered each argument made by Movants, I cannot reach that conclusion. Accordingly, I will deny the Motion as to Count I.

### II.    Count 9: Trustee has adequately pled actual fraudulent intent

In the Opinion, I dismissed Count 11 of Trustee's Complaint, which sought to avoid interest payments to Preferred Stockholders under 11 U.S.C. § 548(a)(1)(A), for failure to plead sufficient facts supporting fraudulent intent. Trustee pled the Ponzi scheme presumption, but failed to allege facts showing the interest payments were "in furtherance

---

[57] Opening Br. 11-12.

of" the Ponzi scheme.[58] Trustee now pleads the same conduct as Count 9 of the Amended

Complaint with the following additional factual allegations.[59]

> 151.   All of the interest payments that Hild and Cantor caused Live Well to make to the Preferred Shareholders were paid in furtherance of, and to conceal, the Criminal Insiders' fraudulent scheme. Indeed, any default on the notes would have created a substantial risk that the Criminal Insiders' and the Directors' wrongdoing would be discovered. At the very least, any failure by Live Well to make the interest payments would have spurred the Preferred Stockholders not otherwise involved in the Criminal Insiders' fraudulent scheme into taking a closer look at Live Well's financials and to begin asking difficult questions about Live Well's financial situation—an inquiry that would have, inevitably, resulted in the discovery of Live Well's insolvency and the fraudulent bond scheme.

> 152.   Moreover, the quarterly interest payments served no legitimate business purpose because Live Well received no consideration in exchange for granting the Preferred Stockholders the notes upon which the interest payments were based. Indeed, as discussed above, Live Well was insolvent when it issued the notes to the Preferred Stockholders, rendering the preferred shares that Live Well purportedly purchased from them worthless.[60]

> \*      \*      \*

> 276.   Furthermore, each of the Interest Payment Transfers were made in furtherance of, and to conceal, the Criminal Insiders' fraudulent scheme. Indeed, any failure by Live Well to make the Interest Payment Transfers would have created a substantial risk that the Criminal Insiders' and the Directors' wrongdoing would be discovered. At the very least, any failure by Live Well to make the Interest Payment Transfers would have spurred the Preferred Stockholders not otherwise involved in the Criminal Insiders' fraudulent scheme into taking a closer look at Live Well's financials and to begin asking difficult questions about Live Well's financial situation—an inquiry that would have, inevitably, resulted in the discovery of Live Well's insolvency and the fraudulent bond scheme.

---

[58] Op. 35. Movants appear to argue that I rejected the position that transfers made to prevent discovery of a Ponzi scheme could not be in furtherance of it. I did not so conclude. Rather, I stated that Trustee had not examined the specific transfers at issue. *Id.* As discussed herein, Trustee has now done so.

[59] Am. Compl. ¶¶ 271-280.

[60] Am. Compl. ¶¶ 151-152.

277.    The Interest Payment Transfers were also part of the *quid pro quo* that Rome and Karides and their affiliated Preferred Stockholders received in exchange for Rome and Karides breaching their fiduciary duties by taking no action to protect Live Well from the fraudulent bond pricing scheme and turning over unfettered control of Live Well to Hild.

278.    Finally, the Interest Payment Transfers served no legitimate business purpose because Live Well received no consideration in exchange for granting the Preferred Stockholders the notes upon which the Interest Payment Transfers were based. Indeed, as discussed above, Live Well was insolvent when it issued the notes to the Preferred Stockholders, rendering the preferred shares that Live Well purportedly purchased from them worthless. [61]

The question before me is whether, by these additional allegations, Trustee pleads facts sufficient to support his claim that the interest payments were made "in furtherance of" a Ponzi scheme and permit his reliance on the Ponzi scheme presumption or otherwise pleads actual fraudulent intent.

Movants do not contest Trustee's allegation that Live Well was engaged in a *de facto* Ponzi scheme.[62] The Ponzi scheme was Live Well's practice of "harvesting" money from margin calls when it needed funds to purchase additional bonds or repurchase bonds from repo lenders by manipulating the bond prices given to IDC.[63] The interest payments made to Preferred Shareholders were not the scheme itself.

As illustrated above, Trustee argues two theories by which the interest payments furthered the scheme: (i) they were intended to prevent the discovery of the scheme and/or (ii) they were part of the *quid pro quo* for Rome and Karides breaching their fiduciary duties to Live Well.

---

[61] Am. Compl. ¶¶ 276-278.

[62] Opening Br. 14-16. *See also* Am. Compl. ¶¶ 89-96, 110-116, 275.

[63] *See, e.g.*, Am. Compl. ¶ 94.

Movants first respond that payments made to hinder discovery of a Ponzi scheme are *pre se* not in furtherance of the scheme as a matter of law.[64] This *per se* contention is not borne out in the caselaw. For example, in *DBSI II* Judge Walsh ruled that plaintiff sufficiently alleged transfers were made in furtherance of a Ponzi scheme where he alleged that commission fees paid to salespeople in exchange for their services created and promoted "the false impression of financial strength" to investors and permitted DBSI to continue to make payments to investors.[65] And the *Geltzer* court decided the Ponzi scheme presumption "or similar principles" should apply where plaintiff had adequately pled that debtor settled with an individual investor "to avoid a dispute with [the investor] and risk disclosure of the entire scheme to other investors."[66] Similarly, while *Bayou Group* is not strictly a Ponzi scheme case, it is instructive. There, in examining redemption payments made to investors, the court ruled that plaintiff made out a *prima facie* case of an actual

