## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LIVE WELL FINANCIAL, INC., | Case No. 19-11317-LSS |
| Debtor. | |
| DAVID W. CARICKHOFF, as Chapter 7 Trustee of LIVE WELL FINANCIAL, INC., | |
| Plaintiff, | Adv. Pro. No. 21-50990-LSS |
| v. | |
| STUART H. CANTOR, JAMES P. KARIDES, BRETT J. ROME, LWFVEST, LLC, NORTH HILL VENTURES II, LP, FIVE ELMS EQUITY FUND I, L.P., FIVE ELMS HAAKON, L.P., FIVE ELMS COINVEST, L.P., JAMES BROWN, GANTCHER FAMILY LIMITED PARTNERSHIP, ERIC LEGOFF, and TITLE WORKS OF VIRGINIA, INC., | |
| And | |
| JOHN DOES 1–10, | |
| Defendants. | |

### DEFENDANTS LWFVEST LLC, NORTH HILL VENTURES II, LP, FIVE ELMS EQUITY FUND I, LP, FIVE ELMS HAAKON, LP, AND FIVE ELMS COINVEST, LP, JAMES KARIDES, AND BRETT ROME'S ANSWER AND AFFIRMATIVE DEFENSES TO THE AMENDED COMPLAINT

Defendants LWFVest LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, LP, Five

Elms Haakon, LP, and Five Elms Coinvest, LP, (collectively the "Funds"), James Karides, and

Brett Rome, (collectively, with the Funds, the "Preferred Shareholder Defendants"), by way of

1

answer to the Amended Complaint of Plaintiff David W. Carickhoff (the "<u>Trustee</u>"), in his capacity as Chapter 7 Trustee of Live Well Financial, Inc. ("<u>Live Well</u>"),[1] states as follows:

## GENERAL DENIAL

Unless expressly admitted, all allegations, including any allegations contained or implied anywhere in the Amended Complaint (whether in the body, headings, footnotes, or otherwise) are denied. Unless expressly otherwise stated, a denial of the allegations in a given Paragraph is a denial of any allegations contained in a footnote, charts, graphs, or anything else contained in that Paragraph. Unless otherwise noted, Preferred Shareholder Defendants' use of defined terms from the Amended Complaint in this Answer should not be interpreted as, and are not, an admission that: (i) Preferred Shareholder Defendants agree with the Trustee's characterization or use of the defined terms; (ii) the defined terms are accurate; or (iii) the documents or items described by the defined terms actually exist or are accurately described. To the extent the Preferred Shareholder Defendants use a defined term it is solely for purposes of responding to the allegations of the Amended Complaint.

## SUMMARY OF ACTION[2]

1.      Through this action the Trustee seeks to recover over $77 million in damages that Live Well suffered as a result of the continuous and brazen breaches of fiduciary duties and self-dealing of its outside directors—Defendants Cantor, Karides, and Rome (collectively with Live Well's fourth outside director, Glen Goldstein, the "<u>Directors</u>"). The Trustee also seeks, among

---

[1] Preferred Shareholder Defendants file this Answer to respond to certain allegations in the Amended Complaint that Preferred Shareholder Defendants were not previously obligated to answer as a result of their pending Partial Motion to Dismiss (Dkt. Nos. 54 & 55). Specifically, Preferred Shareholder Defendants now answer the allegations in paragraphs 271-80 and 306-310. Preferred Shareholder Defendants previously answered all other allegations in the Amended Complaint. *See* Dkt. No. 56. Those answers remain unchanged herein.

[2] The Trustee's Complaint contains a table of contents, several headings, and multiple sub-headings. Preferred Shareholder Defendants do not consider these to be substantive allegations to which a response is required. However, to the extent that a responsive pleading is required, Preferred Shareholder Defendants deny any and all allegations within the table of contents, any headings, and any sub-headings.

other things, to: (i) recover the $19,650,000 million in principal and interest payments Live Well made to its preferred stockholders as part of an unlawful and unjustifiable stock repurchase, and (ii) disallow and expunge or subordinate the proofs of claim filed by certain of the preferred stockholders.

**ANSWER:**    Preferred Shareholder Defendants admits that the Trustee brought this action but denies that that Trustee is entitled to any relief and denies the characterizations therein. Preferred Shareholder Defendants deny any remaining allegations.

2.   As fiduciaries of a Delaware corporation, the Directors owed Live Well the fiduciary duties of due care and absolute loyalty, and the related duty to, at all times, act in good faith and in the best interests of the company. They also owed Live Well a duty to properly oversee the operations of the company and the activities of its officers and employees. The Directors, however, breached these duties by repeatedly elevating their own interests and the interests of their affiliates over those of the company. In doing so, the Directors not only lined their own pockets and the pockets of their affiliates at the expense of Live Well and its creditors, but also knowingly permitted all of the company's legitimate business assets to be dissipated through a massive fraud that began on their watch and that they permitted to continue unabated through the deliberate dereliction of their fiduciary duties.

**ANSWER:**    The first sentence of Paragraph 2 states conclusions of law to which no response is required. Preferred Shareholder Defendants deny the remaining allegations.

3.    The fraud was indisputably perpetrated by certain former officers and employees of Live Well—principally, CEO and Chairman Michael C. Hild, CFO Eric G. Rohr, and Executive Vice President Charles Darren Stumberger (the "Criminal Insiders")—each of whom has either

pleaded guilty to or has been found guilty of multiple counts of securities, wire, and bank fraud and conspiracy in connection with the fraud described herein.

**ANSWER:**    Preferred Shareholder Defendants admit that the Criminal Insiders either pleaded guilty to or have been found guilty of the criminal charges brought against the Criminal Insiders.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

4.    The Criminal Insiders' fraud was a straight-forward bond price-fixing scheme. Beginning in 2015, with the Directors' approval and encouragement, the Criminal Insiders fraudulently inflated the values of the bonds in Live Well's portfolio, caused Live Well to incur debt by leveraging the bonds based upon the inflated values, and then caused Live Well to use the borrowed cash to purchase more bonds. Having acquired more bonds, the Criminal Insiders fraudulently inflated the values of Live Well's newly acquired bonds and repeated the process again and again, fraudulently driving up the reported equity value of Live Well in the process.

**ANSWER:**    Denied.

5.    Using this scheme, the Criminal Insiders purportedly increased the value of Live Well's bond portfolio from approximately $50 million in early 2015 to a staggering $458 million by September 2016 and increased its (fraudulently) reported equity value from approximately $53 million in 2015 to over $108 million by September 2016.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

4

6.      These values, however, were pure fiction. In reality, the debt-financed expansion of the bond portfolio based upon the Criminal Insiders' fraudulently inflated bond prices caused the growth of Live Well's liabilities to quickly outpace the growth, and surpass the value, of its assets. By at least June 2016, the debt obligations incurred by Live Well as a result of the bond fraud had rendered Live Well hopelessly insolvent. Specifically, by at least June 2016, Live Well's bond-related debt obligations had surpassed the actual realizable market value of the bonds that supported those obligations by substantially more than $100 million—an amount sufficient to eclipse the total fair value of Live Well's legitimate assets and business operations as well— rendering not just Live Well's bond business but the company as a whole insolvent.

**ANSWER:**    Denied.

7.      Nevertheless, as the fraudulently reported value of Live Well's bond portfolio grew, so did the greed of both the Criminal Insiders and the Directors. Hild wanted to siphon off Live Well's cash and assets for himself and the other Criminal Insiders through, among other things, increased salaries, bonuses, and guarantee fee payments. Cantor wanted to be paid exorbitant and unjustifiable director fees, and Rome and Karides wanted a substantial buyout to walk away. These competing interests, all of which were to the detriment of Live Well, began to create significant friction on the board during the summer of 2016.

**ANSWER:**    Denied.

8.      In or about June 2016, after the board had rejected Hild's demands for additional compensation, Hild upped the ante by attempting to hold the company hostage until his demands were met. Specifically, Hild threatened to anticipatorily breach his agreement to personally guaranty certain of Live Well's debts if the board did not meet his outrageous demand to be paid tens of millions of dollars in extraordinary, above-market guarantee fees. Hild's anticipatory

breach of his guaranties would have caused Live Well to default on millions of dollars in liabilities and, as a result, sunk the entire company.

**ANSWER:**    Preferred Shareholder Defendants admit that the board rejected Mr. Hild's demands for additional compensation.  Preferred Shareholder Defendants deny the remaining allegations and characterizations in Paragraph 8.

9.    Cantor, who routinely put Hild's and his own interest over those of the company, lobbied the board to meet Hild's demands. The remainder of the board, however, continued to refuse to pay Hild the extraordinary, above-market fees and compensation he demanded. Rome's opposition to Hild's demands was particularly strident, but he suggested a potential, albeit disloyal, solution: pay off the preferred stockholders, who Rome represented, and he and his colleagues would get out of Hild's way so that Hild could take as much from the company as he desired.

**ANSWER:**    Preferred Shareholder Defendants admit that the board rejected Mr. Hild's demands for additional compensation.  Preferred Shareholder Defendants deny the remaining allegations and characterizations in Paragraph 9.

10.    Hild obliged and devised a scheme to acquire complete and unfettered control of the company and its purse strings by engineering a repurchase of the preferred stock—most of which was owned by entities affiliated with Rome and Karides—in exchange for the resignation of Rome and Karides from the board. Because of the pervasive fraud committed on the Directors' watch, however, Live Well was hopelessly insolvent by this point and the preferred stock was completely worthless. Simply put, Rome and Karides took a bribe to abandon their fiduciary duties and walk away. The express purpose of this scheme was to give Hild unchecked power to loot the company by paying himself and his coconspirators whatever he wanted and further dissipate Live Well's assets.

**ANSWER:**    Denied.

11.    Upon learning of Rome's and Karides's agreement to accept Hild's bribe, and with the knowledge that Hild intended to loot the company, Goldstein, promptly resigned from the board, leaving Live Well with absolutely no check on Hild at the board level.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Goldstein resigned from the board but deny each and every remaining allegation.

12.    Ultimately, with Goldstein not there to object, Hild, Rome, and Karides agreed to a deal whereby Hild would cause Live Well to pay its preferred stockholders a total of $18 million in cash and issue $11 million in promissory notes in exchange for their preferred stock and Rome's and Karides' resignations from the board (the "Preferred Stock Repurchase").

**ANSWER:**    Paragraph 12 purports to cite to the Preferred Stock Repurchase agreement materials, which are documents which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny the remaining allegations in Paragraph 12.

13.    But because the company was already insolvent at the time the Preferred Stock Repurchase closed in September 2016, the transaction constituted an unlawful stock repurchase under Delaware law.

**ANSWER:**    Denied.

14.    Cantor was tapped to rubber-stamp the deal as the sole member of a special committee charged with approving the transaction on behalf of Live Well. Cantor happily complied, even though: (i) he was knowingly condoning Hild's, Rome's, and Karides's obvious breaches of fiduciary duty, and (ii) he knew, or was willfully blind in not knowing, that the company was insolvent due to the rampant bond fraud the Criminal Insiders were operating.

Cantor's motivations for doing so, however, would become immediately obvious: getting Rome and Karides off the board also provided him with a significant financial advantage.

**ANSWER:**    Denied.

15.    Indeed, immediately after the transaction closed, with only himself and Hild serving as Live Well's Directors, Cantor approved the payment of over $1 million in "historical" director fees to each of himself and Hild. Furthermore, with the company's financials fraudulently propped up by the bond price-fixing scheme, Cantor and Hild looted over $25 million from the company through various forms of overcompensation, including director fees for Cantor and Hild and excess salary, bonuses, and so-called "guarantee fees" for Hild.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

16.    Cantor was also incentivized to rubber-stamp Hild's fraud, breaches of duty, and systematic looting of Live Well because Title Works of Virginia, Inc. ("Title Works"), a real estate title company Cantor owns or controls, was involved in multimillion dollar real estate transactions with entities owned and controlled by Hild. Through those transactions, Cantor, through Title Works, received a steady stream of income from the proceeds of Hild's fraud, as Hild gobbled up real estate in Richmond, Virginia in an attempt to hide the money he stole from Live Well and its creditors.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

17.    When the scheme ultimately collapsed in June 2019, Live Well was forced into bankruptcy by three of its creditors. But by then, all the company's legitimate business operations had been dissipated as a direct result of the fraud and various related-party transactions approved by the Directors.

**ANSWER:**    Preferred Shareholder Defendants admit that Live Well was placed into bankruptcy in or around June 2019.  Preferred Shareholder Defendants deny the remaining allegations.

18.    The numerous breaches of fiduciary duty and fraudulent transfers described herein caused Live Well and its creditors to suffer tremendous damage in the form of: (i) improper and excessive payments and compensation to the Criminal Insiders and improper and excessive payments to the company's preferred stockholders to buy back their shares, and (ii) the dissipation of all of Live Well's legitimate assets and business operations. All told, Live Well suffered over $77 million in harm as a direct and proximate result of the Directors' breaches of fiduciary duty.

**ANSWER:**    Denied.

19.    Through this complaint, the Trustee seeks, among other things, to hold the Directors liable for these damages and recoup the improper payments that unjustifiably enriched the preferred stockholders at Live Well's expense.

**ANSWER:**    Preferred Shareholder Defendants admits that the Trustee brought this action but denies that that Trustee is entitled to any relief and denies the characterizations therein. Preferred Shareholder Defendants deny any remaining allegations.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b), in that the Complaint asserts causes of action arising in, arising under and/or relating to the above-captioned bankruptcy case.

**ANSWER:**     Paragraph 20 states conclusions of law to which no response is required.

21.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) to be heard and determined by this Court, and this Court may enter final orders for matters therein. In the alternative, this proceeding is a "related to" proceeding under 28 U.S.C. § 157(a).

**ANSWER:**     Paragraph 20 states conclusions of law to which no response is required.

22.     Venue for the action is proper in this Court under 28 U.S.C. § 1409(a), as the action is commenced in the district in which the above-captioned bankruptcy case is pending.

**ANSWER:**     Paragraph 20 states conclusions of law to which no response is required.

23.     The Trustee consents to the entry of final orders or judgments by this Court if it is determined that, absent consent of the parties herein, this Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**ANSWER:**     Preferred Shareholder Defendants admit that the Trustee, in his capacity as the Plaintiff in this case, consents to entry of final judgments or orders by the Bankruptcy Court in this action.  Preferred Shareholder Defendants do not consent to the Bankruptcy Court entering final judgments or orders in this adversary proceeding.

## PARTIES

24.     The Trustee, David W. Carickhoff, is the chapter 7 bankruptcy trustee of Live Well Financial, Inc. Live Well Financial, Inc., is a Delaware corporation and, while operating, its principal place of business was in Richmond, Virginia.

**ANSWER:**     Admitted.

25.     Defendant Stuart H. Cantor served as an outside director on Live Well's board of directors from in or about 2005 until July 1, 2019, when he resigned effective as of the entry of an order for relief under Chapter 7 of the United States Bankruptcy Code. Cantor is the Chairman of TrustMor Mortgage Company, a mortgage brokerage firm. He is also the President of TitleWorks of Virginia, a title company. As discussed more fully below, Cantor and Title Works frequently performed title work for Hild and companies that Hild owned or controlled. Cantor is a graduate of the Wharton School, where he received a bachelor's degree in accounting and economics.

**ANSWER:**     Preferred Shareholder Defendants admit that Cantor was a director of Live Well.  With respect to the remaining allegations in paragraph 25, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

26.     Defendant James P. Karides served as an outside director on Live Well's board of directors from 2012 until September 30, 2016. Karides is a founding partner and Chief Financial Officer of V-Ten Capital Partners, a venture capital firm. An affiliate of V-Ten Capital Partners, Defendant LWFVEST, LLC, owned 50% of the preferred stock in Live Well before the Preferred Stock Repurchase. Karides served on the Live Well board as LWFVEST, LLC's designee. Karides is also a Certified Public Accountant and spent approximately 30 years working as an accountant, including 12 years at KPMG.

**ANSWER:**     Preferred Shareholder Defendants admit the allegations in the first sentence of Paragraph 26.  Preferred Shareholder Defendants further admit and clarify that Mr. Karides is a founding partner and Chief Financial Officer of V-Ten Capital, which is a venture capital firm. Preferred Shareholder Defendants further admit and clarify that LWFVEST, LLC is an affiliate of V-Ten Capital and that LWFVEST, LLC owned 50% of the preferred stock in Live Well before

the Preferred Stock Repurchase.  Preferred Shareholder Defendants admit the allegations in the last two sentences of Paragraph 26.

27.     Defendant Brett J. Rome served as an outside director on Live Well's board of directors from 2008 until September 30, 2016. Rome is a founding partner of North Hill Ventures, a venture capital firm. A fund of North Hill Ventures, Defendant North Hill Ventures, II, LP, owned 21.5% of the preferred stock in Live Well before the Preferred Stock Repurchase. Rome served on the Live Well board as North Hill Ventures II, LP's designee. Rome is a graduate of Princeton University and Dartmouth's Tuck School of Business.

**ANSWER:**     Admitted.

28.     Defendant LWFVEST, LLC ("LWFVEST") was a preferred stockholder of Live Well from December 31, 2015, to September 30, 2016. LWFVEST is an affiliate of V-Ten Capital Management, where Defendant Karides is a partner. Karides is the manager of V-Ten Capital Management, LLC, which owns 100% of LWFVEST. LWFVEST received $9,000,000 in cash and a $5,500,000 note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, LWFVEST also received $825,000 in interest payments on the note.

**ANSWER:**     Preferred Shareholder Defendants admit the allegations contained in the first sentence of Paragraph 28.  Preferred Shareholder Defendants further admit and clarify that LWFVEST is an affiliate of V-Ten Capital where Mr. Karides is a partner.  Preferred Shareholder Defendants further admit and clarify that Mr. Karides is the President of V-Ten Investments, LLC, which owns 100% of LWFVEST.  Preferred Shareholder Defendants admit the allegations contained in the last sentence of Paragraph 28.

29.     Defendant North Hill Ventures II, LP ("North Hill") was a preferred stockholder of Live Well from September 19, 2008, to September 30, 2016. North Hill is a fund of North Hill

Ventures, where Defendant Rome is a partner. Rome is the Managing Director of North Hill Ventures II GP, LLC, the general partner of North Hill. North Hill received $3,864,349.78 in cash and a $2,361,547.09 note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, North Hill also received $354,232.10 in interest payments on the note.

**ANSWER:**    Preferred Shareholder Defendants admit the allegations in the first two sentences of Paragraph 29.  Preferred Shareholder Defendants further admit and clarify that Mr. Rome was the Managing Member of North Hill Partners, LLC, and is currently one of the Managing Members of North Hill Ventures II GP, LLC.  Preferred Shareholder Defendants admit the allegations in the last two sentences of Paragraph 29.

30.    Defendant Five Elms Equity Fund I, L.P. was a preferred stockholder of Live Well from September 19, 2008, to September 30, 2016. Five Elms Equity Fund I, L.P. received $2,976,457.40 in cash and a $1,1818,946.19 note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, Five Elms Equity Fund I, L.P. also received $272,841.90 in interest payments on the note.