---

[64] Opening Br. 15-16 (citing *Zazzali v. 1031 Exch. Grp. LLC (In re DBSI, Inc.)*, 476 B.R. 413, 422-23 (Bankr. D. Del. 2012); *Perkins v. Lehman Bros., Inc. (In re Int'l Mgmt. Assocs. LLC)*, 563 B.R. 393, 418 (Bankr. N.D. Ga. 2017) *rev'd and remanded sub nom.*, C.A. No. 1:17-CV-0302, 2018 WL 8368848 (N.D. Ga. Feb. 12, 2018) ("The Court specifically finds that in [sic] the Bankruptcy Court should not have placed a limitation on the Ponzi scheme presumption that the transfers must directly and materially cause fraudulent inducement of new investors."); *Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 387 (D. Minn. 2016)).

[65] *DBSI II*, 477 B.R. 504, 512 (Bankr. D. Del. 2012) ("*DBSI II*") (citing *Christian Bros. High Sch. v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 302 (S.D.N.Y. 2010) (internal quotation omitted)). Movants cite *Stoebner*, 562 B.R. at 387, for the premise that, under Minnesota law, the combination of comingled funds and a Ponzi scheme in a related organization does not establish actual fraud even when those facts delayed discovery that an organization was insolvent. This case is readily distinguished because the decision turns on the fact that the complaint alleges facts related to the running of a corporate entity engaged in a Ponzi scheme (Petters Company, Inc.), but not facts related to the fraudulent intent of the separate corporate entity (Petters Consumer Brands, LLC) which made the allegedly fraudulent transfers. Here, the transfers were all made by Live Well. I also note this decision does not relate to the Ponzi scheme presumption, which does not apply to claims advanced under the Minnesota Uniform Fraudulent Transfer Act. *Id.* at 385 (citing *Finn v. Alliance Bank*, 860 N.W.2d 638, 648 (Minn. 2015)).

[66] *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (Bankr. S.D.N.Y. 2013).

fraudulent conveyance because, among other things, the payments were made "to avoid detection of the fraud, to retain existing investors and to lure new investors and [because they] constituted an integral and essential element of the alleged fraud, necessary to validate the false financials and to avoid disclosure."[67] The court also concluded that the redemption payments "were accompanied by multiple 'badges of fraud,' including fraudulently inflated principal and profits and inadequate consideration."[68]

Movants next advocate a variation of the *per se* argument—that payments intended to conceal a Ponzi scheme should be limited to "payments that directly further the *Ponzi* scheme, such as payments made to investors in the *Ponzi* scheme to protect the image of the scheme's profitability or to third-parties so as to solicit new investors into the scheme."[69] This argument attempts to cabin the caselaw discussing the Ponzi scheme presumption to their specific facts. I find this reading excessively narrow. While many cases relying on the Ponzi scheme presumption involve attempts to avoid payments made to early investors to give the appearance of a successful investment that is unsurprising given the nature of a Ponzi scheme. But nothing in these decisions limits their logic or conclusions as Movants suggest. As already shown, many published decisions also apply the Ponzi scheme presumption to transfers made to parties other than investors.[70]

---

[67] *Bayou Grp.*, 439 B.R. at 302 (cleaned up).

[68] *Id.* at 307. *See also Manhattan Inv. Fund*, 397 B.R. 1, 13 (S.D.N.Y. 2007) ("While we are cognizant of the possibility, as was the case in *Sharp*, that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply, we proceed under the rule (noted by the Bankruptcy Court below) that if a transfer serves to further a Ponzi scheme, then the presumption applies and 'actual intent' under § 548(a)(1)(A) is present.").

[69] Reply 12-13.

[70] *See, e.g., DBSI II*, 477 B.R. at 512 (payments to salespeople). *See also Kapila v. Integra Bank, N.A. (In re Louis J. Pearlman)*, 440 B.R. 569, 575-76 (Bankr. M.D. Fla. 2010) (finding loan repayments

Moreover, Trustee also alleges that the interest payments were part of a *quid pro quo* arrangement between the Criminal Insiders, Rome and Karides (and their respective entities) for Rome and Karides' agreement to take no action to protect Live Well from the fraudulent bond pricing scheme. Much like hindering the discovery of the scheme, inducing members of Live Well's board of directors to abandon their fiduciary duties to protect Live Well allows the scheme to continue.

Taking Trustee's allegations as true, he pleads sufficient facts to support a reasonable inference that the interest payments were made to conceal the existence of the Ponzi scheme and to induce board members to ignore their fiduciary duties. It is thus plausible, for purposes of the Motion, that the interest payments were made in furtherance of the Ponzi scheme because they permitted the scheme to continue longer than it otherwise would have.

Finally, Trustee has now pled three of the six traditional badges of fraud: the insider nature of the relationship between Live Well and (at least certain) transferees, the lack of consideration for the conveyance, and the insolvency of the debtor.

For these reasons, I will deny the Motion to Dismiss Count 9.

---

made to unrelated banks to retain credit flow which stabilized a Ponzi scheme were in furtherance the scheme; "The trustee's complaint contains enough allegations to make plausible that the loan repayments were "in furtherance of" either the EISA Program or the TCTS Stock Program, which both are undisputable Ponzi schemes.").

**Conclusion**

For the reasons set forth above, the Motion is denied.  A separate order will issue consistent with this memorandum.


Dated: July 23, 2025

Laurie Selber Silverstein
United States Bankruptcy Judge