**ANSWER:**    Admitted.

31.    Defendant Five Elms Haakon, L.P. was a preferred stockholder of Live Well from September 19, 2008, to September 30, 2016. Five Elms Haakon, L.P. received $181,614.35 in cash and a $110,986.55 note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, Five Elms Haakon, L.P. also received $16,648.00 in interest payments on the note.

**ANSWER:**    Admitted.

32.    Defendant Five Elms Coinvest, L.P. was a preferred stockholder of Live Well from September 19, 2008, to September 30, 2016. Five Elms Coinvest, L.P. received $171,524.66 in cash

and a $104,820.63 note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, Five

Elms Coinvest, L.P. also received $15,723.10 in interest payments on the note.

**ANSWER:**    Admitted.

33.    Defendant James Brown was a preferred stockholder of Live Well from September

19, 2008, to September 30, 2016. James Brown received $1,176,457.40 in cash and a $718,946.19

note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, he also received

$107,841.90 in interest payments on the note.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient

to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are

denied.

34.    Defendant Gantcher Family Limited Partnership was a preferred stockholder of

Live Well from September 19, 2008, to September 30, 2016. Gantcher Family Limited Partnership

received $450,000 in cash and a $275,000 note from the Preferred Stock Repurchase. Prior to Live

Well's bankruptcy, Gantcher Family Limited Partnership also received $41,250.00 in interest

payments on the note.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient

to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are

denied.

35.    Defendant Eric Legoff was a preferred stockholder of Live Well from September

19, 2008, to September 30, 2016. Eric Legoff received $179,596.41 in cash and a $109,753.36

note from the Preferred Stock Repurchase. Prior to Live Well's bankruptcy, he also received

$16,463.00 in interest payments on the note.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

36.    LWFVEST, LLC, North Hill, Five Elms Equity Fund I, L.P., Five Elms Haakon, L.P., Five Elms Coinvest, L.P., James Brown, Gantcher Family Limited Partnership, and Eric Legoff are collectively referred to herein as the "Preferred Stockholders."

**ANSWER:**    Preferred Shareholder Defendants admit that the Trustee defines LWFVEST, LLC, North Hill, Five Elms Equity Fund I, L.P., Five Elms Haakon, L.P., Five Elms Coinvest, L.P., James Brown, Gantcher Family Limited Partnership, and Eric Legoff as the "Preferred Stockholders."

## RELEVANT THIRD PARTIES

37.    Michael C. Hild ("Hild") was the founder of Live Well and served as its Chairman and Chief Executive Officer from 2005 through May 2019. In such capacity, Hild oversaw all operations of the company and reported directly to the board of directors. On April 30, 2021, Hild was convicted by a jury of his peers in the District Court for the Southern District of New York for: (i) conspiracy to commit securities fraud, (ii) conspiracy to commit wire fraud and bank fraud, (iii) securities fraud, (iv) wire fraud, and (v) bank fraud in connection with the fraudulent bond price-fixing scheme described herein.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Hild was found guilty of the criminal charges brought against him.  Preferred Shareholder Defendants further admit that Mr. Hild was the founder of Live Well and served as its Chairman and Chief Executive Officer. Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

38.     Eric G. Rohr ("Rohr") was the Chief Financial Officer of Live Well from 2008 through his resignation in December 2018. Rohr oversaw several of Live Well's departments, including financial planning and analysis, accounting, human resources, compliance and risk management, funding, post-closing, and servicing oversight. Rohr reported directly to Hild and to the board. On or about August 23, 2019, Rohr pleaded guilty to: (i) conspiracy to commit securities fraud, (ii) conspiracy to commit wire fraud and bank fraud, (iii) securities fraud, (iv) wire fraud, and (v) bank fraud in connection with the fraudulent bond price-fixing scheme described herein and agreed to be a cooperating witness in connection with the government's prosecution of Hild.

**ANSWER:**     Preferred Shareholder Defendants admit that the Mr. Rohr pleaded guilty to the criminal charges brought against him.  Preferred Shareholder Defendants further admit that Mr. Rohr served as the Chief Financial Officer of Live Well.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

39.     Charles Darren Stumberger ("Stumberger") was an Executive Vice President of Live Well from September 2014 through his resignation in March 2019. Stumberger served as the manager of Live Well's bond portfolio. Stumberger reported directly to Hild and also took direction from Rohr. On or about August 27, 2019, Stumberger pleaded guilty to: (i) conspiracy to commit securities fraud, (ii) conspiracy to commit wire fraud and bank fraud, (iii) securities fraud, (iv) wire fraud, and (v) bank fraud in connection with the fraudulent bond price-fixing scheme described herein and agreed to be a cooperating witness in connection with the government's prosecution of Hild.

**ANSWER:**     Preferred Shareholder Defendants admit that the Mr. Stumberger pleaded guilty to the criminal charges brought against him.  Preferred Shareholder Defendants further

admit that Mr. Stumberger was an Executive Vice President of Live Well.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

40.    Hild, Stumberger, and Rohr are collectively referred to herein as the "Criminal Insiders."

**ANSWER:**    Preferred Shareholder Defendants admit that the Trustee defines Hild, Stumberger, and Rohr as the "Criminal Insiders."

## FACTUAL ALLEGATIONS

**I.    Live Well, a Delaware Corporation, is Established as a Reverse Mortgage Lender.**

41.    Live Well was founded in 2005 as a private financial services company. For the first nine years of its operations, Live Well primarily operated two related lines of business: originating Home Equity Conversion Mortgages ("HECMs"), more commonly known as "reverse mortgages," and servicing those mortgages.

**ANSWER:**    Upon information and belief, the Preferred Shareholder Defendants admit the allegations set forth in Paragraph 41 of the Complaint.

42.    To operate its reverse mortgage lending business, Live Well invested substantial resources to obtain licensing from federal and state regulatory authorities, develop a retail and wholesale lending platform, develop servicing and secondary market proficiency, and build a nationwide network of wholesale brokers and correspondents.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

17

43.     Live Well was an approved seller and servicer of various mortgages and mortgage-backed securities including HECMs and conforming forward mortgages by the Federal National Mortgage Association. Live Well was also approved by the Government National Mortgage Association to issue and sell reverse and forward mortgage-backed securities.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

44.     Live Well's core business operations were successful. Indeed, before its collapse in 2019, Live Well was among the top reverse mortgage companies in the nation by volume.

**ANSWER:**     Upon information and belief, Preferred Shareholder Defendants admit that when Mr. Rome and Mr. Karides served on the board, Live Well's business operations were successful. Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

45.     At all relevant times, Live Well's assets from its core mortgage origination and servicing businesses comfortably exceeded its liabilities from those businesses. Indeed, the fair-market value of the assets of Live Well's origination and servicing business, excluding associated liabilities, was approximately $100 million as of October 2018.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

46.     In 2008, Live Well, a Delaware corporation, sought to raise capital through the issuance of preferred stock. Pursuant to the Series A Preferred Stock Purchase Agreement, dated September 19, 2008,

as amended on or about December 19, 2008, North Hill and LLWFVEST's predecessors-in-interest were each entitled to appoint one director to Live Well's five-person board of directors.

    **ANSWER:**    Preferred Shareholder Defendants admit to the creation of the Preferred Stock Purchase Agreement and that North Hill and LLWFVEST were entitled to appoint a director to the Live Well board of directors. Preferred Shareholder Defendants further state that the Series A Preferred Stock Purchase Agreement is a document which speaks for itself, and any mischaracterization thereof is denied. Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

    47.    As of December 31, 2015, the owners of Live Well's preferred stock included the following persons:

| Preferred Stockholder | Shares of Series A-1 Preferred Stock | Shares of Series A-2 Preferred Stock |
|---|---|---|
| LWFVEST, LLC | 892 | 0 |
| North Hill Ventures II, LP | 0 | 383 |
| Five Elms Equity Fund I, L.P. | 295 | 0 |
| Five Elms Haakon, L.P. | 18 | 0 |
| Five Elms Coinvest, L.P. | 17 | 0 |
| James Brown | 116.6 | 0 |
| Gantcher Family Limited Partnership | 44.6 | 0 |
| Eric Legoff | 17.8 | 0 |

    **ANSWER:**    Upon information and belief, Preferred Shareholder Defendants admit that the stock allocation amounts reflected in the chart in Paragraph 47 reflect the Preferred Stockholders' ownership stake at or around December 31, 2015.

    48.    From July 2012, through most of 2016, Live Well's board consisted of Michael Hild, who also served as the CEO, and the following outside directors: Stuart Cantor, Brett Rome,

James Karides, and Glen Goldstein. While Rome and Karides served as the designees of North Hill and LLWFVEST's predecessors-in-interest, respectively, the others were voted onto the board by the holders of the company's common stock.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Hild served as CEO of Live Well and that Mr. Hild served on the board with outside directors Mr. Cantor, Mr. Rome, Mr. Karides, and Mr. Goldstein.  Preferred Shareholders Defendants further admit that Mr. Rome and Mr. Karides served on the board as the designees of North Hill and LLWFVEST.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

49.    Goldstein, Rome, and Karides had all resigned from the Live Well board by September 2016 in connection with the company's repurchase of 100% of the outstanding preferred stock and related transactions. After their resignations, the board was left with only two directors—Hild and his longtime ally, Cantor.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Goldstein, Mr. Rome, and Mr. Karides resigned from the board of directors of Live Well in September 2016 with only Mr. Hild and Mr. Cantor remaining as directors at that time.  Preferred Shareholder Defendants deny the remaining allegations in paragraph 49.

50.    While they served as directors on Live Well's board, the Directors were charged with the duty to oversee the operations of the company and owed the company the fiduciary duties of due care, good faith, and absolute loyalty. As described herein, each of the Directors breached these duties to the detriment of Live Well, its stockholders, and its creditors.

**ANSWER:**    The first sentence of Paragraph 50 states conclusions of law to which no response is required. Preferred Shareholder Defendants deny the remaining allegations.

II.      **The Directors Sign Off on Live Well's New Investment Line of Business.**

51.      In or around August 2014, Stumberger approached Hild about expanding Live Well's business by establishing a trading desk to invest in HECM IO (Home Equity Conversion Mortgage, Interest Only) bond strips. HECM IO bonds are reverse mortgage-backed securities that entitle the holder to receive a portion of the interest payments, but not principal payments, from a particular pool of reverse mortgage loans and pay the holder a monthly coupon (effectively, an interest rate) based upon the performance of the underlying mortgage loans.

**ANSWER:**      Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence; therefore, such allegations are denied. The remainder of the allegations appear to describe HECM IO bond information, which bonds are evidenced by documents which speak for themselves, and any mischaracterization thereof is denied.  To the extent a response is required, Preferred Shareholder Defendants deny any remaining allegations.

52.      At the time Stumberger approached Hild, Stumberger worked at the HECM trading desk at Stifel Nicolaus ("Stifel"), a New York-based investment bank and broker-dealer, and thus had knowledge about the market for HECM IO bonds.

**ANSWER:**      Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

53.      Hild presented the prospect of engaging in this new line of business to the board as "an incredible opportunity." He described the bond trading business model as "extremely lucrative" and the bond portfolio as a "gold mine" that "gins [] cash."

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

54.    To acquire a bond portfolio, however, Live Well required lenders to finance the purchase. Although Hild admitted that certain lenders were wary of the volatility of forward HECM IO strips, he represented that this was not a concern for reverse HECM IO strips because "they don't have the prepay risk" of forward mortgages. Moreover, Hild assured the board that financing the acquisition of a bond portfolio would not present any risk to the company, explaining "[i]f at some future point we ever need cash, we can simply sell off an appropriate amount of the IOs (these are highly liquid)."

**ANSWER:**    Paragraph 54 appears to cite to documents and/or communications which speak for themselves, and any mischaracterization thereof is denied.    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

55.    Apparently without any further investigation, the Directors supported Live Well's acquisition of a bond portfolio based upon Hild's representations. It would not take long, however, for these representations to be proven false.

**ANSWER:**    Denied.

56.    With the board's blessing, Stumberger and Hild began working toward a deal for Live Well to acquire a portfolio of approximately 18 HECM IO bond strips from Stifel for approximately $46 million and for Stumberger and several members of his team to leave Stifel to

join Live Well to manage the portfolio. Before Live Well could close the deal, however, the
Criminal Insiders needed to work out arrangements to finance the bond purchases.

**ANSWER:** Preferred Shareholder Defendants deny the allegation that Mr. Hild and Mr.
Stumberger had the "the board's blessing" to engage in any improper conduct. Preferred
Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth
of the remaining allegations in this paragraph; therefore, such allegations are denied.

57.    Ultimately, and at all relevant times, Live Well financed its acquisition of HECM IO
bonds primarily through repurchase ("repo") agreements. Repo agreements are a form of short-term
financing (similar to, and sometimes referred to herein as, "loans"). But, whereas in a traditional
loan, the financed securities serve as collateral and security for the repayment of the loan, a repo
agreement is structured as the sale and repurchase of the security. In a repo agreement, the seller of
a security (sometimes referred to as the "borrower") agrees to buy it back from the purchaser
(sometimes referred to as the "lender," "repo lender," or "repo counterparty") at a specified price
and time, and to pay a specified interest rate when repurchasing the security.

**ANSWER:** Preferred Shareholder Defendants state that the bond repurchase
agreements are documents which speaks for themselves, and any mischaracterization thereof is
denied. Preferred Shareholder Defendants lack knowledge or information sufficient to form a
belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are
denied.

58.    To determine the purchase price of the bonds (*i.e.*, the loan amount), Live Well's repo
counterparties took the then-current value of the bonds pledged as collateral and applied a discount,
or "haircut," typically in a range of 10 to 20 percent of the value of the pledged bonds. For example,
if the value of the financed bonds was $10 million, the repo lender would "lend" between $8 and $9

million depending on the terms of the relevant repo agreement. In other words, the repo lender would purchase the bonds from Live Well for 80 to 90% of their current value and Live Well would agree to buy them back on a certain date for the total purchase price plus interest.

**ANSWER:**    Preferred    Shareholder    Defendants    state    that    the    bond    repurchase agreements are documents which speaks for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

59.    Significantly,    if    Live    Well    failed    to    repurchase    the    bonds    after    receiving notification from the repo lender that it was terminating the repo agreement at the end of the applicable repo term, the repo lender could "seize" the bonds. Doing so, however, would not relieve Live Well of its debt obligation to the repo lender unless the value of the bonds equaled or exceeded the value of the loan at the time of "seizure."

**ANSWER:**    Preferred    Shareholder    Defendants    state    that    the    bond    repurchase agreements are documents which speaks for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

60.    The repo agreements also had two-way margin requirements that would effectively increase or decrease the amount of "loan" by the amount of the margin. If the value of a bond decreased by a certain dollar amount, as determined by whatever means of valuation Live Well and the repo counterparty mutually agreed upon, then Live Well would be required to post margin (*i.e.*, send a payment) to the repo lender in an amount proportional to the decrease in value, thereby

decreasing the amount of the loan or the repurchase price. Conversely, if a bond increased in value, the repo counterparty could be required to post margin (*i.e.*, increase the amount of the "loan" and Live Well's liability) in an amount proportional to the increase in value.

**ANSWER:**    Preferred Shareholder Defendants state that the repurchase agreements are documents which speaks for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

61.    These transactions are known as "margin calls." The purpose of these margin calls was to maintain the haircut at the agreed upon level to ensure the repo lender could obtain sufficient value from the purchased security to cover the amount of the loan in the event of a default. Thus, determining an objective and unbiased daily value of the bonds, and reaching an agreement on how the bonds would be valued, was a material issue for Live Well's repo counterparties.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

62.    The mechanics of these repo financing arrangements were discussed often during board meetings and the Directors knew that they were necessarily premised on having market-based valuations of the financed bonds. Although Hild had represented this to be a non-issue because of the HECM IOs' purported salability, in reality, obtaining a market-based pricing source was particularly challenging because the HECM IOs that Live Well purchased are relatively illiquid and thinly traded.

**ANSWER:**    Denied.

63.     To resolve the issue, Live Well turned to Interactive Data Pricing and Reference Data LLC ("IDC")—one of the few securities pricing services that published prices for these HECM IO bonds. With IDC's commitment to evaluate and publish prices for the HECM IO bonds in Live Well's portfolio, Live Well was able to enter into repo agreements to finance its bond purchases.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

64.     Thus, in or around November 2014, and with board approval, Live Well began its bond trading business by completing its purchase of 18 HECM IO bond strips from Stifel for approximately $46 million financed through repo agreements with three separate repo lenders. Upon acquiring the bond portfolio, Live Well hired Stumberger and several members of the team that had managed the bond portfolio from Stifel.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

**III.    Live Well's Bond Investment Business Creates Liquidity Issues for the Company.**

65.     Live Well's new investment line of business got off to a shaky start. For the first several months, IDC published objective, independent market-based prices for Live Well's HECM IO bonds. And those bond prices, determined based upon IDC's own independent methodology, fluctuated up and down based upon market conditions. These fluctuations resulted in Live Well's frequent receipt of margin calls from its repo lenders.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

66.    The margin calls created a significant cash-flow strain on Live Well. For example, in February 2015, IDC's published prices had caused a $30,000 day-over-day reduction in the value of the bond portfolio, which had caused an implied margin call of $247,000. Hild desperately searched for a solution that would smooth out the daily changes in the bond prices and allow him to better manage Live Well's cash flows and eventually tasked Stumberger with the task of working with IDC to find a solution.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

67.    On February 12, 2015, Stumberger reported back to Hild that he "just had an all-hands-on call with IDC. This issue is solved." He explained, "We will be supplying prices daily to IDC, and IDC will use these." Stumberger assured Hild, ***"They will use the prices verbatim and not model these bonds until we are interested in them doing so"*** (emphasis added).

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

68.    For all relevant times thereafter, IDC ceased using its own pricing model or any objective market data and started publishing the prices provided to it by the Criminal Insiders verbatim as "broker quotes." This provided the Criminal Insiders with the unfettered ability to set the prices published by IDC for the bonds in Live Well's portfolio.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

IV.    **The Criminal Insiders Perpetrate a Fraudulent Price-Fixing Scheme That Sinks Live Well While the Directors Look the Other Way.**

69.    With IDC's agreement to publish the prices for the HECM IO bonds submitted by Live Well, the Criminal Insiders' management of Live Well's bond portfolio quickly turned into a massive fraud that Hild would later describe as a "self-generating money machine." Although the scheme started out small, it quickly expanded and resulted in Live Well's incurrence of massive debt obligations that it could never repay and that would dissipate all the value of Live Well's legitimate business operations. As the fraud ramped up, the Directors knew, at a minimum, that Live Well was borrowing more against the value of the bonds than the market could support and was thus hopelessly underwater on its bond-related debt. The Directors also knew that Hild had lied to them about the riskiness of the bond portfolio and the bond-related financing. But, despite this knowledge, the Directors continued to encourage the Criminal Insiders' efforts to acquire more and more bonds based upon the Criminal Insiders' fraudulent bond valuations to the detriment of Live Well and in violation of their fiduciary duties.

**ANSWER:**    Denied.

A.    **The Criminal Insiders Used Their Newfound Ability to Manipulate the Bond Prices to Avoid Margin Payments.**

70.    The Criminal Insiders started to fraudulently inflate the prices of the bonds in Live Well's portfolio on *the very same day* that IDC agreed to publish the prices they submitted.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

71.    The Criminal Insiders started out small, however, testing the limits of IDC's willingness to publish the bond prices they provided. For example, immediately after IDC agreed to accept Live Well's prices, Hild directed Stumberger to submit prices that would "[u]ndo the $30K incorrect day over day reduction up to this point," to avoid the implied margin call of $247,000. Stumberger replied, "We can mark everything up by 1.25 ticks to erase out the IMC [implied margin call]."

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

72.    Stumberger submitted the prices with the adjustments as Hild directed. Upon confirmation that "IDC marks are up ~$250k today for tmrw's distribution," Hild mused, "Well that was easy :-)".

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

73.    Thus, the Criminal Insiders prevented a margin call by manipulating the prices published by IDC, not based on any analysis of the bonds' actual market value, but rather based solely on Live Well's liquidity needs. Live Well's repo lenders continued to accept IDC's prices as representative of the fair market value.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

74.     With demonstrated control over the published bond prices, the Criminal Insiders knew they could eliminate the risk of the unpredictable margin calls that put a strain on cash flows and create the false appearance that the new bond trading business was performing well. And with the fear of unpredictable margin calls effectively eliminated, from February 2015 through August 2015, Live Well purchased more bonds and fraudulently increased the reported value of its repo-financed bond portfolio from approximately $50 million to $71 million.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

**B.     The Directors Knew Hild had Misrepresented the Risks Associated with Live Well's Bond Business by at Least the Summer of 2015.**

75.     By August 2015, several red flags of the Criminal Insiders' nascent fraudulent scheme had already come to the board's attention. Indeed, despite Hild's representations to the contrary, securing financing for the bond portfolio had already become an issue that threatened the business as a whole and was often discussed at the board level.

**ANSWER:**    Denied.

76.     For example, as early as January 5, 2015, Hild informed the board that a $400 million line of credit Live Well had secured from one repo lender for financing HECM IO bonds "just evaporated into thin air." Hild explained that the lender "has made a credit committee decision to disallow the use of their funds for financing any reverse mortgage bonds (even those backed by GNMA). . . . [W]e are being told to take our bonds off the line and are working to do so by placing them on Repo with another provider. Obviously this is not the type of news we wanted to return to. This will mean we will need to user [sic] larger haircut lines which in turn will tie up more cash and produce lower ROEs."

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

77.    Similarly, on May 4, 2015, shortly after the Criminal Insiders had gained the ability to manipulate the bond prices published by IDC, Hild emailed the board about a potential "calamity" that came about when another of Live Well's repo lenders, Xenith Bank ("Xenith") stopped providing financing. Xenith, which had given Live Well a $37 million repo credit facility, had asked Live Well to stop using the facility to finance HECM IO bonds because they were concerned about the risk. Hild reported that Live Well could be forced to sell its entire HECM IO bond portfolio as fallout. Hild told the board: "I would equate this situation (if forced to sell) to prior analogies of trying to control a nuclear explosion without any collateral damage." In other words, within just eight months of Live Well entering the bond business, a fall out with just one of Live Well's repo lenders threatened the business as a whole, including Live Well's core operations of mortgage origination and servicing.

**ANSWER:**    To the extent Paragraph 77 appears to cite an e-mail to the board of directors, that e-mail speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations, including the substantive allegations made in the quoted statements.

78.    Thus, the Directors quickly learned that: (i) Live Well financed its HECM IO bond purchases with repo financing, (ii) at least some repo lenders considered HECM IO bonds to be too risky to finance, (iii) repo financing could be terminated by the repo lenders on short notice, and (iv) the loss of a repo credit facility could have ruinous effects for both the bond business and the company as a whole. In stark contrast to the representations Hild had previously made about

Live Well's bond portfolio, financing and maintaining the bond portfolio created massive risks for Live Well.

**ANSWER:**    Denied.

79.    And most critically for Live Well's legitimate business operations, the Directors also knew that the repo lenders provided financing based upon discounts off the market values of the bonds—that is, the price the repo lender could reasonably expect to receive for the bonds if it sold them in an arms-length transaction. As such, any financing of the bonds based upon above-market values would necessarily increase Live Well exposure well beyond what the portfolio could cover, putting the rest of the business risk.

**ANSWER:**    Denied.

**C.    The Criminal Insiders Expand the Fraudulent Price-Fixing Scheme While the Directors Continue to Look the Other Way.**

80.    Up to around August 2015, the Criminal Insiders had primarily used their ability to unilaterally set the bond prices to smooth out the daily fluctuations in the "market price." They eventually realized, however, that they could manipulate the IDC-published bond prices to dramatically inflate the apparent value of the HECMI IO bonds in Live Well's portfolio.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

81.    Indeed, after their first successful bond price manipulation, Stumberger and the bond trading desk began modeling various "scenarios"—*i.e.*, sets of "assumptions" and parameters—for valuing the bonds to maximize their "value" without regard for their true market prices or any objective market data.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

82.    In or about August 2015, the Criminal Insiders and their coconspirators developed a pricing model they referred to internally as "scenario 14." Scenario 14 fundamentally changed the way Live Well valued the bonds in its portfolio. Among other things, scenario 14 "assumed" a dramatic drop in the bond yields (*i.e.,* the return on the bonds demanded by the market), which resulted in a dramatic increase in the purported "value" of the bond portfolio.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

83.    Neither the "assumptions" underlying scenario 14 nor the dramatic increase in bond valuations that scenario 14 generated had any market-basis whatsoever. To the contrary, the inflated bond prices generated by scenario 14 were false and could never actually be obtained in the market.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

84.    Nevertheless, the Criminal Insiders began using scenario 14 to generate the bond prices that they submitted to IDC. IDC published these prices as it had done since February, perhaps believing them to be legitimate broker quotes from a market participant. Once published, the Criminal Insiders used the prices they derived as the "market values" for their repo transactions and their own financial statements.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

85.    In September 2015 alone, by submitting the fraudulently inflated bond prices to IDC, the Criminal Insiders dramatically expanded Live Well's bond portfolio and increased its reported value (*i.e.*, the value based upon the prices generated by scenario 14 and published by IDC) from $71 million to $141 million.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

86.    The board held a meeting on November 2, 2015, to discuss, among other things, the recent and unprecedented "success" of the bond portfolio. At the meeting, Hild and Rohr described the "new methodology" to the Directors in detail. As Hild testified at his criminal trial, he and Rohr "explained that [they] had gone through a rigorous analytical exercise in order to establish a more sophisticated methodology . . . tha[n] the conventional or forward market was using and adopted [it] for the reverse mortgage [HECM] IOs, and that that produced a more accurate reflection of the true value of the bonds and that it had been adopted."

**ANSWER:**    Preferred Shareholder Defendants admit that a board meeting was held on November 2, 2015.   Paragraph 86 appears to cite to the *Hild* transcripts which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations, including the substantive allegations made in the quoted statements.

87.    The Directors asked a lot of questions about the new methodology. As described by Hild: "[T]hey wanted to understand how the methodology framework worked, what some of

the inputs were, what the implications were and the like. It was a very free-flowing discussion amongst the board and board observers, corporate counsel and the like. We all discussed it."

**ANSWER:**    Paragraph 87 appears to cite to the *Hild* transcripts which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations, including the substantive allegations made in the quoted statements.

88.    According to Hild, the Directors were "euphoric" and "enthusiastic" about the scenario 14 methodology. Hild recalled that there were "a bunch of high fives" at the board meeting because Live Well had "struck gold" by discovering an "insight" about the HECM IO bond market, after just one year in the business, that everyone else had allegedly missed and from which the Directors would benefit. Hild testified that the board said, "let's go buy as much of these [HECM IO bonds] as we can as quickly as we possibly can and as fast as we possibly can."

**ANSWER:**    To the extent the quoted language come from the *Hild* transcripts, those transcripts speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations, including the substantive allegations made in the quoted statements.

89.    Thus, with the Directors' knowledge and encouragement, the Criminal Insiders set out to do just that. To generate the cash necessary to purchase the bonds, the Criminal Insiders kicked their bond price-fixing fraud into high gear. Specifically, the Criminal Insiders caused Live Well to borrow funds based upon fraudulently inflated bond values they submitted to IDC and use those funds to purchase bonds. They then fraudulently inflated the values of the newly acquired bonds using scenario 14 and repeated the process again and again, up to the limits of their repo credit facilities. Using this scheme, the Criminal Insiders dramatically increased both the number of bonds in Live Well's portfolio and their reported values.

**ANSWER:**    Denied.

90.    The Criminal Insiders were able to borrow against the materially inflated bond values generated by scenario 14 by using repo lenders that would agree to rely exclusively on IDC's published prices, instead of other objective market inputs, to determine the bond values. Accordingly, the Criminal Insiders specifically targeted repo lenders that relied solely on IDC for bond prices, even if those repo lenders offered financing terms that were less favorable than those of lenders that obtained bond prices from sources other than IDC.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

91.    Because the Criminal Insiders had complete control over the bond prices submitted to IDC, they could set the published bond prices wherever they wanted and, by extension, fraudulently manufacture increased credit from the repo lenders.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

92.    Beginning in September 2015, the Criminal Insiders consistently submitted prices to IDC that were on average 29% higher than the purchase price Live Well paid for the bonds in arms-length market transactions, ***often on the same day***. The following table demonstrates the mechanics of the inflation scheme:

| Purchase Date | Bond | Purchase Price | Date of Submission | Value Submitted | Percentage Inflation |
|---|---|---|---|---|---|
| 09/11/2015 | GNR 2015-H14 AI | $12.8125 | 09/14/2015 | $15.3750 | 20.00% |
| 09/15/2015 | GNR 2013-H08 DI | $10.3906 | 09/15/2015 | $12.0469 | 15.94% |
| 09/15/2015 | GNR 2015-H16 DI | $13.6406 | 09/15/2015 | $16.8750 | 23.71% |

| 09/28/2015 | GNR 2015-H23 AI | $12.4063 | 09/28/2015 | $14.9700 | 20.66% |
|---|---|---|---|---|---|
| 09/17/2015 | GNR 2015-H12 BI | $12.4531 | 09/18/2015 | $14.7031 | 18.07% |
| 09/21/2015 | GNR 2015-H12 BI | $12.4531 | 09/18/2015 | $14.7031 | 18.07% |
| 09/28/2015 | GNR 2015-H22 CI | $12.7813 | 09/29/2015 | $15.6400 | 22.37% |
| 09/24/2015 | GNR 2015-H17 AI | $13.0000 | 09/25/2015 | $16.0938 | 23.80% |
| 09/24/2015 | GNR 2015-H06 DI | $11.0000 | 09/25/2015 | $14.1875 | 28.98% |
| 09/24/2015 | GNR 2015-H08 BI | $11.4375 | 09/25/2015 | $14.0313 | 22.68% |
| 10/07/2015 | GNR 2015-H08 BI | $11.3438 | 10/12/2015 | $14.6665 | 29.29% |
| 11/04/2015 | GNR 2015-H27 AI | $11.7500 | 11/04/2015 | $14.2500 | 21.28% |
| 11/13/2015 | GNR 2015-H29 JI | $12.1406 | 11/24/2015 | $15.3750 | 26.64% |
| 11/17/2015 | GNR 2015-H29 BI | $11.3125 | 11/24/2015 | $14.5626 | 28.73% |
| 12/01/2015 | GNR 2015-H30 CI | $11.6250 | 12/01/2015 | $15.4375 | 32.80% |
| 12/02/2015 | GNR 2015-H26 BI | $12.1250 | 12/02/2015 | $16.0625 | 32.47% |
| 12/03/2015 | GNR 2015-H28 BI | $9.2500 | 12/03/2015 | $11.8438 | 28.04% |
| 12/30/2015 | GNR 2015-H32 MI | $9.6906 | 12/30/2015 | $12.4375 | 28.35% |
| 12/30/2015 | GNR 2015-H32 AI | $11.9063 | 12/30/2015 | $15.8750 | 33.33% |
| 01/04/2016 | GNR 2015-H33 AI | $12.1094 | 01/04/2016 | $15.8750 | 31.10% |
| 02/25/2016 | GNR 2016-H04 DI | $10.9177 | 02/25/2016 | $14.7813 | 35.39% |
| 03/21/2016 | GNR 2016-H07 KI | $11.0938 | 03/25/2016 | $14.8750 | 34.08% |
| 04/01/2016 | GNR 2016-H07 KI | $11.2813 | 03/25/2016 | $14.8750 | 31.86% |
| 05/05/2016 | GNR 2016-H09 NI | $12.0625 | 05/10/2016 | $16.1894 | 34.21% |
| 05/11/2016 | GNR 2016-H11 LT | $1,643.00 | 05/25/2016 | $2,123.09 | 29.22% |
| 05/27/2016 | GNR 2016-H11 | $1,608.00 | 05/31/2016 | $2,054.03 | 27.74% |
| 06/08/2016 | GNR 2016-H11 LG | $1,608.00 | 06/08/2016 | $2,098.23 | 30.49% |
| 07/27/2016 | GNR 2016-H16 LX | $1,476.45 | 07/26/2016 | $1,930.75 | 30.77% |
| 08/26/2016 | GNR 2016-H17 AI | $14.4797 | 08/26/2016 | $20.0533 | 38.49% |
| 09/12/2016 | GNR 2016-H11 MI | $11.6875 | 09/12/2016 | $17.0620 | 45.99% |
| 09/29/2016 | GNR 2016-H17 BI | $12.1016 | 09/29/2016 | $17.1250 | 41.51% |
| 09/29/2016 | GNR 2016-H07 GI | $11.0000 | 09/29/2016 | $15.2813 | 38.92% |
| 10/25/2016 | GNR 2016-H23 MI | $15.1250 | 10/26/2016 | $18.2094 | 20.39% |
| 10/28/2016 | GNR 2016-H11 JI | $11.8438 | 10/31/2016 | $14.5313 | 22.69% |
| 11/29/2016 | GNR 2016-H24 BI | $14.2656 | 11/29/2016 | $17.7500 | 24.42% |
| 11/29/2016 | GNR 2016-H23 BI | $11.3281 | 11/29/2016 | $14.5625 | 28.55% |

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

93.     In this manner, the Criminal Insiders not only increased the size of Live Well's bond portfolio, but also increased the company's debt obligations at an even greater pace. These debt obligations, which could not be satisfied by the bond portfolio upon which they were based, would eventually wipe out all Live Well's legitimate assets and business operations.

**ANSWER:**   Denied.

94.     The Criminal Insiders also used their ability to set bond prices to generate liquidity whenever they needed it. When Live Well required additional cash to purchase additional bonds or repurchase bonds from their repo lenders, the Criminal Insiders simply submitted prices based on the amount of money they wanted to "harvest" from margin calls issued to its repo lenders. For example, in January 2016, a trading desk employee reported in an email, "[a]s it sits in IDC right this second we could harvest 850k. Depending on which exact prices we want to export itd [sic] be an additional 3.3-4.2M on top of that." Accordingly, the Criminal Insiders could, and routinely did, simply manipulate the prices given to IDC to produce the amount of cash they desired.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

95.     Hild aptly described this fraudulent scheme on a phone call with Live Well's bond trading desk: "***it is a little bit of a self-generating money machine, right?*** In that if you buy [HECM IO bonds] in the marketplace and then apply this methodology, ***every single time you do that, you're gonna free up additional borrowing capacity, right?***"

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

96.     The money the Criminal Insiders "harvested" in this way, however, came at a significant expense to Live Well. Every margin call Live Well issued to one of its lenders resulted in a dollar for dollar increase in the outstanding loan amount and came with an increased interest cost. Thus, although obtaining additional financing in this way permitted the Criminal Insiders to fraudulently inflate the value of the Live Well bond portfolio on its financial statements, it also increased Live Well's liabilities beyond what the true market value of the bonds could cover.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

97.     The Directors—all highly sophisticated investors and financial professionals who had been briefed on the details of scenario 14—knew that the apparent dramatic changes in the fortunes of the company's bond portfolio, and the mechanics of the strategy as a whole, made no sense.

**ANSWER:**     Denied.

98.     Indeed, the board received regular updates from the Criminal Insiders touting the performance of the bond portfolio, and the longer the scheme went on, the less sense it made. For example, the December 2015 Management Report, reviewed at the December 17, 2015 board meeting, showed the bond portfolio's market value, notional face value, interest revenue, and cash flow as almost flat from January to September of 2015. Then, from September to December 2015— after the Criminal Insiders had changed their internal valuation methodology (and had begun materially inflating the bond prices)—all of these graphs show a sudden, hockey-stick increase. For example, the Criminal Insiders told the Directors that the market value of the bond portfolio

had jumped from approximately $50 million in August 2015 *to $218 million* by December 2015—all in a market that was allegedly under-pricing the bonds.



**ANSWER:** Paragraph 98 appears to cite to the December 2015 Management Report which speaks for itself, and any mischaracterization thereof is denied. Preferred Shareholder Defendants deny any remaining allegations.

99. Then again, *just five months later*, the May 2016 Management Report to the board showed the same trends as the apparent market value of the portfolio had grown *to $350 million*.



**ANSWER:**    Paragraph 99 appears to cite to the May 2016 Management Report which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations.

100.    This trend continued throughout 2016 and, by September 2016, just one year after the Criminal Insiders began setting the bond values based upon scenario 14, the reported value of Live Well's bond portfolio had increased to over $458 million. In other words, although the performance of Live Well's bond portfolio during its first year was largely flat, during the following year the reported value had miraculously increased by over 900%. The only explanation offered for this dramatic change was the implementation of scenario 14, the internal valuation methodology that had been so enthusiastically embraced by the Directors back at the November 2015 board meeting. Significantly, however, the Directors also knew that Live Well's bond-related debt was increasing at the same rate—indicating that Live Well was borrowing against the bond valuations generated by scenario 14.

**ANSWER:**    Denied.

101.    But, while the scenario 14 valuation methodology could potentially account for the internal values that Live Well assigned to its bond portfolio and perhaps inform the company's decisions about which bonds to buy, scenario 14 could not account for the unvarying dramatic upward trend—or, even more importantly, the absence of any downward volatility—in the market prices of the bonds Live Well had purchased. Nor could it explain Live Well's apparent ability to borrow against scenario 14 values.

**ANSWER:**    Denied.

102.    The entire value proposition of Live Well's bond portfolio, as represented by Hild to the board, was that Live Well knew something that the rest of the market did not. That knowledge—

*i.e.*, the scenario 14 valuation methodology—is what purportedly allowed Live Well to identify and purchase bonds that the market supposedly undervalued. But, as the Directors knew, to purchase those supposedly undervalued bonds, Live Well relied upon repo financing. And, as the Directors also knew, Live Well's repo lenders only lent against a discount (*i.e.*, a haircut) off the amount they could reasonably expect to receive if they sold the bonds on the market. But that amount was necessarily materially lower than the values generated by scenario 14 because the market, according to Hild, did not have access to this new valuation methodology.

**ANSWER:**    Denied.

103.    In other words, the Directors knew, or were willfully blind in not knowing, that Live Well could not finance its bond portfolio with repo financing based upon Live Well's top secret valuation methodology unless the Criminal Insiders were committing fraud and putting the entire business at risk in the process.

**ANSWER:**    Denied.

104.    Indeed, the only way the Criminal Insiders could generate the cash they did through the bond portfolio, and increase the apparent value of the bond portfolio from approximately $50 million to over $458 million in just one year, was by defrauding Live Well's repo lenders into lending it far more than the bonds could cover or the company could ever hope to repay.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

105.    And that is exactly what the Criminal Insiders did. Between September 2015 and September 2016, with the Directors' knowledge, Live Well borrowed hundreds of millions of dollars from its repo lenders based upon fraudulently inflated bond prices generated using

scenario 14. In just one year, using the scheme described above, Live Well increased the amount of its bond-related debt from $124 million to over $381 million. Of course, the amount of these borrowings was based upon the fraudulently inflated bond prices. As a result, and as discussed in more detail below, the actual realizable market value of Live Well's bond portfolio could not cover these debts, and the deficiency far outstripped the value of all Live Well's legitimate assets and business operations by a significant margin, rendering the company insolvent.

**ANSWER:**    Denied.

106.    In short, based on their knowledge of the mechanics of Live Well's repo financing, Live Well's repayment obligations under its repo agreements, the sudden meteoric growth of both the reported value and size of Live Well's bond portfolio based entirely upon scenario 14, the lack of any downward volatility in the bond prices of Live Well's bonds immediately *after* the implementation of scenario 14, the inherent contradictions in the investment strategy as a whole, and their significant experience as investors and businessmen, the Directors either knew, or were willfully blind in not knowing, of the Criminal Insiders' fraud and the risks it posed to Live Well. Indeed, as Hild would lament in late 2016 in connection with Rome's and Karides's imminent resignations from the board, the Directors knew the "playbook . . . for how to do the securities work that we currently do"—*i.e.*, fraudulently generating value and "ginning cash" at the expense of Live Well's repo lenders and, ultimately, Live Well itself.

**ANSWER:**    Denied.

107.    Thus, the Directors knew, or were willfully blind in not knowing, that the Criminal Insiders' fraudulent inflation of the bond values meant that Live Well's debt obligations on repo agreements involving those bonds far exceeded the realizable value Live Well (or its repo lenders) could obtain from selling those bonds in the market—putting all of the company's assets at risk any

time a repo lender called its debt. Indeed, by as early as May or June 2016, based upon the size of the debt obligations Live Well incurred in furtherance of the scheme, any event of default or a discovery of the fraud would have destroyed the entire company—the bond portfolio would collapse and take all of Live Well's legitimate business operations along with it.

**ANSWER:**    Denied.

108.    Nevertheless, in violation of their fiduciary duties as directors of a Delaware corporation, the Directors not only permitted the fraud to continue unabated, but also encouraged the Criminal Insiders to purchase more and more bonds using financing based upon scenario 14 valuations, putting the company further and further at risk. Rather than step in to protect the company from this obvious and ruinous investment fraud, the Directors ignored the numerous red flags and blindly chose to believe in the convenient fiction that the bond portfolio was wildly successful because it suited their own individual interests to do so.

**ANSWER:**    Denied.

109.    Their motivation: greed. In less than a year, from August 2015, when the fraud first began to ramp up, to July 2016, when several of the Directors either resigned or began to negotiate their resignations, Live Well's reported stockholder equity increased from $53 million to over $108 million after remaining mostly flat for years. This increase, based almost entirely upon the shift to using scenario 14 to value Live Well's bonds and the Criminal Insiders' fraudulent scheme, ultimately benefited the Directors, and in the case of Rome and Karides—who managed to cash in at close to the peak of the fraud—the Preferred Stockholders they represented.

**ANSWER:**    Denied.

**D.     The Debt-Financed Expansion of Live Well's Bond Portfolio Based upon the Criminal Insiders' Fraudulent Bond Price-Fixing Scheme Rendered Live Well Hopelessly Insolvent by No Later Than June 2016.**

110.     As a result of the Criminal Insiders' fraud, Live Well incurred debt obligations to its repo lenders that were greater than the actual realizable market value of the bonds that were subject to the repo agreements. In other words, Live Well effectively borrowed more money from its repo lenders than the bonds upon which those loans were based could support. As Live Well purchased more bonds, and borrowed more money from its repo lenders based upon the fraudulently increased values of its existing bonds, the gulf between the value of the bonds and Live Well's bond-related debt obligations increased—and rapidly created a deficiency that overtook the fair-market value of Live Well's legitimate assets and business operations, rendering the company insolvent.

**ANSWER:**     Denied.

111.     For example, in September 2015, when the Criminal Insiders began to ramp up their fraud, the deficiency between Live Well's bond-related debt and the value of the bonds was around $9 million. Over the next several months, as Live Well purchased more bonds, and borrowed more money, based upon the Criminal Insiders' fraudulently inflated bond prices, that deficiency grew exponentially. By, at least June 2016, if not earlier, the deficiency between Live Well's bond-related debt and the market value of its bonds was sufficient to render not just Live Well's bond business, but the entire company insolvent.

**ANSWER:**     Denied.

112.     Specifically, by June 2016, Live Well had incurred over $336 million in debt obligations to its repo lenders based upon fraudulent bond values. The estimated actual realizable market value of the bonds that supported that debt, however, was less than $222 million—creating a deficiency of at least $114 million. During the same time period, the fair-market value of Live

Well's legitimate assets and business operations was less than $84 million—rendering Live Well balance-sheet insolvent by approximately $30 million.

**ANSWER:**    Denied.

113.    The size of Live Well's equity deficit (*i.e.*, insolvency) continued to grow along with the growth of Live Well's debt-financed bond portfolio. Indeed, by year-end 2016, Live Well was balance-sheet insolvent to the tune of almost $80 million and remained insolvent until its ultimate collapse into bankruptcy.

**ANSWER:**    Denied.

114.    Moreover, also by at least June 2016, Live Well had become unable to pay its debts as they came due, undercapitalized, and doomed to failure. To be sure, by at least 2016, Live Well had insufficient capital to repurchase its bonds from its repo lenders when the terms of the repo agreements expired.

**ANSWER:**    Denied.

115.    Every time the term of one of Live Well's repo agreements expired (a routine occurrence because repo agreements are short-term financing arrangements), Live Well was required to repurchase the bonds subject to the expiring agreement. As a result of the bond fraud, however, the value of Live Well's repo'd bonds could not cover the amounts owed to the repo lender whose debt had come due and Live Well did not have sufficient liquidity to cover the difference. Thus, Live Well could only survive, and in fact only did survive, so long as it could either convince its repo lenders to enter into new repo agreements, effectively rolling the bonds over for another term based upon their fraudulently inflated values, or defraud other repo lenders into purchasing the bonds at the fraudulently inflated values.

**ANSWER:**    Denied.

116. In other words, Live Well could only satisfy its debts as they came due through the Criminal Insiders' ongoing fraud. And, as such, its ultimate collapse was only a matter of time. Indeed, as discussed below, Live Well's inevitable demise finally came when its repo lenders demanded that Live Well repurchase its bonds pursuant to the terms of the repo agreements and the Criminal Insiders had run out of new repo lenders to defraud.

**ANSWER:** Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

**V.  The Directors Breach their Fiduciary Duties of Good Faith and Loyalty by Handing Complete Control of Live Well to Hild with Knowledge that He Intended to Loot the Company.**

117. As the Criminal Insiders' bond fraud ramped up, so did Hild's unreasonable demands for additional compensation. Although Cantor willingly acquiesced to Hild's demands, the remainder of the board initially sought to block Hild's attempts to loot the company solely for his own benefit through the payment of, among other things, exorbitant guaranty fees. When they did, Hild seized control of the company and its purse strings by offering Rome and Karides a bribe to walk away—a bribe they willingly accepted in violation of their fiduciary duties.

**ANSWER:** Preferred Shareholder Defendants admit that the board rejected Mr. Hild's demands for additional compensation. Preferred Shareholder Defendants deny the remaining allegations and characterizations in Paragraph 117.

**A.  Hild's Demand for Unreasonable Compensation Creates a Corporate Governance Crisis.**

118. Since founding Live Well in 2005, Hild had personally guaranteed all, or substantially all, of Live Well's mortgage warehouse debt (but not its bond-related repo debt). Given the value of the reverse and forward mortgage assets at issue, Hild had little, if any, actual

risk on these personal guarantees, which would have been triggered only if Live Well, the primary

obligor, was unable to pay (an unlikely event absent Hild's fraud).

**ANSWER:** Preferred Shareholder Defendants lack knowledge or information sufficient

to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are

denied.

119.   The mortgage warehouse debt was secured by Live Well's legitimate assets,

including, among other things, the underlying mortgage loans, liens, the properties that secured

those liens, and servicing rights, among other assets. Thus, the mortgage warehouse debt was, at

all relevant times to this Complaint, fully secured.

**ANSWER:** Preferred Shareholder Defendants lack knowledge or information sufficient

to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are

denied.

120.   Notwithstanding, Hild routinely insisted that he be compensated in the form of

guarantee fees for taking on this personal risk. But, prior to 2016, the board had never resolved

how much Hild should be compensated for guaranteeing Live Well's warehouse debt. Rome in

particular was not willing to sign-off on the guarantee fees Hild demanded.

**ANSWER:** Preferred Shareholder Defendants admit that the board rejected Mr. Hild's

demands for additional compensation.  Preferred Shareholder Defendants deny the remaining

allegations and characterizations in Paragraph 120.

121.   The issue came to a head as Live Well's apparent value was skyrocketing based

primarily upon the fraudulently inflated value of Live Well's bond portfolio. In February 2016,

Cantor lobbied Rome, on Hild's behalf and at Hild's direction, to pay Hild guarantee fees at far

above market rates. In an email to Rome dated February 24, 2016, after getting Hild's express

approval, Cantor attempted to persuade Rome to sign off on granting Hild 1.5% annual guarantee

fees, in cash, based upon the maximum amount of each warehouse line of credit.

**ANSWER:**    Denied.

122.    Rome flatly rejected this proposal. Rome thought the rate was off-market based

upon the low risk involved and suggested the median one-year T-bill rate (0.25%) was a better

benchmark. Rome also disagreed that the fees should be based on the full lines of credit, noting

that they should be based on the lesser of the amount guaranteed and the amount actually at risk—

Hild's personal net worth. "If I have a net worth of $1,000 but sign a personal guarantee for $1

trillion," Rome pointed out, "should I get paid a percentage of $1 trillion for this guarantee?" Rome

also objected to the fees being paid in cash, suggesting stock or option payments instead; but Rome

added the caveat—betraying his true loyalties—that cash guarantee fee payments to Hild should

be off the table at least until dividends had been paid out to the Preferred Stockholders. The

message was clear: Rome would not sign off on Hild's fees, unless and until he and the rest of the

Preferred Stockholders got paid first.

**ANSWER:**    Paragraph 122 appears to cite to e-mail communications which speak for

themselves, and any mischaracterization thereof is denied. To the extent a further response is

required, Preferred Shareholder Defendants admit that the board rejected Mr. Hild's demands for

additional guarantee fees.  Preferred Shareholder Defendants deny any remaining allegations.

123.    After several months of frustration that his demands were not met, Hild took matters

into his own hands. Specifically, Hild had Rohr, Live Well's CFO and Hild's coconspirator in the bond

fraud, send an email, dated May 26, 2016, to the board stating: "I have been advised going forward

that Michael will no longer provide his personal guarantee in support of our various debt facilities

unless the Company pays him a Letter of Credit or guarantee fee." Rohr went on to say that he would

pay Hild a 1.5% annualized fee on the full line size, to be paid monthly, so that dialogue could continue with the board. Rohr explained, "Without these personal guarantees these borrowing facilities would not be available to the Company and we would immediately go into default . . . . Given this situation the decision was made to pay the guarantee fee vs. the alternative."

**ANSWER:**    Paragraph 123 appears to cite to e-mail communications which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations, including the substantive allegations made in the quoted statements.

124.    Rome immediately objected, noting that it violated the company's bylaws to take such an action without board approval. Karides and Goldstein joined the chorus, requesting that no payments be made until the board resolved the issue. Rohr rushed to defend his actions as vital to the company's survival, noting that one of Live Well's credit facilities needed to be renewed that day and Hild "flat out refused" to sign the personal guarantees without a guarantee fee agreement in place.

**ANSWER:**    Preferred Shareholder Defendants admit that the board  rejected Mr. Hild's attempts to obtain additional guarantee fees.  Preferred Shareholder Defendants deny any remaining allegations, including the substantive allegations made in the quoted statements.

125.    Rome, Karides, and Goldstein, however, did not immediately cow to Hild's threats. Rather, at first, they appeared to act in the company's interests by suggesting a special board meeting be held on July 1 to resolve the issue.

**ANSWER:**    Preferred Shareholder Defendants admit that the board rejected Mr. Hild's attempts to obtain additional guarantee fees.  Preferred Shareholder Defendants deny any remaining allegations.

126.   On June 30, Rome circulated two draft resolutions to the board: (i) a Special Committee Resolution forming a special committee to determine the amount of guarantee fees to pay Hild, and (ii) a CEO Payments Resolution clarifying that any payments to the CEO must first be approved by the board. The proposed Special Committee Resolution named Rome as the chairs and authorized the committee to seek counsel from lawyers, investment bankers, and other professionals.

**ANSWER:**   Preferred Shareholder Defendants admit that the board circulated two draft resolutions for consideration.  The remainder of Paragraph 126 appears to describe the two draft resolutions which speak for themselves, and any mischaracterization thereof is denied.

127.   Hild was livid that the board was challenging him and escalated his threats from simply destroying the company to threatening legal action against any Director that approved Rome's draft resolutions. Specifically, in response to the resolutions, Hild wrote:

> I will remind you, that directors are personally responsible in their fiduciary responsibility from a duty of care perspective for avoiding taking actions that cause the company to incur losses. Specifically, each director must avoid actions that will cause the company to become insolvent, fail, lose its regulatory approvals, incur losses, or cause the guarantor to refuse to keep his guarantees in place so that it may may [sic] no longer continue operating as a going concern . . . .

> Should any director conspire to forcibly implement such actions, or cause others to implement such actions, that cause losses for the Company, its shareholders, insurers, bonding companies, or regulators and described above, the Company (and myself as the Company's largest shareholder, and almost certainly the insurers, regulators, and bonding companies), will pursue each director personally for remuneration caused by those actions.

> Don't claim you haven't been warned.

**ANSWER:**   Paragraph 127 appears to cite to documents and/or communications which speak for themselves, and any mischaracterization thereof is denied.   Preferred Shareholder Defendants deny any remaining allegations.

128.    In the face of these threats, Rome sought outside legal advice for the board regarding the creation of a special committee. Rome's attempt to get outside legal counsel for the board further inflamed Hild. In response to Live Well's strong June 2016 year-to-date financial results—generated through the fraudulent bond price-fixing scheme—Hild accused Rome of "interference" with the company's success and demanded Rome's resignation from the board for orchestrating an "ill purposed legal agenda."

**ANSWER**:    Paragraph 128 appears to cite to documents and/or communications which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations.

129.    Nevertheless, the board set a meeting to vote on revised versions of Rome's resolutions for July 20. With his back against the wall, Hild became desperate and again raised the stakes. Immediately before the board meeting on July 20, Hild sent an email to the board and Rohr giving "official written notice" that he was "OFFICIALLY REVOKING" his personal guarantees to Live Well's creditors. But Hild underscored, "this Personal Guarantee Revocation SHALL NOT APPLY IF the company continues to make the guarantee fee payments . . . , AND these resolutions (or any semblance thereof) are not passed, AND the personal guarantee agreements are fully approved by the Board of Directors in due course." The letter further instructed Rohr to immediately notify the lenders of Hild's revocation of the guarantees after the board meeting if the board passed the resolutions.

**ANSWER**:    Paragraph 129 appears to cite to documents and/or communications which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations.

130.    Hild, of course, knew his anticipatory breach of his guarantee obligations (the guarantees themselves were irrevocable) could cause numerous defaults under Live Well's existing lending arrangements, which would result in an immediate wind down of the company risking significant damage to every stakeholder. Nevertheless, Hild attempted to hold the company hostage to get what he wanted. And what he wanted, at bottom, was the power to pay himself as much money as he saw fit.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

131.    At the July 20, 2016 board meeting, Rome, Karides, and Goldstein called Hild's bluff and voted in favor of the Special Committee Resolution and the CEO Payments Resolution. Hild and Cantor voted against both resolutions. Accordingly, both resolutions were adopted and approved.

**ANSWER:**    Preferred Shareholder Defendants admit that a board meeting was held on July 20, 2016 during which the board approved the Special Committee Resolution and the CEO Payments Resolution.  Preferred Shareholder Defendants deny any remaining allegations.

132.    Hild continued to threaten to cause Live Well to fail by "revoking" his guarantees if the Special Committee did not agree to his demands. Hild, however, knew, as did the board, that his threats to sink the company were empty because if he did so, the bond price-fixing scheme would immediately collapse and the rampant criminal activities of the Criminal Insiders would be revealed.

**ANSWER:**    Denied.

133.    Undeterred, however, Hild had already begun working on another solution if the board did not comply with his demands: get Rome and Karides to resign, leaving him and his lackey, Cantor, with complete control over the board and Live Well.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

**B.    The Directors Breach their Fiduciary Duties in Connection with the Preferred Stock Repurchase.**

134.    Hild was desperate to neutralize Rome's influence on the board that was preventing him from funneling money from the fraudulent bond price-fixing scheme to himself and the other Criminal Insiders. To that end, Hild devised a scheme to give Rome what he had made clear he wanted: a bribe to walk away.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

135.    By no later than July 19, 2016, Hild began seeking the advice of the company's outside general counsel on whether and how he could cause Live Well to repurchase Rome's preferred stock to get him off the board. Originally, Hild focused his attention entirely on Rome, writing: "The objective is to buy all of Brett [Rome]'s shares, and only Brett's shares." Eventually, however, Hild realized that he needed to clear out all of the Preferred Stockholders to take complete control of the board and thus the company.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

136.     On that same day, Hild had Rohr send a draft term sheet for a Series A-2 and Series A-1 preferred stock repurchase (the "Preferred Stock Repurchase") to Live Well's outside general counsel. In furtherance of Hild's goals and in violation of his own duties to the company, on the morning of July 20, company counsel suggested adding Rome's resignation from the board as a closing condition. Live Well's counsel, however, also advised against including any closing conditions regarding any special committee, "to avoid any possible support for an allegation that the Company is using corporate assets to buy out the Director who has been most opposed to the [guarantee fee] terms Michael [Hild] has put forth." Of course, that is exactly what Hild was proposing to do, and all of the Directors knew it. In any event, counsel pointed out that the post-closing board could rescind any action of the existing board regarding a special committee.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of Hild's actions or his discussions with counsel as set forth in this paragraph; therefore, such allegations are denied.  Preferred Shareholder Defendants deny the remaining allegations.

137.     Hild accepted these changes and had Rohr send the draft term sheet to the board before the July 20, 2016 board meeting. The original draft term sheet for the Preferred Stock Repurchase proposed that the company would repurchase the preferred stock for an amount equal to the original purchase price of the preferred stock plus any accrued dividends—a total amount of just over $18 million—and called for Rome's resignation as a condition of closing.

**ANSWER:**     Paragraph 137 appears to cite to the Preferred Stock Repurchase Agreement, which is a document that speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a

belief about the truth of Hild's actions as set forth in this paragraph; therefore, such allegations are denied. Preferred Shareholder Defendants deny the remaining allegations.

138.    During the July 20, 2016 board meeting, after the board had passed Rome's proposed Special Committee Resolution to determine the appropriate amount guarantee of Hild's fees and CEO Payments Resolution prohibiting further payments to Hild without board approval, the Preferred Stock Repurchase term sheet was briefly discussed. Despite's Hild's outrageous behavior over the past several months and the obvious risks he posed to the company, Rome and Karides appeared to be open to the transaction as a path forward and, on Cantor's motion, agreed to stay the effectiveness of the CEO Payments Resolution pending further discussions the next week on July 27.

**ANSWER:**    Preferred Shareholder Defendants admit that a board meeting was held on July 20, 2016 and that the board voted and approved the two resolutions.  Preferred Shareholder Defendants admit that the board stayed the adoption and approval of the CEO Payments Resolution until the July 27, 2016 board meeting.  Preferred Shareholder Defendants deny the remaining allegations.

139.    While the term sheet was being considered, on July 23, 2016, Hild emailed Cantor informing him that unless: (i) the board signed off on the guarantee fees he demanded, or (ii) the Preferred Stockholders fully subscribed to the Preferred Stock Repurchase offer, Hild was prepared to wind down the company—ensuring that if he did not get what he wanted (*i.e.*, unfettered control of Live Well), no one would get anything.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

140.    Four days later, the board met again for its scheduled July 27 meeting. This time, the conversation had changed. The focus of the board was now firmly on the proposed Preferred

Stock Repurchase. Karides's and Rome's affiliated entities collectively owned nearly three quarters of the preferred stock outstanding, and they had apparently decided to seize the opportunity to cash out while they still could, subject to further negotiations on, among other things, the repurchase price—which would be entirely funded by Live Well.

**ANSWER:**    Preferred Shareholder Defendants admit that a meeting of the board occurred on July 27, 2016 and that during the meeting the Preferred Stock Repurchase was discussed.  Preferred Shareholder Defendants deny the remaining allegations.

141.    In light of the Preferred Stock Repurchase offer, Rome and Karides backed off the issue of Hild's guarantee payments. They also confirmed the obvious *quid pro quo* between them and Hild by recusing themselves from voting on any further resolutions regarding Hild's guarantee fees, despite the fact that they were still directors of Live Well and still owed the company the duty of absolute, and undivided loyalty.

**ANSWER:**    Denied.

142.    Hild's bribe had worked better than even he intended. Immediately after Rome and Karides revealed their intention to take Hild's bribe and back off the guarantee fee issue, Goldstein had seen enough and informed the board that he was resigning, effective immediately.

**ANSWER:**    Denied.

143.    With Rome and Karides abstaining on voting on Hild's guarantee fees and Goldstein gone, the board approved a resolution to form a Guarantee Compensation Committee with a single member: Cantor. But as the remainder of the board knew, Cantor was in Hild's pocket and would cede complete control to Hild once the other Directors were out of the way. Indeed, as discussed below, Cantor was a long-time confidant of Hild and willingly went along with whatever Hild wanted, so long as Hild continued to funnel money his way. And just one week earlier, Cantor

had voted with Hild ***against*** the formation of any special committee charged with resolving the amount of Hild's guarantee fees.

**ANSWER:**    Denied.

144.    The board also determined at the July 27, 2016 meeting that another special committee would be formed to authorize the Preferred Stock Repurchase. When the special committee was eventually formed, it also had a single member: Cantor. As everyone knew, the deck was now stacked against the company: Cantor would rubber stamp whatever agreement or guarantee fee Hild wanted; Goldstein was gone; and Hild, Rome, and Karides were essentially negotiating, in their respective self-interests and against the interests of Live Well, the terms of a *quid pro quo* that would line their own pockets and the pockets of the Preferred Stockholders at Live Well's expense.

**ANSWER:**    Denied.

145.    Over the next several weeks, the Preferred Stockholders, led by Rome and Karides, continued to negotiate the terms of the Preferred Stock Repurchase. Ultimately, the parties agreed that Live Well would repurchase all the outstanding preferred stock for $29 million—$18 million in cash and $11 million in notes payable—representing a stock price based upon the company's financial statements, which were, of course, grossly overstated as a result of the ongoing bond fraud. In addition, as Hild had insisted, Rome and Karides would resign from the board as a closing condition of the transaction.

**ANSWER:**    Denied.

146.    While these negotiations were ongoing, on or about August 23, 2016, Cantor, as the sole member of the Guarantee Compensation Committee, signed off on paying Hild a $221,917.81 guarantee fee for the month August. Given Cantor's voting history on these issues and his ties to Hild,

this was a foregone conclusion after Rome and Karides agreed to accept Hild's bribe. And Rome and Karides knew without a doubt that, after their resignations, Hild would continue to take as much as he could from the company and Cantor would not stand in his way.

**ANSWER:**   Denied.

147.   As further evidence for this inescapable conclusion, on August 30, 2016, Cantor signed off on the payment of Hild's September guarantee fee despite lacking the authority to do so. The resolution the board passed creating the Guarantee Compensation Committee only allowed fees to be paid to Hild through August without full board approval. Nevertheless, as Hild's man on the inside, Cantor approved this illegal payment.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

148.   One month later, on September 30, 2016, the Preferred Stock Repurchase deal closed, at Hild's direction and rubber-stamped by Cantor on the company's behalf. Per the terms of the agreement, at closing Rome and Karides resigned from the board, and the Preferred Stockholders received the following payments: (i) LWFVEST, LLC, the entity affiliated with Karides's firm V-Ten, received $9 million in cash plus a $5,500,000 note (ii) North Hill, a fund of Rome's venture capital firm North Hill Ventures, received at least $3,864,349.78 in cash plus a $2,361,547.09 note; (iii) Five Elms Equity Fund I, L.P. received $2,976,457.40 in cash and a $1,1818,946.19 note; (iv) Five Elms Haakon, L.P. received $181,614.35 in cash and a $110,986.55 note; (v) Five Elms Coinvest, L.P. received $171,524.66 in cash and a $104,820.63 note; (vi) James Brown received $1,176,457.40 in cash and a $718,946.19 note; (vii) Gantcher Family Limited

Partnership received $450,000 in cash and a $275,000 note; and (viii) Eric Legoff received $179,596.41 in cash and a $109,753.36 note.

**ANSWER:**   Paragraph 148 appears to cite the Preferred Stock Repurchase which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations.

149.   Each of these payments, along with the notes the Preferred Stockholders received, constituted an unlawful stock repurchase because Live Well was hopelessly insolvent at the time of the transaction due to the crushing debt obligations the company had already incurred in connection with the Criminal Insiders' fraudulent bond price-fixing scheme. Further, each of the Directors knew of, should have known of, or were willfully blind to this fact. Moreover, because the company was insolvent at the time of the repurchase, the preferred stock had no value.

**ANSWER:**   Denied.

150.   For each quarter following the September 30, 2016 closing of the Preferred Stock Repurchase, beginning in or about December 2016 through in or about March 2019, Hild and Cantor caused Live Well to make so-called "interest payments" to the Preferred Stockholders on account of the notes. These quarterly interest payments totaled not less than $1,650,000 in the aggregate.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

151.   All of the interest payments that Hild and Cantor caused Live Well to make to the Preferred Shareholders were paid in furtherance of, and to conceal, the Criminal Insiders' fraudulent scheme. Indeed, any default on the notes would have created a substantial risk that the

Criminal Insiders' and the Directors' wrongdoing would be discovered. At the very least, any failure by Live Well to make the interest payments would have spurred the Preferred Stockholders not otherwise involved in the Criminal Insiders' fraudulent scheme into taking a closer look at Live Well's financials and to begin asking difficult questions about Live Well's financial situation—an inquiry that would have, inevitably, resulted in the discovery of Live Well's insolvency and the fraudulent bond scheme.

**ANSWER:**   Denied.

152.   Moreover, the quarterly interest payments served no legitimate business purpose because Live Well received no consideration in exchange for granting the Preferred Stockholders the notes upon which the interest payments were based. Indeed, as discussed above, Live Well was insolvent when it issued the notes to the Preferred Stockholders, rendering the preferred shares that Live Well purportedly purchased from them worthless.

**ANSWER:**   Denied.

153.   Nevertheless, in breach of their fiduciary duties of loyalty and good faith, each of Rome, Karides, Cantor, and Hild participated in or approved the Preferred Stock Repurchase, and Hild and Cantor approved the interest payments on the notes, for their own individual benefits and to the detriment of Live Well.

**ANSWER:**   Denied.

154.   For their parts, Rome and Karides breached their duties of loyalty and good faith by accepting and supporting the Preferred Stock Repurchase as a *quid pro quo* for their resignations from the board. In other words, they cashed out their worthless preferred stock in Live Well for a substantial profit in exchange for giving Hild free reign to loot the company at his leisure. In short, Rome and Karides took the money and ran to the detriment of Live Well.

**ANSWER:**    Denied.

155.    Hild's conflicts in the transactions were glaringly obvious. Hild pulled the strings to force the approval of the Preferred Stock Repurchase despite knowing full well that the preferred stock was worthless and that Live Well did not have the cash to fund the purchase price. Indeed, Hild generated the funds to pay off the Preferred Stockholders by tapping Live Well's repo lenders for more funds by, once again, fraudulently inflating the values of Live Well's HECM IO bonds.

**ANSWER:**    Denied.

156.    For example, during the period leading up to closing, Hild caused Live Well's trading desk employees to submit to IDC the following fraudulently inflated bond price quotes:

- On July 26-27, 2016, a price quote was submitted that was 30.77% higher than the market price Live Well had just paid for that bond.

- On August 26, 2016, a price quote was submitted that was 38.49% higher than the market price Live Well had just paid for that bond.

- On September 12, 2016, a price quote was submitted that was 45.99% higher than the market price Live Well had just paid for that bond.

- On September 29, 2016, two price quotes were submitted that, respectively, were 38.92% and 41.51% higher than the market price Live Well had just paid for that bond.

- The price quotes submitted on August 26 and September 12 and 19, 2016, during the run up to the closing of the Preferred Stock Repurchase, were the ***most inflated fraudulent bond price quotes*** submitted to IDC at Hild's direction during the period from September 2015 through November 2016.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

157.    The price quotes submitted on August 26 and September 12 and 19, 2016, during the run up to the closing of the Preferred Stock Repurchase, were the most inflated fraudulent bond

price quotes submitted to IDC at Hild's direction during the period from September 2015 through November 2016.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

158.    Cantor, as the sole member of the special committee that approved the Preferred Stock Repurchase, also stood on both sides of the transaction because his loyalties were divided between the company and Hild, who, as discussed below, compensated Cantor handsomely for bending to his will.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

159.    Furthermore, both Hild and Cantor had another reason to get Rome, in particular, off of the board. The board had been discussing directorial compensation issues for years with no resolution. For over a year, Rome had been specifically objecting to paying Hild a director fee as an inside director, and Hild would not allow any director fees to be paid if he was excluded. Shortly after Rome and Karides resigned, Cantor was able to pass a resolution to pay himself and Hild over $1 million each in "historical" director fees. Thus, Cantor was also conflicted in the Preferred Stock Repurchase that was, on its face, grossly unfair to the company, and he approved the deal based upon his own interests in violation of the duty of loyalty that he owed Live Well.

**ANSWER:**    Preferred Shareholder Defendants admit that the board rejected Mr. Hild's demands for additional compensation.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth about anything that occurred after Mr. Rome

and Mr. Karides resigned from the board; therefore, such allegations are denied. Preferred Shareholder Defendants deny any remaining allegations and characterizations in Paragraph 159.

160.    Perhaps most shockingly, Cantor and Hild were so desperate to remove Rome and Karides that they further violated their fiduciary duties to Live Well by purporting to release any claims the company may have against Rome, Karides, and the Preferred Stockholders as part of the Preferred Stock Repurchase. To that end, Hild executed, and Cantor approved, a Separation and Release Agreement (the "Release") on behalf of Live Well. The Release purports to waive and release all of Live Well's claims for any cause of action against the Preferred Stockholders, including "any claim that any present or former director of the Company breached the fiduciary duties that he owed to the Company."

**ANSWER:**    Paragraph 160 appears to cite to the Separation and Release Agreement which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations.

161.    To be sure, all the Directors involved in the Preferred Stock Repurchase knew they were acting in bad faith by elevating their own interests over those of the company in violation of their fiduciary duties. And this purported Release was the icing on the cake. Not only did Rome, Karides, Hild, and Cantor breach their fiduciary duties and defraud the company by approving and entering into the transaction, but they also went a step further by attempting to ensure that the company could never hold them liable for the very breaches of fiduciary duty they were committing in connection with the transaction.

**ANSWER:**    Denied.

162.    This purported Release serves only as evidence of the fact that the remaining Directors knowingly breached the duties they owed the company and defrauded the company by

causing it to repurchase Live Well's worthless preferred stock. As such, the Release, along with the Preferred Stock Repurchase generally, is void and completely unenforceable because (i) the Release itself constituted a breach of fiduciary duty, and (ii) it was procured through fraud and the breaches of fiduciary duty of the Directors. Indeed, the Release was ultimately approved solely by Cantor (and executed by Hild) on behalf of the company. Cantor, of course, as discussed above, was conflicted in the transaction and was acting in his own and Hild's interests—and not the interests of Live Well—in approving the Release.

**ANSWER:**    Denied.

VI.    **Cantor Continues to Breach His Fiduciary Duties to Live Well Until the Company Finally Collapses Under the Weight of the Bond Fraud.**

163.    After the Preferred Stock Repurchase, Cantor remained on the board as little more than a rubber stamp for Hild's agenda of personal enrichment. Cantor enabled the systematic looting of Live Well by Hild and the Criminal Insiders in exchange for massive director fees and a steady stream of business from Hild through his other business ventures. Notably, over $6.6 million of Hild's ill-gotten income from Live Well passed through Title Works, Cantor's title company, in connection with various real estate deals in which Hild was involved and from which Cantor and his company, Title Works, received substantial fees. In other words, at all relevant times, Cantor had a direct financial incentive to keep Hild happy.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

164.    And that is exactly what he did in violation of his fiduciary duties to Live Well. Indeed, Cantor had a long track record of supporting anything Hild wished to do, no matter how unreasonable it was on its face. For example, prior to the Preferred Stock Repurchase, Cantor had

long been trying to convince Rome and the other directors to sign off on Hild's guarantee fees. In one February 2016 email exchange, Hild told Cantor he had "No ideas yet on how to incentivize Brett [Rome] to negotiate" regarding the guarantee fees. Cantor replied, "I like your suggestion as a good start, however, it does not resolve the Brett issue. Let's keep thinking on that too."

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

165.    And during the entire guarantee fee dispute, Cantor consistently took Hild's side. Cantor had also been the sole outside director to oppose both the Special Committee Resolution to create a special committee to determine Hild's guarantee fees and the CEO Payments Resolution to require board approval for payments to Hild.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

166.    Upon becoming the sole remaining outside director, Cantor routinely rubber-stamped whatever fees and compensation Hild declared he deserved, including guarantee fees, salary, bonuses, and director fees.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

167.    For example, immediately after the Preferred Stock Repurchase, Cantor agreed to award Hild guarantee fees equal to 1.5% of Live Well's debt that was personally guaranteed by Hild. This included guarantees dating all the way back to 2005, even though many of these facilities had

been retired for years. In total, between the Preferred Stock Repurchase and Live Well's bankruptcy, ***Cantor approved of Live Well paying Hild over $15.5 million in guarantee fee payments***. These were paid to Hild in monthly installments of hundreds of thousands of dollars.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

168.    In addition, Cantor approved whatever director fees Hild wanted to pay himself, so long as Cantor could participate. Because most companies do not pay their CEO additional compensation for serving on the board of directors, the other Directors had consistently rejected Hild's demand for director fees.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

169.    Not Cantor. As discussed above, immediately after Rome and Karides resigned, Cantor approved the payment of very large director fees to himself and Hild and continued to do so until Live Well's inevitable collapse. All told, Cantor approved of and caused Live Well to pay at least $1,346,000 in "director fee" payments to Hild and at least $1,388,975 in "director fee" payments to himself.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

170.    Moreover, prior to the Preferred Stock Repurchase, the board had set Hild's base compensation at $250,000 and approved certain performance bonuses for Hild. Prior to the fraud,

Hild's total pre-tax compensation from Live Well averaged approximately $1 million. This is consistent with the total pre-tax compensation that other similarly sized firms in the industry paid to their CEOs at the time.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

171.    By contrast, after the Preferred Stock Repurchase, Cantor approved Live Well's payment to Hild of more than $9.7 million in total compensation in 2017 and more than $8.1 million in total compensation in 2018. During the first six months of 2019, when the Criminal Insiders' fraud was coming to light and the company was barreling toward bankruptcy, Cantor approved the payment of nearly $2.9 million in total compensation to Hild, which was more than double the total compensation paid to Hild in 2015, the last year before the Preferred Stock Repurchase.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

172.    During the three-and-a-half-year period from January 2016 through June 2019, Cantor approved of Live Well paying Hild ***not less than $25,726,623.49*** in total pre-tax compensation. That averages more than $7.25 million per year. Thus, Hild received more than a seven-fold increase in compensation from Live Well once Cantor was the only outside director remaining.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

173.    Even as the scheme began to unravel and it became increasingly obvious that Live Will would be forced into bankruptcy, Cantor continued to fight for Hild's ability to continue receiving his guarantee fees as scheduled.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

174.    On November 30, 2018, after one of Live Well's only remaining repo lenders demanded an immediate $14 million payment that Live Well could not pay, Live Well's outside counsel, a long-time Hild ally, emailed Cantor suggesting that, because a bankruptcy filing was likely imminent, Live Well should stop making guarantee payments to Hild as they would receive scrutiny as insider payments. The next guarantee fee payment to Hild, due soon, would be hundreds of thousands of dollars. "We understand that the company not making this payment would have significant adverse consequences for Michael [Hild], but we think the interests of the company would be better served by the company not making the payment," counsel wrote. Counsel pointed out that the decision fell to Cantor. Hild, who was copied on the email, replied in fury at counsel's suggestion.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

175.     Cantor, of course, agreed with Hild, replying that in his opinion, "to prevent a bankruptcy filing, I think a company should continue to act - as much as possible - as it has always acted and to avoid any impression that it is moving toawrd [sic] a bankruptcy." But he expressed a desire to meet with company counsel to become fully informed on insider payments and understand counsel's advice.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

176.     On December 2, after meeting with company counsel, Cantor wrote an email to Hild and Rohr with the subject line "Guarantee Fee Payments." Cantor reported that company counsel, in deference to Hild, had "rescinded that advice and we are all in agreement that the guarantee fee payments should be made as scheduled tomorrow." With full knowledge that Live Well was likely on the brink of bankruptcy, Cantor single-handedly permitted Hild to pay himself $569,119.09 in guaranty fee payments on or about December 3, 2019 and to pay himself a further $2,276,007.61 in guaranty fee payments up to the time when Live Well collapsed.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

177.     In sum, Cantor routinely breached his fiduciary duties to Live Well by acting in his own, and in Hild's, financial interests to the detriment of the company. Cantor readily approved Hild's extraction of more than $25 million from Live Well in the form of unjustified personal compensation. For his willingness to sign-off on Hild's gross overcompensation, Cantor secured nearly $1.4 million in director fees and a steady stream of business for his title company. Thus,

Cantor breached his fiduciary duty of loyalty to Live Well in favor of his loyalty to Hild, and for his own financial wellbeing.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

**VII.   The Fraud is Revealed, Live Well Collapses into Bankruptcy, and the Criminal Insiders are Convicted.**

178.   Under the Directors' watch, the Criminal Insiders had transformed Live Well's bond investment business into a *de facto* Ponzi scheme and operated it as such for several years until the scheme inevitably collapsed. Simply put, the Criminal Insiders routinely used new repo loans to finance acquisitions of more and more bonds. Then, when one repo lender wanted to close out its loans, they sought out new lenders to finance the bonds at even higher values to pay off the lenders that wanted out. In other words, just like in a classic Ponzi scheme, Live Well and the Criminal Insiders used new money to pay off old debt in furtherance of, and in an effort to conceal, their fraud with knowledge that creditors would inevitably be harmed when the scheme eventually collapsed.

**ANSWER:**   Denied.

179.   For example, in early 2015, Live Well had three repo lenders. By mid-2015 (after the Criminal Insiders had obtained exclusive control over the bond prices published by IDC), each of those three counterparties had sought to reduce or eliminate its exposure to the bonds. Thus, as would become their pattern, Hild and the other Criminal Insiders sought out and obtained repo financing from three new repo lenders to get the necessary liquidity to pay off Live Well's old repo-lenders (*i.e.*, repurchase the financed bonds).

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

180.     This pattern repeated in 2017, when two of Live Well's most significant repo lenders sought to reduce or eliminate their repo bond lending facilities with Live Well. This time, the Criminal Insiders targeted several Wall Street trading houses and a federally-insured bank, convincing them to rely exclusively on IDC pricing (which remained under the control of the Criminal Insiders), and obtained or borrowed hundreds of millions of dollars from these new innocent lenders, using the funds to pay off the old repo lenders.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

181.     Because the bonds securing the loans of the old repo lenders were so grossly inflated, the funds borrowed from the new victims were used to pay artificially high returns to the old repo lenders.

**ANSWER:**     Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

182.     As is inevitable with all such schemes, the house of cards built by the Criminal Insiders collapsed in spectacular fashion. By March 2018, Live Well only had three remaining repo lenders for the bonds. By the spring of 2019, these lenders had discovered Live Well's bonds were extremely overvalued and informed Live Well that they would stop financing the bonds.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

183.    Because of the Criminal Insiders' fraud, Live Well did not have the liquidity to repay the repo lenders and could not find any new lenders to continue to perpetrate the fraud. And the bonds could not be sold to pay the lenders because the market prices of the bonds were much lower than the amounts due to the lenders.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

184.    Trying desperately to avoid default and exposure of his fraud and theft, Hild began liquidating Live Well's core legitimate businesses assets, including its reverse mortgage master servicing rights and related business (together with certain other assets), at a significant discount. This directly resulted in the dissipation of at least $15 million of the Live Well's legitimate business assets. The sale was an ill-fated effort to obtain much needed cash to keep the scheme going. Not surprisingly, Hild's last-ditch attempt to save his scheme fell far short.

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

185.    As a result, on May 3, 2019, with the SEC and the DOJ finally closing in on the Criminal Insiders, Hild abruptly shut down Live Well's operations and terminated substantially all of its employees. Terminating operations in this matter resulted in the dissipation of the remainder of Live Well's legitimate business assets—primarily its reverse mortgage loan origination

business—which at the time were worth approximately $18 million. All told, as a direct and foreseeable consequence of the fraud that the Criminal Insiders perpetrated on the Directors' watch and the Directors' numerous breaches of fiduciary duty, Live Well suffered at least $33 million in harm in the form of the dissipation of its legitimate business assets.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first two sentences of this paragraph; therefore, such allegations are denied.   Preferred Shareholder Defendants deny the remaining allegations.

186.   On June 10, 2019 (the "Petition Date"), three of Live Well's repo lenders filed an involuntary chapter 7 petition against Live Well in the United States Bankruptcy Court for the District of Delaware.

**ANSWER:**   Admitted.

187.   On July 1, 2019, an order for relief was entered and the Trustee was appointed to administer Live Well's bankruptcy estate.

**ANSWER:**   Admitted.

188.   Live Well's creditors (excluding insiders) have asserted more than $110 million in claims.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

189.   On August 29, 2019, the office of the United States Attorney for the Southern District of New York (the "U.S. Attorney") announced a five-count Indictment against Hild relating to the bond pricing scheme described herein, specifically: (i) conspiracy to commit

securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud.

**ANSWER:**    Admitted.

190.    On that same date, the U.S. Attorney's office announced that both Rohr and Stumberger had entered into plea agreements regarding their respective roles in the fraudulent bond price-fixing scheme and were cooperating with federal authorities.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Rohr and Mr. Stumberger pleaded guilty to the criminal charges brought against them.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

191.    Rohr and Stumberger each admitted to participating in the scheme with Hild to defraud Live Well's repo lenders.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Rohr and Mr. Stumberger pleaded guilty to the criminal charges brought against them.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

192.    As part of his plea allocution, Rohr stated, among other things:

> I agreed with others, including Michael Hild, the CEO of Live Well, to cause a third party, Pricing Service, to misrepresent the value of certain bonds to Live Well's counterparties and repurchase agreement transactions in order to induce the counterparties to purchase the bonds from Live Well for higher prices than they otherwise would have accepted or to induce the counterparties to loan more money to Live Well than they otherwise would have. . . . I also agreed with Hild and others to provide misrepresentations from Live Well about the value of certain collateral in order to induce a federally insured bank to loan more money to Live Well than it otherwise would have.

**ANSWER:**    Paragraph 192 appears to cite to Mr. Rohr's plea allocution which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants admit

that Mr. Rohr pleaded guilty to the criminal charges brought against him.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

193.    As part of his plea allocution, Stumberger stated, among other things:

> From 2015 until its bankruptcy in 2019, Live Well, at the direction of its CEO Michael Hild, submitted inflated valuations to IDC knowing that IDC was publishing those valuations in its database verbatim and expecting that Live Well's lenders would rely on those inflated valuations in making lending decisions. Live Well's knowing publication of inflated valuations caused lenders to be less secure in their extension of credit to Live Well than they believed. I was aware that Live Well was doing this. I knew that it was wrong for Live Well to submit valuations that did not reflect the market value of the interest-only bonds in Live Well's portfolio . . . .

**ANSWER:**    Paragraph 193 appears to cite to Mr. Stumberger's plea allocution which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants admit that Mr. Stumberger pleaded guilty to the criminal charges brought against him.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied, including the substantive allegations made in the quoted statements.

194.    Also on August 29, 2019, the SEC filed a civil complaint against Hild, Rohr, Stumberger, and Live Well seeking declaratory, injunctive, and other relief.

**ANSWER:**    Admitted.

195.    On April 12, 2021, Hild went on trial in the District Court for the Southern District of New York.

**ANSWER:**    Admitted.

196.    At the criminal trial, both Rohr and Stumberger testified, consistent with their plea allocutions, that they had participated in the scheme to defraud Live Well's repo lenders by inflating the values of the bonds and that Hild directed that scheme.

**ANSWER:**    Paragraph 196 appears to cite to Mr. Rohr's and Mr. Stumberger's trial testimony which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

197.    On April 30, 2021, after a three-week trial and after less than four hours of deliberation, a jury unanimously found Hild guilty on all counts charged and specifically referenced above.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Hild was found guilty of the criminal charges brought against him.  Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; therefore, such allegations are denied.

198.    That guilty verdict demonstrates beyond a reasonable doubt, as the government stated in its summation at the criminal trial, that:

> Michael Hild masterminded a deliberate scheme to defraud and deceive and mislead his lenders. He tricked them into lending Live Well Financial hundreds of millions of dollars. He hid from them the fact that what they thought were independent market values for the bonds that Live Well owned were in fact Live Well's own pie-in-the-sky prices, [p]rices that bore no relation to where you could sell the bonds in the market. He used IDC as his puppet for years, pumping up prices when it suited him and never acknowledging that he was the one pulling the strings.
>
> Why did he do it?
>
> You know the answer. It was all about the money. The defendant pocketed over $25 million from the scheme, and he continued to line his pockets even as the entire company was crumbling around him. . . .

**ANSWER:**    Paragraph 198 appears to cite to the *Hild* transcripts which speak for themselves, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny the remaining allegations, including the substantive allegations made in the quoted statements.

199.    Unfortunately for Live Well and its creditors, each of the Directors shared Hild's motivation and, for years, routinely looked the other way while Hild was burying the company in unrepayable debt. And Rome, Karides, and Cantor, just like Hild, used their positions as fiduciaries of the company to extract as much money as they could to line their own pockets (and in the case of Rome and Karides, the pockets of the Preferred Stockholders) to the detriment of Live Well and its creditors.

**ANSWER:**    Denied.

200.    By the time the company was forced into bankruptcy, the value of Live Well's legitimate mortgage loan origination and servicing businesses had diminished to nothing as a result of the Criminal Insiders' fraud and the Directors' breaches of fiduciary duty. All told, the fraud and breaches of fiduciary duty directly resulted in the fraudulent dissipation of at least $77 million in assets and profits from Live Well's legitimate business operations.

**ANSWER:**    Denied.

**VIII.    Five of the Preferred Stockholders File Claims in Live Well's Bankruptcy.**

201.    During Live Well's bankruptcy proceedings, at least five of the Preferred Stockholders filed claims against the Live Well estate related to the amounts outstanding on the promissory notes they received in connection with the Preferred Stock Repurchase. Specifically, LWFVEST—the entity managed by Karides—filed a claim in the amount of $5,650,643.67; North Hill—the entity owned and managed by Rome—filed a claim in the amount of $2,426,227.68; Five Elms Equity Fund I, L.P. filed a claim in the amount of $1,868,766.29; Five Elms Haakon, L.P.

filed a claim in the amount of $114,025.91; and Five Elms Coinvest, L.P. filed a claim in the amount of $107,691.82.

**ANSWER:**   Preferred Shareholder Defendants admit that the Preferred Shareholder Defendants have filed claims in the Live Well bankruptcy. The claims submissions speak for themselves, and any mischaracterization thereof is denied.

202.    For the reasons set forth below and described herein, the Trustee objects to each of these claims and each of these claims should be disallowed and/or subordinated pursuant to sections 510 and 502 of the Bankruptcy Code and other applicable law.

**ANSWER:**   Preferred Shareholder Defendants admits that the Trustee objects to the Preferred Shareholder Defendants claims but denies that the Preferred Shareholder Defendants claims should be disallowed and/or subordinated pursuant to sections 510 and 502 of the Bankruptcy Code and other applicable law.  Preferred Shareholder Defendants deny any remaining allegations.

### CAUSES OF ACTION
### COUNT 1
### (Breach of Fiduciary Duty Against Rome and Karides)

203.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**   Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

204.    As directors of a Delaware corporation, Rome and Karides owed fiduciary duties to Live Well, including the fiduciary duty of absolute loyalty and the related duty to act in good faith and in the best interests of the company. They also owed Live Well the fiduciary duty of care.

**ANSWER:**   Paragraph 204 states conclusions of law to which no response is required. Preferred Shareholder Defendant deny any remaining allegations.

205.    From at least September 2015 through their resignations in September 2016, Rome and Karides continuously breached the fiduciary duties they owed to Live Well by, among other things:

- Encouraging and expressly approving of Hild's efforts to cause Live Well to dramatically increase the size and reported value of its bond portfolio using an investment strategy that they knew, or were willfully blind in not knowing, was only possible through a pervasive fraud;

- Encouraging and expressly approving of a fraudulent investment strategy that caused Live Well to incur massive liabilities that it had no ability to repay and that eventually dissipated all of its legitimate business assets;

- Expressly accepting a bribe from Hild in the form of the Preferred Stock Repurchase in exchange for their resignations from the Board and otherwise engaging in self-interested and disloyal conduct that was not entirely fair to Live Well;

- Acting in their own self-interests to the detriment of Live Well by negotiating, participating in, and approving of the Preferred Stock Repurchase while knowing, or being willfully blind in not knowing, that the purchase price was far greater than the value of the repurchased stock because, in fact, the stock was worthless at the time of the transaction; and

- Agreeing to resign from the board with full knowledge that doing so would grant Hild unfettered control of the company and its purse strings even though Hild had made his intention to loot the company for his own benefit at the expense of Live Well, its stockholders, and creditors clear.

**<u>ANSWER</u>:**    Denied.

206.    By knowingly permitting the Criminal Insiders to operate their fraudulent bond price-fixing scheme at Live Well's expense, Rome and Karides, along with the other Directors, allowed the Criminal Insiders to cause Live Well to increase its liabilities to its repo lenders to an amount far in excess of the value of the bonds upon which those liabilities were based. As such, Rome and Karides knew, or were willfully blind in not knowing, that the scheme would eventually consume all Live Well's assets and profits from its legitimate business lines and leave the company woefully insolvent and unable to continue as a going concern.

**<u>ANSWER</u>:**    Denied.

207.    To make matters worse, when the fraudulent bond price-fixing scheme was nearing its peak and the value of the company's legitimate business lines was already outstripped by the debt obligations Live Well incurred by defrauding its repo lenders, Rome and Karides used their positions as fiduciaries to extract millions of dollars for themselves and on behalf of the Preferred Stockholders through the self-dealing Preferred Stock Repurchase on terms that were not entirely fair to the company. In doing so, they further breached the fiduciary duties they owed to Live Well by accepting the Preferred Stock Repurchase as a *quid pro quo* for giving Hild unfettered control of the company when they knew he would use that control to loot the company.

**ANSWER:**    Denied.

208.    As a direct and proximate cause of Rome's and Karides's breaches of fiduciary duty, Live Well suffered significant harm, including: (i) more than $25 million in grossly excess, unjustified, and unconscionable overcompensation and other transfers paid to Hild, Cantor and the Criminal Insiders; (ii) at least $19,650,000 in the form of improper payouts to the Preferred Stockholders, including entities with which Rome and Karides were affiliated; (iii) not less than $33 million through the dissipation of Live Well's legitimate assets and business operations; and (iv) other costs and expenses associated with becoming over-leveraged with no related business purpose.

**ANSWER:**    Denied.

209.    All told, Rome's and Karides's breaches of fiduciary duty directly and proximately caused Live Well to suffer harm that is recoverable from them in an amount to be proven at trial, but in no event less than $77,650,000.

**ANSWER:**    Denied.

## COUNT 2
### (Breach of Fiduciary Duty Against Cantor)

210.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

211.    As a director of a Delaware corporation, Cantor owed fiduciary duties to Live Well, including the fiduciary duty of loyalty and the related duty to act in good faith and in the best interests of the company. He also owed Live Well the fiduciary duty of care.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  Furthermore, Paragraph 211 states conclusions of law to which no response is required.

212.    From at least September 2015 through Live Well's eventual collapse in 2019, Cantor continuously breached his fiduciary duties by, among other things:

- Encouraging and expressly approving of Hild's efforts to cause Live Well to dramatically increase the size and reported value of its bond portfolio using an investment strategy that he knew, or was willfully blind in not knowing, was only possible through a pervasive fraud;

- Encouraging and expressly approving of a fraudulent investment strategy that caused Live Well to incur massive liabilities that it had no ability to repay and that eventually dissipated all its legitimate business assets;

- Routinely elevating Hild's and his own financial interests over those of Live Well and to Live Well's detriment;

- Approving the payment of Hild's September 2016 guarantee fee in his capacity as the only member of the Guarantee Compensation Committee when the board had not authorized the committee to approve such a payment;

- Acting in his own self-interest to the detriment of Live Well by approving the Preferred Stock Repurchase and Release on behalf of the company knowing, or being willfully blind in not knowing, that (i) the purchase price was far greater than the value of the repurchased stock and, in fact, the stock was worthless at the time

of the transaction; (ii) the express purpose of the transaction was to free Hild and himself from any board oversight; (iii) the entire transaction, including the Release, constituted and was procured through the flagrant breaches of each Director's fiduciary duties; and (iv) otherwise engaging in self-interested and disloyal conduct that was not entirely fair to Live Well;

- Approving over $25 million in overcompensation to Hild in the form of salary, bonuses, and guarantee fee payments and director fee payments;

- Approving not less than $1,388,975 in excessive and unjustified director fees for himself as a *quid pro quo* for, among other things, approving the Preferred Stock Repurchase and elevating Hild's interests over those of the company; and

- Failing to provide any oversight as the sole remaining outside director after September 30, 2016.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

213.    By knowingly permitting the Criminal Insiders to operate their fraudulent bond price-fixing scheme at Live Well's expense, Cantor, along with the other Directors, allowed the Criminal Insiders to cause Live Well to increase its liabilities to its repo lenders to an amount far in excess of the value of the bonds upon which those liabilities were based. As such, Cantor knew, or was willfully blind in not knowing, that the scheme would eventually consume all Live Well's assets and profits from its legitimate business lines and leave the company woefully insolvent and unable to continue as a going concern.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants deny the allegations in Count 2 of the Amended Complaint.

214.    To make matters worse, Cantor routinely acted in his own and Hild's financial interests to the detriment of Live Well. Among other things, Cantor acted in his own and Hild's interests by approving the Preferred Stock Repurchase and the Release—neither of which were entirely fair to Live Well—on behalf of the company with knowledge of, or with willful blindness to, the fact that the preferred stock was worthless because Live Well had already been rendered woefully insolvent by the Criminal Insiders' fraudulent bond trading scheme. In doing so, Cantor also condoned and approved Hild's bribe of Rome and Karides to get them to resign from the board.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants deny the allegations in Count 2 of the Amended Complaint.

215.    Thus, because the Preferred Stock Repurchase and Release were unfair and self-dealing transactions that were procured through fraud and the breaches of fiduciary duties of each of the Directors, and because Cantor was materially conflicted in the transaction along with the other Directors, all aspects of the Preferred Stock Repurchase, including the notes payable and the Release, are void.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants deny the allegations in Count 2 of the Amended Complaint.

216.    After approving the self-dealing Preferred Stock Repurchase in violation of his fiduciary duties, Cantor continued to act exclusively for his own benefit and for Hild's benefit, and

to the detriment of Live Well, by approving the payment of over $24 million in excess compensation to Hild in the form of salary, guarantee fees, and director fees and by approving the payment of nearly $1.4 million in director fees to himself.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

217.    Because at all relevant times Cantor was a faithless director serving Hild's and his own financial interests to the detriment of Live Well, Cantor was not entitled to any director fees, and all of the fees he received for his purported service as a Live Well director are subject to disgorgement.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

218.    As a direct and proximate cause of Cantor's breaches of fiduciary duty, Live Well suffered significant harm, including: (i) more than $25 million in excess compensation paid to Hild, Cantor, and the Criminal Insiders; (ii) at least $19,650,000 in the form of improper payouts to the Preferred Stockholders; (iii) not less than $33 million through the dissipation of Live Well's legitimate assets and business operations; and (iv) other costs and expenses associated with becoming over-leveraged with no related business purpose.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is

required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

219.    All told, Cantor's breaches of fiduciary duty directly and proximately caused Live Well to suffer harm that is recoverable from Cantor in an amount to be proven at trial, but in no event less than $77,650,000.

**ANSWER:**    Count 2 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

### COUNT 3
### (Unlawful Stock Repurchase Pursuant to 8 Del. C. § 174
### Against Cantor, Karides, and Rome)

220.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

221.    As directors of a Delaware corporation, Cantor, Karides, and Rome owed fiduciary duties to Live Well, including the fiduciary duty of loyalty and the related duty to act in good faith and in the best interests of the company. They also owed Live Well the fiduciary duty of care.

**ANSWER:**    Paragraph 221 states conclusions of law to which no response is required. Preferred Shareholder Defendant deny any remaining allegations.

222.    At the time of the Preferred Stock Repurchase in September 2016, Live Well was hopelessly insolvent due to the massive financial fraud executed by the Criminal Insiders. Thus, the Preferred Stock Repurchase occurred when the capital of Live Well was impaired.

**ANSWER:**    Denied.

223.    Pursuant to the terms of the Preferred Stock Repurchase, Live Well paid the Preferred Stockholders (i) $18 million in cash, (ii) $11 million in notes, and (iii) $1,650,000 in prepetition quarterly interest payments on account of such notes, all for the worthless preferred stock of an insolvent company. Therefore, Live Well did not receive reasonably equivalent value for the Preferred Stock Repurchase.

**ANSWER:**    Denied.

224.    The Preferred Stock Repurchase was approved by a special committee of Live Well's board comprised of one Director, Cantor, on September 30, 2016. Cantor willfully or negligently violated 8 Del. C. § 160 by approving a repurchase of Live Well's preferred stock when he knew, or was negligent in not knowing, the capital of Live Well was impaired.

**ANSWER:**    Denied.

225.    Neither Karides nor Rome dissented to Cantor's vote to approve the Preferred Stock Repurchase. Thus, Karides and Rome willfully or negligently violated 8 Del. C. § 160 by failing to dissent to Cantor's approval of the Preferred Stock Repurchase when they knew, or were negligent in not knowing, the capital of Live Well was impaired.

**ANSWER:**    Denied.

226.    Accordingly, Cantor, Karides, and Rome are jointly and severally liable to Live Well and its creditors under 8 Del. C. § 174 for the full amount of the unlawful Preferred Stock Repurchase, which is not less than $19,650,000.

**ANSWER:**    Denied.

## COUNT 4
### (Aiding and Abetting Breach of Fiduciary Duty
### Against LWFVEST, LLC and North Hill Ventures II, LP)

227.    The Trustee repeats and realleges the allegations set forth above as if fully set forth

herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred

Shareholder Defendants' Answers as if fully set forth herein.

228.    As directors of a Delaware corporation, Rome and Karides owed fiduciary duties

to Live Well, including the fiduciary duty of absolute loyalty and the related duty to act in good

faith and in the best interests of the company. They also owed Live Well the fiduciary duty of care.

**ANSWER:**    Paragraph 228 states conclusions of law to which no response is required.

Preferred Shareholder Defendant deny any remaining allegations.

229.    As set forth above, both Rome and Karides breached their fiduciary duties by,

among other things, (i) using their positions as fiduciaries to extract millions of dollars for

themselves and on behalf of the Preferred Stockholders to the detriment of Live Well in connection

with the unfair and self-dealing Preferred Stock Repurchase; and (ii) accepting the Preferred Stock

Repurchase as a bribe to grant Hild complete and unfettered control of Live Well at a time when

they knew Hild intended to loot the company for his own benefit.

**ANSWER:**    Denied.

230.    As set forth above, as a direct and proximate result of Rome's and Karides's

breaches of fiduciary duty, Live Well suffered significant harm, including: (i) more than $25

million in excess compensation paid to Hild, Cantor, and the Criminal Insiders; (ii) at least

$19,650,000 in the form of improper payouts to the Preferred Stockholders; (iii) not less than $33

million through the dissipation of Live Well's legitimate assets and business operations; and (iv)

other costs and expenses associated with becoming over-leveraged with no related business purpose.

**ANSWER:**    Denied.

231.    At all relevant times, Rome served as an agent of North Hill and as North Hill's designated director on Live Well's board. As its agent, Rome's knowledge and acts performed in such capacity are imputed to North Hill.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Rome served on the Live Well board.  Preferred Shareholder Defendants deny the remaining allegations.

232.    At all relevant times, Karides served as an agent of LWFVEST and as LWFVEST's designated director on Live Well's board. As its agent, Karides's knowledge and acts performed in such capacity are imputed to LWFVEST.

**ANSWER:**    Preferred Shareholder Defendants admit that Mr. Karides served on the Live Well board.  Preferred Shareholder Defendants deny the remaining allegations.

233.    As such, North Hill and LWFVEST knew that Rome and Karides were fiduciaries of Live Well and that Rome's and Karides's acts, including using their positions as fiduciaries to extract millions of dollars from Live Well in exchange for worthless preferred stock through the Preferred Stock Repurchase and accepting Hild's bribe to resign from the board, constituted violations of the duties they owed to Live Well.

**ANSWER:**    Denied.

234.    North Hill and LWFVEST also knew, through their respective agents, that Hild and Cantor were fiduciaries of Live Well and breached their fiduciary duties in connection with the Preferred Stock Repurchase because the express purpose of the transaction was to remove Rome

and Karides from the board so that Hild and Cantor could loot the company without any independent oversight.

**ANSWER:**   Denied.

235.   Nevertheless, through their respective agents, North Hill and LWFVEST substantially assisted the Directors to breach their fiduciary duties and improperly extract millions of dollars from the company by, among other things, (i) consenting to the Preferred Stock Repurchase and each of the agreements related thereto, and (ii) receiving the payments under the Preferred Stock Repurchase in bad faith. Indeed, the Directors could not have executed the unlawful Preferred Stock Repurchase without North Hill's and LWFVEST's willful participation in their scheme.

**ANSWER:**   Denied.

236.   The harm suffered by Live Well as a result of the Directors' breaches of their fiduciary duties are recoverable from North Hill and LWFVEST because they knowingly and substantially assisted the Directors' breaches of their fiduciary duties. All told, Live Well suffered harm that is recoverable from North Hill and LWFVEST in an amount to be proven at trial, but in no event less than $77,650,000.

**ANSWER:**   Denied.

**COUNT 5**
**(Avoidance of the Release as Constructively Fraudulent**
**Under 11 U.S.C. § 544 and Applicable State Law, Including Without**
**Limitation 6 Del. Code § 1301, et seq. and Va. Code Ann. § 55.1-400, et seq**.)

237.   The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**   Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

238.    In violation of their fiduciary duties to Live Well, Cantor approved and Hild executed the Release in connection with the Preferred Stock Repurchase. Pursuant to the terms of the Release, Live Well incurred various obligations, including the purported waiver of its claims for any cause of action against, among others, the Preferred Stockholders, Rome, and Karides for, among other things, "any claim that any present or former director of the Company breached the fiduciary duties that he owed to the Company."

**ANSWER:**    Paragraph 238 appears to cite to the Separation and Release Agreement which speaks for itself, and any mischaracterization thereof is denied.  Preferred Shareholder Defendants deny any remaining allegations.

239.    Live Well did not receive consideration deemed valuable in law in exchange for the obligations it incurred under the terms of the Release.

**ANSWER:**    Denied.

240.    Live Well incurred the obligations under the Release at a time when Live Well was undercapitalized.

**ANSWER:**    Denied.

241.    The obligations under the Release were made at a time when Live Well had unreasonably small capital.

**ANSWER:**    Denied.

242.    Live Well incurred the obligations under the Release at a time when Live Well was insolvent. Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Insiders' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well was rendered insolvent by at least June 2016.

**ANSWER:**    Denied.

243.   The obligations under the Release were incurred at a time when Live Well had incurred, intended to incur, or believed it would incur debts beyond its ability to repay as such debts matured.

**ANSWER:**   Denied.

244.   Before and after the date of the Release and as of the Petition Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged the Release. Such creditors include, without limitation, Mirae Asset Securities (USA) Inc., Republic Bank & Trust Company, Reverse Lending Club LLC, and Credit Plus, Inc., among many others.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

245.   By reason of the foregoing, the Release and the obligations purportedly incurred by Live Well thereunder constitute constructively fraudulent obligations which should be avoided pursuant to Bankruptcy Code section 544 and applicable state law.

**ANSWER:**   Denied.

**COUNT 6**
**(Avoidance of Release as Actually Fraudulent**
**Under 11 U.S.C. § 544 and Applicable State Law, Including Without**
**Limitation 6 Del. Code § 1301, et seq. and Va. Code Ann. § 55.1-400, et seq.)**

246.   The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**   Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

247.   In violation of their fiduciary duties to Live Well, Cantor approved and Hild executed the Release on or around September 30, 2016 in connection with the Preferred Stock

Repurchase Agreement. Pursuant to the terms of the Release, Live Well incurred various obligations, including the purported waiver of its claims for any cause of action against, among others, the Preferred Stockholders, Rome, and Karides for, among other things, "any claim that any present or former director of the Company breached the fiduciary duties that he owed to the Company."

**ANSWER:**    Denied.

248.    As explained in detail above, Live Well, acting through its agents, incurred the obligations set forth in the Release with the actual intent to hinder, delay, or defraud its creditors. Specifically, each of the Directors knew, should have known, or were willfully blind in not knowing, that the claims and causes of action that Live Well purportedly waived under the Release were valuable assets. In violation of their fiduciary duties, the Directors knowingly caused Live Well to approve and accept the obligations under the Release in their own self-interest and to the detriment of Live Well and its creditors.

**ANSWER:**    Denied.

249.    The Release and the obligations Live Well purportedly incurred thereunder exhibit several badges of fraud, including, among other things:

- The obligations Live Well incurred were to insiders;

- Live Well received less than reasonably equivalent value in exchange for the obligations incurred under the Release because the preferred stock it repurchased in connection with the Release was worthless; and

- Live Well was insolvent at the time the obligations under the Release were incurred.

**ANSWER:**    Denied.

250.    Moreover, the obligations under the Release were incurred by Live Well in furtherance of the Criminal Insiders' ongoing fraudulent scheme to loot the company through the perpetration of their Ponzi-like bond price-fixing scheme that dissipated of all of the company's

legitimate assets. As such, the obligations incurred under the Release are presumed to have been incurred with the actual intent to hinder, delay, or defraud creditors.

**ANSWER:**   Denied.

251.   Before and after the date of Live Well incurred obligations under the Release and as of the Petition Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged the obligations as fraudulent.

**ANSWER:**   Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

252.   By reason of the foregoing, the Release and the obligations purportedly incurred by Live Well thereunder constitute constructively fraudulent obligations which should be avoided pursuant to Bankruptcy Code section 544 and applicable state law.

**ANSWER:**   Denied.

**COUNT 7**
**(Avoidance and Recovery of Transfers as Constructively Fraudulent Under 11 U.S.C.**
**§§ 544 and 550 and Applicable State Law, Including Without Limitation 6 Del. Code**
**§ 1301, et seq. and Va. Code Ann. § 55.1-400, et seq., Against Cantor)**

253.   The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**   Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

254.   From December 2016 to the Petition Date, Live Well made the following transfers to Cantor (the "Cantor Director Fees"):

| Date | Amount |
|------|--------|
| 12/16/2016 | $ 100,000 |
| 01/05/2017 | $ 902,200 |

| | |
|---|---|
| 04/07/2017 | $ 42,975 |
| 07/05/2017 | $ 42,975 |
| 10/10/2017 | $ 42,975 |
| 01/05/2018 | $ 42,975 |
| 04/06/2018 | $ 42,975 |
| 07/05/2018 | $ 42,975 |
| 10/03/2018 | $ 42,975 |
| 01/04/2019 | $ 42,975 |
| 04/05/2019 | $ 42,975 |
| **TOTAL:** | **$ 1,388,975** |

**ANSWER:**   Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.   To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

255.   Live Well had an interest in the property transferred through the payment of all of the Cantor Director Fees.

**ANSWER:**   Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.   To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

256.   Live Well did not receive reasonably equivalent value in exchange for the Cantor Director Fees. Indeed, at all times relevant, Cantor was a faithless director serving Hild's and his own financial interests to the detriment of Live Well. As such, Cantor was not entitled to any director fees, and Live Well received no consideration in exchange for the Cantor Director Fees.

**ANSWER:**   Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.   To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

257.    All of the Cantor Director Fees were transferred to Cantor at a time when Live Well was undercapitalized.

**ANSWER:**    Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

258.    All of the Cantor Director Fees were transferred to Cantor at a time when Live Well had unreasonably small capital.

**ANSWER:**    Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

259.    All of the Cantor Director Fees were transferred to Cantor at a time when Live Well was insolvent. Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Insiders' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well was rendered insolvent by at least June 2016.

**ANSWER:**    Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants deny the allegations in Paragraph 259.

260.    All of the Cantor Director Fees were transferred to Cantor at a time when Live Well had incurred, intended to incur, or believed it would incur debts beyond its ability to repay as such debts matured.

**ANSWER:**   Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

261.   Before and after the date of that each of the Cantor Director Fees were transferred and as of the Petition Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such transfers.

**ANSWER:**   Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

262.   By reason of the foregoing, the Cantor Director Fees constitute constructive fraudulent transfers which should be avoided pursuant to Bankruptcy Code section 544 and applicable state law and are recoverable by the Trustee under section 550.

**ANSWER:**   Count 7 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

## COUNT 8
**(Avoidance and Recovery of Transfers as Actually Fraudulent Under 11 U.S.C. §§ 544 and 550 and Applicable State Law, Including Without Limitation 6 Del. Code § 1301, *et seq.* and Va. Code Ann. § 55.1-400, *et seq.* Against Cantor)**

263.   The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

264.    The Cantor Director Fees were made, and received, with the actual intent to hinder, delay, or defraud Live Well and its creditors.

**ANSWER:**    Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

265.    The Cantor Director Fees exhibit several badges of fraud, including, among other things:

- The Cantor Director Fees were transferred to an insider;

- Live Well received less than reasonably equivalent value in exchange for the Cantor Director Fees—indeed, Live Well received no value for the Cantor Director Fees because, as a faithless director, Cantor was not entitled to any compensation for his purported service to Live Well;

- Live Well was insolvent at the time it transferred each of the Cantor Director Fee payments; and

- Based upon the Ponzi-like nature of the Criminal Insiders' fraudulent scheme, each of the Cantor Director Fees were paid shortly after Live Well had incurred a substantial debt.

**ANSWER:**    Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

266.    Moreover, the Cantor Director Fees were paid with the fruits of the Criminal Insiders' fraudulent bond price-fixing scheme.

**ANSWER:**   Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

267.   Simply put, as a result of the fraudulent price-fixing scheme, Live Well's bond trading business had turned into a *de facto* Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims. Also, just like a Ponzi scheme, Live Well's fraudulent bond trading business was doomed to fail, and take down the company with it, because the value of Live Well's entire bond portfolio was, at all times relevant, fraudulently overstated and each of Live Well's repo-lenders were materially undercollateralized on their repo loans. As such, Live Well could not pay its obligations under its repo agreements by selling the bonds at market prices, and any failure by Live Well to secure the financing necessary to meet a repurchase demand from one of its repo lenders would, and inevitably did, result in the entire scheme collapsing.

**ANSWER:**   Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

268.   Accordingly, all transfers made by Live Well, including the Cantor Director Fees, are presumed to have been made with actual intent to hinder, delay, or defraud creditors.

**ANSWER:**   Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.  To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

269.    Before and after the date that each of the Cantor Director Fees were transferred and as of the Petition Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such transfers.

**ANSWER:**    Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.   To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

270.    By reason of the foregoing, the Cantor Director Fees constitute constructive fraudulent transfers which should be avoided pursuant to Bankruptcy Code section 544 and applicable state law and are recoverable by the Trustee under section 550.

**ANSWER:**    Count 8 of the Amended Complaint is not brought against the Preferred Shareholder Defendants and, therefore, no response is required.   To the extent a response is required, Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

## COUNT 9
**(Avoidance and Recovery of Transfers as Actually Fraudulent Under 11 U.S.C.
§§ 548(a)(1)(A) and 550 Against the Preferred Stockholders)**

271.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

272.    Within two years of the Petition Date—*i.e.*, from June 10, 2017, to June 10, 2019— Live Well made each of the Transfers listed on Exhibit A, attached hereto and incorporated herein, to the Preferred Stockholders (the "Interest Payment Transfers").

**ANSWER:**    Admitted.

273.    Live Well had an interest in the assets transferred by each of the Interest Payment Transfers

**ANSWER:**    Preferred Shareholder Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph; therefore, such allegations are denied.

274.    Each of the Interest Payment Transfers were made by Live Well with the actual intent to hinder, delay, or defraud Live Well's creditors because the Interest Payment Transfers were made with the fruits of the Criminal Insiders' fraudulent bond price-fixing scheme.

**ANSWER:**    Denied.

275.    Simply put, as a result of the fraudulent price-fixing scheme, Live Well's bond trading business had turned into a *de facto* Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims. Also, just like a Ponzi scheme, Live Well's fraudulent bond trading business was doomed to fail, and take down the company with it, because the value of Live Well's entire bond portfolio was, at all times relevant, fraudulently overstated and each of Live Well's repo-lenders were materially undercollateralized on their repo loans. As such, Live Well could not pay its obligations under its repo agreements by selling the bonds at market prices, and any failure by Live Well to secure the financing necessary to meet a repurchase demand from one of its repo lenders would, and inevitably did, result in the entire scheme collapsing.

**ANSWER:**    Denied.

276.    Furthermore, each of the Interest Payment Transfers were made in furtherance of, and to conceal, the Criminal Insiders' fraudulent scheme. Indeed, any failure by Live Well to make the Interest Payment Transfers would have created a substantial risk that the Criminal Insiders' and the

Directors' wrongdoing would be discovered. At the very least, any failure by Live Well to make the Interest Payment Transfers would have spurred the Preferred Stockholders not otherwise involved in the Criminal Insiders' fraudulent scheme into taking a closer look at Live Well's financials and to begin asking difficult questions about Live Well's financial situation—an inquiry that would have, inevitably, resulted in the discovery of Live Well's insolvency and the fraudulent bond scheme.

**ANSWER:**    Denied.

277.    The Interest Payment Transfers were also part of the *quid pro quo* that Rome and Karides and their affiliated Preferred Stockholders received in exchange for Rome and Karides breaching their fiduciary duties by taking no action to protect Live Well from the fraudulent bond pricing scheme and turning over unfettered control of Live Well to Hild.

**ANSWER:**    Denied.

278.    Finally, the Interest Payment Transfers served no legitimate business purpose because Live Well received no consideration in exchange for granting the Preferred Stockholders the notes upon which the Interest Payment Transfers were based. Indeed, as discussed above, Live Well was insolvent when it issued the notes to the Preferred Stockholders, rendering the preferred shares that Live Well purportedly purchased from them worthless.

**ANSWER:**    Denied.

279.    Accordingly, all transfers made by Live Well, including the Interest Payment Transfers, are presumed to have been made with actual intent to hinder, delay, or defraud creditors.

**ANSWER:**    Denied.

280.    Therefore, the Interest Payment Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A), and recoverable from the Preferred Stockholders in the amounts they individually received pursuant to 11 U.S.C. § 550. The Interest Payment Transfers are also recoverable under

11 U.S.C. § 550 from any of the John Does 1–10 for whose benefit the Interest Payment Transfers were made.

**ANSWER:**    Denied.

## COUNT 10
### (Unjust Enrichment Against the Preferred Stockholders)

281.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

282.    As detailed in this Complaint, on or around September 30, 2016, the Preferred Stockholders were unjustly enriched by $18 million in cash from Live Well's repurchase of their preferred stock. Further, Live Well gave the Preferred Stockholders $11 million in promissory notes pursuant to the terms of the Preferred Stock Repurchase, which, for the reasons stated above, is void as a matter of law. Prior to the Petition Date, Live Well had paid a total of not less than $1,650,000 in interest to the Preferred Stockholders on the notes.

**ANSWER:**    Denied.

283.    LWFVEST, LLC was unjustly enriched in the amount of $9,825,000.00: $9 million in cash received at the closing of the Preferred Stock Repurchase plus $825,000.00 in interest payments on a $5,500,000 note.

**ANSWER:**    Denied.

284.    North Hill Ventures, II, LP, was unjustly enriched in the amount of $4,218,581.87: $3,864,349.78 in cash received at the closing of the Preferred Stock Repurchase plus $354,232.10 in interest payments on a $2,361,547.09 note.

**ANSWER:**    Denied.

285.    Five Elms Equity Fund I, L.P. was unjustly enriched in the amount of $3,249,299.30: $2,976,457.40 in cash received at the closing of the Preferred Stock Repurchase plus a $272,841.90 in interest payments on a $1,1818,946.19 note.

**ANSWER:**    Denied.

286.    Five Elms Haakon, L.P. was unjustly enriched in the amount of $198,262.35: $181,614.35 in cash received at the closing of the Preferred Stock Repurchase plus $16,648.00 in interest payments on a $110,986.55 note.

**ANSWER:**    Denied.

287.    Five Elms Coinvest, L.P. was unjustly enriched in the amount of $187,247.76: $171,524.66 in cash received at the closing of the Preferred Stock Repurchase plus $15,723.10 in interest payments on a $104,820.63 note.

**ANSWER:**    Denied.

288.    James Brown was unjustly enriched in the amount of $1,284,299.30: $1,176,457.40 in cash received at the closing of the Preferred Stock Repurchase plus $107,841.90 in interest payments on a $718,946.19 note.

**ANSWER:**    Denied.

289.    Gantcher Family Limited Partnership was unjustly enriched in the amount of $491,250.01: $450,000.00 in cash received at the closing of the Preferred Stock Repurchase plus $41,250.01 in interest payments on a $275,000 note.

**ANSWER:**    Denied.

290.    Eric Legoff was unjustly enriched in the amount of $196,059.42: $179,596.41 in cash received at the closing of the Preferred Stock Repurchase plus $16,463.01 in interest payments on a $109,753.36 note.

**ANSWER:**   Denied.

291.   Live Well received no consideration for the amounts unjustly received by the Preferred Stockholders. Because Live Well was already insolvent at the time of the Preferred Stock Repurchase, the preferred stock was worthless. The preferred stock was overpriced by $29 million—the price Live Well agreed to pay to buy back all of the outstanding preferred stock.

**ANSWER:**   Denied.

292.   The Criminal Insiders directed, participated in, and perpetuated a fraudulent bond price-fixing scheme that directly and proximately caused the enrichment of the Preferred Stockholders and harm to Live Well in the amount of not less than $19,650,000, consisting of $18,000,000 in cash and at least $1,650,000 in prepetition interest payments on the notes.

**ANSWER:**   Denied.

293.   Live Well was damaged and impoverished by the amounts unjustly received by the Preferred Stockholders. Because Live Well was forced to borrow yet more money from its repo lenders based on bond prices the Criminal Insiders had fraudulently inflated in order to finance the Preferred Stock Repurchase, the transaction resulted in the further dissipation of Live Well's legitimate assets.

**ANSWER:**   Denied.

294.   The money and other benefits that the Preferred Stockholders received came from, and would not have been possible but for, the Criminal Insiders' fraudulent scheme and the Directors' wrongful, self-interested, unfair, and completely unjustified decisions to transfer such sums out of Live Well to the Preferred Stockholders.

**ANSWER:**   Denied.

295.    The transfers to the Preferred Stockholders were unsupported by adequate consideration and were made with the actual intent to hinder, delay, or defraud Live Well and its present and future creditors.

**ANSWER:**    Denied.

296.    Consequently, it would be inequitable for Preferred Stockholders to retain this money.

**ANSWER:**    Denied.

**COUNT 11**
**(Equitable Subordination Against LWFVEST, LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, L.P., Five Elms Haakon, L.P., and Five Elms Coinvest, L.P.)**

297.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

298.    Claims have been filed in Live Well's bankruptcy case on behalf of LWFVEST, LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, L.P., Five Elms Haakon, L.P., and Five Elms Coinvest, L.P. (collectively, the "Claimants"), including the following:

- A filed claim in the amount of $5,650,643.67 related to the Preferred Stock Repurchase for LWFVEST, LLC;

- A filed claim in in the amount of $2,426,227.68 related to the Preferred Stock Repurchase for North Hill Ventures II, LP;

- A filed claim in in the amount of $1,868,766.29 related to related to the Preferred Stock Repurchase for Five Elms Equity Fund I, L.P.;

- A filed claim in in the amount of $114,025.91 related to related to the Preferred Stock Repurchase for Five Elms Haakon, L.P.; and

- A filed claim in in the amount of $107,691.82 related to related to the Preferred Stock Repurchase for Five Elms Coinvest, L.P.

**ANSWER:**    Preferred Shareholder Defendants admit that the Preferred Shareholder Defendants have filed claims in the Live Well bankruptcy. The claims submissions speak for themselves, and any mischaracterization thereof is denied.

299.    As detailed herein, these Claimants engaged in inequitable conduct with respect to Live Well.

**ANSWER:**    Denied.

300.    The inequitable conduct of these Claimants not only injured Live Well and its creditors, but also conferred unfair advantages or benefits on Claimants, including proceeds from their sales of Live Well's preferred stock to Live Well.

**ANSWER:**    Denied.

301.    Equitable subordination of the claims of these Claimants is not inconsistent with the Bankruptcy Code. Rather, equitable subordination of these claims redresses the underlying inequitable conduct that directly harmed Live Well and its creditors.

**ANSWER:**    Denied.

302.    Accordingly, the Trustee requests that the claims of the Claimants be equitably subordinated to the claims of all other creditors pursuant to section 510(c) of the Bankruptcy Code and applicable law.

**ANSWER:**    Denied.

### COUNT 12
**(Objection to Claims Against LWFVEST, LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, L.P., Five Elms Haakon, L.P., and Five Elms Coinvest, L.P.)**

303.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:**    Preferred Shareholder Defendants incorporate by reference all of Preferred Shareholder Defendants' Answers as if fully set forth herein.

304.    Claims have been filed in Live Well's bankruptcy case on behalf of LWFVEST, LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, L.P., Five Elms Haakon, L.P., and Five Elms Coinvest, L.P., including the following:

- A filed claim in the amount of $5,650,643.67 related to the Preferred Stock Repurchase for LWFVEST, LLC;

- A filed claim in in the amount of $2,426,227.68 related to the Preferred Stock Repurchase for North Hill Ventures II, LP;

- A filed claim in in the amount of $1,868,766.29 related to related to the Preferred Stock Repurchase for Five Elms Equity Fund I, L.P.;

- A filed claim in in the amount of $114,025.91 related to related to the Preferred Stock Repurchase for Five Elms Haakon, L.P.; and

- A filed claim in the amount of $107,691.82 related to related to the Preferred Stock Repurchase for Five Elms Coinvest, L.P.

**ANSWER:**    Preferred Shareholder Defendants admit that the Preferred Shareholder Defendants have filed claims in the Live Well bankruptcy. The claims submissions speak for themselves, and any mischaracterization thereof is denied.

305.    The Trustee hereby objects to these claims because the claims: (i) are subject to subordination pursuant to section 510(a) of the Bankruptcy Code and applicable law because the claims are based upon subordinated notes; (ii) are subject to subordination pursuant to section 510(b) of the Bankruptcy Code because such claims arise from the rescission of a purchase or sale of securities of Live Well or are claims for damages arising from the purchase or sale of securities (*i.e.*, the preferred stock); (iii) are subject to set off, recoupment, and/or withholding based upon the causes of action asserted against these Defendants in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law; and (iv) should be disallowed pursuant to section

502(d) of the Bankruptcy Code because the Claimants are each entities from which property is recoverable under 11 U.S.C. § 550 as set forth above.

**ANSWER:**    Denied.

## TOLLING OF LIMITATIONS

306.    Any statute of limitations applicable to the Trustee's claims was tolled for two years after the filing of Live Well's bankruptcy case, pursuant to 11 U.S.C. §§ 108(a) and 546(a).

**ANSWER:**    Paragraph 306 states conclusions of law to which no response is required. To the extent a response is required, Preferred Shareholder Defendants deny the allegations in Paragraph 306.

307.    Prior to Live Well's bankruptcy, all statutes of limitations for claims against the Directors related to the fraudulent bond scheme, and the harm caused to Live Well thereby, were equitably tolled until the Petition Date because neither Live Well nor any innocent stakeholder of Live Well that had knowledge or, through the exercise of reasonably diligence, had reason to know of the fraudulent scheme or the harm it caused Live Well until the scheme ultimately collapsed.

**ANSWER:**    Paragraph 307 states conclusions of law to which no response is required. To the extent a response is required, Preferred Shareholder Defendants deny the allegations in Paragraph 307.

308.    Live Well, as an entity, had no knowledge of the fraudulent bond scheme independent from the knowledge of its agents and fiduciaries. The only Live Well agents and fiduciaries that had knowledge, or, through reasonable diligence, could have obtained knowledge, of the fraud, were the Criminal Insiders and the Directors. As described in detail above, however, the interests of the Criminal Insiders and the Directors were adverse to the interests of Live Well with respect to the fraudulent bond scheme because each of them stood to gain financially, to the

detriment of Live Well, from the fraud. They were also highly incentivized to ensure that neither Live Well nor any innocent stakeholder of Live Well learned of the fraudulent bond scheme because its revelation could potentially subject them to significant civil and/or criminal liability. As such, Live Well cannot be charged with the Criminal Insiders' or its faithless directors' knowledge of the bond fraud. And, for the same reasons, the existence of the bond fraud was inherently unknowable to Live Well.

**ANSWER:**    Denied.

309.    Moreover, Hild and the Directors fraudulently concealed their fraud and breaches of fiduciary duties from Live Well and its creditors and innocent stockholders (the only other stake holders that could have brought a claim) through their approval and issuance of fraudulently misstated financial statements, which were reasonably relied upon by such stakeholders. As such, all statutes of limitations related to the bond fraud and Defendants' breaches of fiduciary duties are equitably tolled under the doctrine of fraudulent concealment.

**ANSWER:**    Denied.

310.    In short, equity requires that any statute of limitations applicable to the harm Live Well suffered as a result of the bond fraud be tolled. As set forth in detail above, Live Well was the victim of a pervasive fraud committed by Hild and his co-conspirators. The Directors were the **only** parties with the knowledge and the opportunity to stop the fraud and to prevent or mitigate the harm it caused to Live Well. Instead, the Directors breached their fiduciary duties by accepting significant payouts in exchange for their silence. In such circumstances, it would be highly inequitable to reward the Directors' misconduct by limiting the breach of fiduciary duty claims against them to only the three-year period prior to the Petition Date.

**ANSWER:**    Denied.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trustee respectfully requests that judgment be entered in his favor and against Defendants as follows:

a. As against Cantor, Karides, Rome, LWFVEST, LLC, and North Hill Ventures, II, LP awarding monetary damages in an amount to be proven at trial, but not less than $77,650,000;

b. As against LWFVEST, LLC, awarding monetary damages in an amount to be proven at trial, but not less than $9.8 million, in connection with the Preferred Stock Repurchase;

c. As against North Hill Ventures, II, LP, awarding monetary damages in an amount to be proven at trial, but not less than $4.2 million, in connection with the Preferred Stock Repurchase;

d. As against Five Elms Equity Fund I, L.P., awarding monetary damages in an amount to be proven at trial, but not less than $3.2 million;

e. As against Five Elms Haakon, L.P., awarding monetary damages in an amount to be proven at trial, but not less than $200,000;

f. As against Five Elms Coinvest, L.P., awarding monetary damages in an amount to be proven at trial, but not less than $200,000;

g. As against James Brown, awarding monetary damages in an amount to be proven at trial, but not less than $1.3 million;

h. As against Gantcher Family Limited Partnership, awarding monetary damages in an amount to be proven at trial, but not less than $500,000;

i. As against Eric Legoff, awarding monetary damages in an amount to be proven at trial, but not less than $200,000;

j. Awarding pre-judgment and post-judgement interest at the maximum rate permitted by law or equity;

k. Awarding reasonable attorney's fees and expenses, together with all costs of court;

l. Disallow or subordinate each of the claims filed by the Claimants in the Live Well bankruptcy case;

m. Granting such other and further relief, at law or equity, as this Court deems just and proper.

**ANSWER:**    Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Trustee's Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or in part, because Mr. Rome and Mr. Karides at all times acted loyally, with due care, in good faith, and in the honest and reasonable belief that their actions were beneficial to and in the best interest of Live Well and, therefore, did not breach their fiduciary duties.

### THIRD AFFIRMATIVE DEFENSE

The Trustee's claim of aiding and abetting fails because the Mr. Rome and Mr. Karides did not breach their fiduciary duties, nor did the Preferred Shareholder Defendants knowingly participate in any alleged breach of fiduciary duty, nor has the Trustee established that any knowledge or conduct should be imputed to the Preferred Shareholder Defendants.

### FOURTH AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or part, because the Preferred Shareholder Defendants were not involved in any attempt to hinder or defraud creditors and were entitled to receive the transfers and releases.

### FIFTH AFFIRMATIVE DEFENSE

To the extent the Preferred Shareholder Defendants received the transfers described in the Trustee's Complaint, such transfers were received for value and in good faith.

## SIXTH AFFIRMATIVE DEFENSE

To the extent the Preferred Shareholder Defendants received the transfers described in the Trustee's Complaint, Preferred Shareholder Defendants gave new value to or for the benefit of the Debtors.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent the Preferred Shareholder Defendants received the transfers described in the Trustee's Complaint, the transfers described in the Complaint were a contemporaneous exchange for new value given to the Debtor.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent the Preferred Shareholder Defendants received the transfers described in the Trustee's Complaint, the transfers were made in the ordinary course of business of the Debtor and the Defendants.

## NINTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the Debtor's affirmative release of all claims against the Preferred Shareholder Defendants.

## TENTH AFFIRMATIVE DEFENSE

The Trustee's damages, the nature and extent of which Defendants deny, were directly caused in whole or in part by the acts, omissions, or fault of the Debtor itself and/or the Debtors'

agents, directors, or officers whose acts, omissions, or fault the Preferred Shareholder Defendants are not liable.

## ELEVENTH AFFIRMATIVE DEFENSE

The Debtors, and by extension the Trustee, failed to mitigate its damages, if any.

## TWELFTH AFFIRMATIVE DEFENSE

Any recovery by the Trustee for the transfers described in the Complaint, the liability for which recovery the Preferred Shareholder Defendants deny, would be subject to setoff or recoupment.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Trustee's damages, the nature and extent of which Defendants deny, will be credited under the restitution awards against the Criminal Insider Defendants such that the Trustee is not entitled to duplicative recoveries.

## FOURTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the relevant statute of limitations.

## FIFTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred because the Preferred Shareholder Defendants are Bona Fide Purchasers.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the doctrines of waiver and estoppel.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The Trustee's Complaint seeks duplicative relief.  To the extent the Trustee can prove the claims alleged in his Complaint, The Trustee is entitled to only one recovery.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or in part, by the legal principle of laches.

## NINETEENTH AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or in part, by the doctrines of *in pari delicto* and unclean hands by the acts and/or omissions of the Debtors.

## TWENTIETH AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or in part, by the Debtor's solvency.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or in part, because Mr. Rome's and Mr. Karides' actions, as alleged in the Complaint, are protected by the business judgment rule.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The Trustee's Complaint is barred, in whole or in part, because the Debtors suffered no injury or damage as a result of the Preferred Shareholder Defendants actions, as alleged in the Complaint, and/or the Preferred Shareholder Defendants actions did not proximately cause such injury or damage.

\* \* \*

Preferred Shareholder Defendants hereby expressly reserve the right to revise, amend, and supplement this Answer, including these Affirmative Defenses, and to assert any further or other defenses under applicable law.

WHEREFORE, Defendants respectfully requests that the Court dismiss the Complaint with prejudice and on the merits, and that the Court grant Defendants such other relief as may be just and equitable.

Dated:  <u>August 6, 2025</u>

**DLA PIPER LLP (US)**

By:  <u>  /s/ R. Craig Martin</u>
R. Craig Martin (Delaware Bar No. 5032)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 778-7913
Email:  craig.martin@us.dlapiper.com

-and-

Dale K. Cathell (admitted *pro hac vice*)
William W. Reichart III (*pro hac vice* forthcoming)
650 South Exeter Street
Suite 1100
Baltimore, MD  21202
Telephone:  (410) 580-3000
Facsimile:  (410) 580-3001
Email:  dale.cathell@us.dlapiper.com
            wes.reichart@us.dlapiper.com

*Counsel to James Karides, Brett Rome, LWFVest LLC, North Hill Ventures II, LP, Five Elms Equity Fund I, LP, Five Elms Haakon, LP and Five Elms Coinvest, LP.*